
# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

**David E. Patton**
*Executive Director and
Attorney-in-Chief*

**Deirdre D. von Dornum**
*Attorney-in-Charge*

March 16, 2020

**BY ECF UNDER SEAL**
The Hon. Edward R. Korman
Senior District Judge
Eastern District of New York

Re: *United States v. Kareen Brown*, 16 CR 341

Your Honor:

I write to ask the Court to calendar the case for **Wednesday, March 18, 2020**, at 230 p.m. Mr. Brown pleaded guilty on August 16, 2016, before a Magistrate Judge. We now request that Your Honor move forward with sentencing and will urge a "time served" sentence. Alternatively, we have 3 financially responsible suretors prepared to sign a bond securing his release on bail pursuant to 18 USC 3143. Both the PSR and 5K1.1 letter are expected today.

The suretors are:

Latifah McDonald (Defendant's wife/mother of child), lives in Brooklyn; Works at United States Postal Service 160 Duryea RD Melville, NY; salary $36,000/yr

Henrietta Corbett (Defendant's Mother), lives in Brooklyn; works at New York City College of Technology, Brooklyn, salary $35,000/yr

Felix Medero (Defendant's Stepfather), lives in Brooklyn, works at New York City College of Technology, Brookly, salary $75,000/yr

All three potential suretors will be available to be interviewed by the Government and/or be addressed by the Court if needed on Wednesday, March 18.

**EXCEPTIONAL URGENCY**

The request here is for an **in court appearance on Wednesday March 18.** A video appearance would be fine, too, so long as release at the end is a possibility.

The basis for exceptional urgency here is that the Defendant qualifies for a sentence of "time served." He has served over 4 years at this point. He is in exceptionally harsh conditions in the MCC SHU *for his own protection*. The BOP announced this weekend a COVID-19 driven 30-day lockdown with no social or legal visits and no plan for how inmates will communicate with the outside. This will be during a time when Mr. Brown is locked in a dirty, rodent and roach infested, leaking cell in SHU. This is an unnecessary and dangerous situation that can be remedied with Mr. Brown's release under strict supervision.

### 5K1 AND PSR EXPECTED TODAY

We expect the 5K1 letter to be disclosed today, Monday, March 16, 2020, and to justify a "time served" sentence here. Mr. Brown has been incarcerated at the MDC and MCC since January, 2016. His cooperation with the Government started early in the investigation and has proved extraordinarily valuable to the Government. He proffered early and pleaded guilty within months of his arrest.

We expect the PSR to show that Mr. Brown has a loving and supportive family from which his crime deviated in an unexpected and intense way. During proffers, he admitted one-by-one, detail-by-detail, to a string of dangerous robberies of strip clubs and similar establishments that, prior to his confessing these other crimes, law enforcement had not connected to Brown.

### COOPERATION DETAIL

Mr. Brown's choice to cooperate resulted in his being so threatened at the MDC that he was moved to MCC. After he moved to the MCC, he was attacked. We lobbied the BOP to move him to a more secure GEO facility, but they could not, citing confidential security concerns. The BOP had only one tool left – to move him to SHU, and that is where Mr. Brown has been for 7 months.

We did not fight the BOP on this, and trust that their judgment was sound, but the unusually harsh nature of being in SHU *for your own protection* ought to have some impact on sentencing, and for this reason alone we think the 5K1 will be a particularly strong basis for "time served" of over 4 years in this case, with 5 years of supervision to follow.

### DANGER OF CONTINUED UNNECESSARY INCARCERATION

The Court knows the history of both the MCC and MDC. It lived through the effect of the Polar Vortex lockdown of 2019 (see attached as Exhibit B the transcript of the Hon. Analisa Torres' recorded walk through of the MDC in January 2019). It is also aware that COVID 20 has prompted the BOP to issued a 30 day visit lockdown, and will prohibit legal and social visits. The Court is also familiar with the various prosecutions of

MDC and MCC prison employees recently, and most recently (March 2020)  the lockdown investigation of a gun being smuggled into the MCC.

These conditions aside, the Government will fairly point out the seriousness of Mr. Brown's crimes in its 5K1.1 letter.

We cannot truly mitigate these crimes -  except to address Mr. Brown's motive and his demonstrated rehabilitation.  The Court will learn from the PSR that Mr. Brown's brother was killed in the kind of club that he targeted for the robberies.  His crimes became a form of personal vigilantism to avenge the death of his brother.  That does not begin to excuse them, but it does speak to his future dangerousness.

In the five years since his crime spree began (summer of 2015), Mr. Brown has had had to come to terms with his actions during his many meetings with attorneys and the Government.  Through that process, he earned the trust of experienced and savvy law enforcement agents.  He did not lie to them to protect himself or anyone else.  He came clean.  From that experience, as well as his own personal growth, has emerged a young man for whom prison has worked – both as a deterrent and a springboard for rehabilitation.

We all know that prisons are no longer thought to exist to rehabilitate people, and rehabilitation cannot be a goal of incarceration.  *See generally Tapia v. U.S.,* 564 U.S. 319 (2011).  But demonstrated rehabilitation can and should be viewed as a mitigating §3553 factor.  Here, the Defendant's 2015 crime spree was a deviation, an aberrant act, an unexpected turn.  In custody and under the most challenging of circumstances, he has maintained a strong, gentle demeanor.  He has examined his motives, realizing how ridiculous was his belief that hurting other people was a way to bring back his brother.  And he has endured, without resort to angry outbursts or entitled demands, the harsh reality of being in SHU for his own protection.

We need not point out how collateral consequences (such as "unearned" punitive SHU placement) might be a mitigating factor at sentencing to the Judge who wrote *United States v. Restrepo,* 802 F.Supp. 781 (EDNY 1992), *judgment unfairly vacated by* 999 F.2d 620 (2d Cir 1993).   Courts have eventually circled back to Your Honor's observations that "however imperfectly it is accomplished, one of the purposes of [a] departure is to ensure a measure of equality in the penalty that is imposed on defendants who are guilty of comparable criminal acts."  802 F.Supp at 785.  The notion took root in *Koon v. United States,* 518 U.S. 81 (1996), where the Supreme Court held that "potential conditions of confinement that a particular defendant is likely to encounter while in custody" could constitute permissible ground to depart under proper circumstances.  518 U.S. at 96.

Here, of course, we need not speculate about the danger to Mr. Brown at the MCC.  Mr. Brown has already been attacked for his cooperation.   The trade off for safety for him is solitary confinement – he has no other options.

A measure of equality can be achieved here if we recognize that the conditions of Mr. Brown's incarceration have been and can be expected to continue to be exceptionally harsh as compared to similarly situated inmates. Four years "on the run," even if behind prison bars, with threats so bad you must be in SHU for your own protection, is more like double that, and that reality is a mitigating sec. 3553 factor.

**Mr. Brown's REHABILITATION**

Mr. Brown, to his credit, has maintained his sanity in solitary confinement. He kept himself busy and even worked himself up to becoming the one and only orderly in the SHU at MCC, demonstrating an enormous trust by guards. This is in part based on the rehabilitative nature of his cooperation, the trusting relationship formed with the agents who were assigned to the case, and the dignified message of accountability set by their example.

But Mr. Brown's rehabilitation also attracted the attention of the Focus Forward Project, a coveted educational program that once offered a 12-week reentry program offered to a chosen few inmates who participated in group study. As a 2018 Focus Forward class participant, Mr. Brown learned to read and analyze a text, discuss thematic elements, and study life skills to prepare him for reentry. The Focus Forward leaders deemed Mr. Brown an "exceptionally motivated and driven student" who possesses skills that will permit him to have a positive impact on his local community." *See* Letter of Focus Forward Project Facilitators (attached as Exhibit A).

**FUTURE DANGEROUNESS ADDRESSED**

Mr. Brown's involvement in Focus Forward helped him explore his unique motivations in committing these serious crimes of robbing patrons of strip clubs. He explored in writing and sharing with the group how he felt he was on a horribly misguided effort to avenge the murder of his brother, which took place at such a club.

Through his incarceration, he has maintained and strengthened his relationship with his partner. He has tried to minimize the negative impact of his experience of being an incarcerated parent (his daughter was born after his incarceration). He ruminates constantly on his daughter's future, and over the course of her life (she is now 4), Mr. Brown has expressed the outrage of many a parent over the violence he has seen at schools and public places. The irony there is his own involvement in gun related crime, but this is not lost on him. Expressing his feelings about gun control in a journal entry written during his 2019 Focus Forward studies, attached as Exhibit C, he questions the ready availability of firearms and the political and economic backing of the gun industry. However, he does so while still maintaining personal responsibility: "We can't only point the finger at the NRA due to the fact that they aren't the ones pulling the trigger on these weapons." *Id.*

In the end, while the seriousness of his crimes must be acknowledged and atoned for, the germane question here is his future dangerousness.

On that question, his self-analysis and the clarity of his ability to express it is inconsistent with dangerousness. As is his willingness to admit to the Government robberies or attempted robberies that law enforcement did not connect to him – including robberies not even on law enforcement's radar. The justification for his release would be in at least some part premised upon his candor in the cooperation process. So, too, his successful completion of the Focus Forward program, and the trust placed in him shown by his current position as an orderly at MCC, give even more reason to believe that Mr. Brown has been rehabilitated and that presents no current threat to the community.

Meanwhile, if left in MCC custody, we fear for Mr. Brown's safety. The ongoing threats in the facility are well-documented, and in this case rise beyond systemic failures and are quite personal to him. His continued precautionary placement in SHU is untenable and no alternatives exist to protect him.

**COVID-19**

This request for release is additionally informed by the COVID-19. As can be seen from the MDC and MCC's response to the Polar Vortex 2019 response, and the ongoing difficulties of legal and social access, much less adequate healthcare, the MCC is not prepared for the massive quarantine expected from the COVID-19 pandemic. Conditions of pretrial confinement obviously create the ideal environment for the transmission of contagious disease. See generally Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials,* Business Insider (Feb. 21, 2020) at https://bit.ly/2vSzSRT.

In this regard, the Bail Reform Act provides a basis for "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). While the Court need not resort to this basis here, the COVID-19 pandemic can and must factor into the §3143 standard.

Or the Court could just impose sentence on Wednesday, March 18. Either way, Mr. Brown would be expected to live with one of his suretors and to be under strict supervision of either Pretrial Services or Probation.

Thank You for Your consideration of this request.

Respectfully Submitted,
/s/
JAN A. ROSTAL, ESQ.
MICHAEL P. PADDEN, Esq.

enc.
Cc: AUSA Michael Keilty, Esq.



THE
FOCUS
FORWARD
PROJECT, INC.

P.O. Box 2092, Church St. Station, New York, NY 10008-2092 | Tel (347) 619-2080 | info@focusforwardproject.org

Joel Putnam
*Interim Director*

BOARD OF DIRECTORS

Hon. Barbara S. Jones
*Chairperson*

Justice Alice Kerata Cho

Alexandra Katz

Fiona Doherty

Deirdre von Dornum

Jose Maldonado

Amy Fettig

Anne Paterson Finn

Elizabeth Kossarewa

June 11, 2018

Hon. Edward Korman
United States Courthouse
225 Cadman Plaza E
Brooklyn, New York 11201

Dear Judge Korman,

We, Zoe Stahl and Nora Stephens, write in support of Kareem Brown, who is a graduate of The Focus Forward Project. The Focus Forward Project is a nonprofit organization dedicated to providing an educational curriculum focused on reentry for federal pretrial inmates and those under pretrial supervision. The 12-week course is designed to provide both an intellectual and emotional outlet for students as they navigate the stress and uncertainty of the pretrial phase of their federal cases. The class meets once a week for two hours, and participants complete weekly reading, journal, and other homework assignments. The first half of each class is spent discussing and connecting with themes in the memoir, *A Long Way Gone*, by Ishmael Beah, who was a boy soldier in the Sierra Leone civil war, while the second half of each class focuses on life skills, highlighting a different skill each week. By the end of the course, participants have gained a variety of transferable skills and tools, including, but not limited to: a completed resume, interview skills, conflict resolution skills, public speaking skills, and the setting of both short and long term goals. The mission of The Focus Forward Project is to provide participants with the confidence and practical tools to successfully move forward with their lives.

Kareem is an exceptionally motivated and driven individual. He has a unique ability to stay positive in order to achieve his goals. When sharing weekly highlights, Kareem would often speak on how he is working diligently to make himself a better person while at the Metropolitan Correctional Center. Kareem spoke specifically of channeling the pain he feels, especially when missing special moments in his family members' lives, to push himself to become the best possible version of himself. Instead of dwelling on the negatives, Kareem would, instead, work on his novel, improve his chess game, perfect his homework for Focus Forward, or exercise. Kareem shared this positivity with others in the class, too. While some students would, understandably, complain about the jail settings, Kareem talked openly and

often about how he works to stay motivated to continue so he can be a better man and community member when he returns home.

Kareem's goals also illustrate his desire to use his time in jail to improve himself. At the beginning of this course, Kareem listed the following as his short term goals: finish writing a novel, feel more comfortable sharing with the group, and learn to express himself more clearly. Kareem worked toward, or accomplished, each of these goals. Although we were never privy to the specifics of Kareem's novel, he often shared how his writing was progressing and that some of the lessons from Focus Forward were helping him in improving his project.

Kareem's ability to share improved over the course, as well. Early in the course, Kareem was more reserved. He would often ask questions to the group and expressed his interest in thematic elements of *A Long Way Gone*, but he did not always share his thoughts. As the course progressed, Kareem began to more openly share his thoughts. For example, during a conversation about how outside forces impact an individual's decision making, Kareem shared how he regretted moments of being influenced by others who did not have his best interests in mind. Kareem openly shared some specific regrets and shared how deeply he is trying to move past these prior mistakes to his partner and daughter.

Kareem's goal to express himself more clearly was not only illustrated by his more frequent sharing in class, but also through his public speaking abilities. From our first to our second public speaking class, Kareem improved greatly. During the first lesson, we, along with his fellow classmates, offered specific feedback to Kareem: speak slower, enunciate more clearly, use specific anecdotes, and have an arc to your story. Kareem received the feedback gracefully and was eager to incorporate these suggestions. In Kareem's second speech, he clearly took all of this advice to heart. Kareem did not merely follow these tips, but also clearly thought deeply about how to incorporate these suggestions into his speech. For example, instead of merely slowing down his speech as we suggested, Kareem found a specific rhythm that felt most natural to him. When speaking, Kareem was more at ease and allowed his rhythm and intonation to highlight salient points. Kareem's ability to graciously receive feedback and think critically about how to best incorporate the advice illustrates Kareem's maturity, intelligence, and truth in his desire to continue working to become the best possible version of himself.

Kareem's long term goals further illustrate his intention to leave the criminal justice system as a more focused, supportive, and fulfilled person. Kareem hopes to achieve the following long term goals: put his daughter through

EXHIBIT A

college, have a positive impact on his local community, ideally through working with youth to help them make smart decisions, and make his family proud by supporting them financially and emotionally. Kareen's ability to achieve his short term goals, his dedication to improvement, and his positive outlook, make us confident Kareen will succeed at achieving these long term goals.

Your Honor, our intent is to give you our view of Kareen, who we have had the pleasure to know since fall 2017. We appreciate the time Your Honor has taken to read our letter. If you have any questions, please feel free to contact us directly at the numbers listed below.

Sincerely,

/s/Zoe Stahl
Zoe Stahl
Focus Forward Project
Class Facilitator
(646) 530-2782

/s/Nora Stephens
Nora Stephens
Focus Forward Project
Class Facilitator
(301) 787-0332

J257SEG1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                   18 Cr. 219 (AT)

JOSE SEGURA-GENAO,

              Defendant.
------------------------------x
UNITED STATES OF AMERICA,

        v.                   17 Cr. 513 (AT)

WILSON PEREZ,
              Defendant.
------------------------------x

                           New York, N.Y.
                           February 5, 2019
                           11:00 a.m.

Before:              HON. ANALISA TORRES
                            District Judge

                       APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  KARIN PORTLOCK
     EMILY BRETZ
     JEFFREY OESTERICHER
     DAVID JONES
     Assistant United States Attorneys

EZRA SPILKE
GIDEON OLIVER
     Attorneys for Defendant Jose Segura-Genao

SARAH KUNSTLER
     Attorney for Defendant Wilson Perez

ALSO PRESENT:  Rachel Bass, paralegal
               David Mintz, Spanish Interpreter
               Erika De Los Rios, Spanish Interpreter
               Paul Gold, Spanish Interpreter

J257SEG1

1          (In open court)

2          (Case called)

3          THE COURT:  Good morning.  We are here in the matters

4    of the United States v. Jose Segura-Genao and the United States

5    versus Wilson Perez.  Counsel, would you make your appearances,

6    please.

7          MS. PORTLOCK:  Good morning, your Honor.  Karin

8    Portlock for the government.  I'm joined by AUSA Jessica Fender

9    here on behalf of the government in Wilson Perez's case.  To my

10   left are AUSA's Jeffrey Oestericher, Emily Bretz and David

11   Jones, who are assistant United States attorneys in the civil

12   division and represent the Bureau of Prisons in connection

13   with.

14         MS. BRETZ:  Good morning, your Honor.

15         MR. JONES:  Good morning, your Honor.

16         MR. SPILKE:  Good morning, your Honor.  Ezra Spilke

17   for Jose Segura-Genao who is not in the courtroom yet; he's

18   being brought out right now.  Along with me at counsel table

19   are Sarah Kunstler who represents Wilson Perez, Gideon Oliver,

20   a colleague who is assisting us, and Rachel Bass from the

21   Federal Defender's office, paralegal.

22         THE COURT:  Please be seated.  Mr. Segura-Genao has

23   joined us.  We also have an interpreter here.  Would you please

24   make are appearance.

25         THE INTERPRETER:  David Mintz, M-I-N-T-Z.

1          THE INTERPRETER:  Erika Del Los Rios, staff

2     interpreter.

3          THE INTERPRETER:  And Paula Gold, staff interpreter.

4          THE COURT:  Starting last Thursday, I received several

5     letters from Ezra Spilke, the attorney for Mr. Segura-Genao,

6     claiming that his client had been subjected to troubling living

7     conditions at the Metropolitan Detention Center in Brooklyn,

8     where he is housed in the West Building as a pretrial detainee.

9     In addition, Mr. Spilke complained that MDC had suspended

10    inmate visits with their attorneys.  Mr. Spilke also stated

11    that he was not able to communicate with or get any information

12    about Mr. Segura-Genao.  Last Friday, I received a similar

13    letter from Sarah Kunstler, the attorney for Wilson Perez, who

14    is also housed at MDC.  Ms. Kunstler stated that Mr. Perez was

15    recovering from surgery to repair a collapsed eye socket -- an

16    injury he sustained as a result of being hit in the head with a

17    fire extinguisher.  Ms. Kunstler stated that the current

18    conditions at MDC imperil her client's health.  She also

19    complained about the suspension of lawyer visits.

20         At a conference I held last Friday, attorneys Nicole

21    McFarland and Adam Johnson appeared on behalf of the Bureau of

22    Prisons.  Ms. McFarland said that although there was a fire in

23    the MDC mechanical room on January 27th, "since that time there

24    has been heat, hot water and hot meals provided to the

25    inmates."  Transcript at page 5, lines 18 to 19.  She also

1  stated that the temperature in "the majority of the units

2  ranged from 67 to about 78 [degrees]" and that although some

3  units were in the 50s, this was "immediately rectified."

4  Transcript at page 6, lines 2 to 6.

5       Because the Bureau of Prisons and the defense offered

6  contradictory accounts of the conditions at MDC, I scheduled a

7  fact-finding hearing for this morning.  Today, I will hear

8  testimony from individuals who have experienced the conditions

9  at MDC firsthand -- corrections officers who work there, a

10  lawyer with clients housed there, inmates who are detained

11  there, and an inspector with the U.S. Attorney's office for the

12  Eastern District of New York who visited the facility.

13       Yesterday, the Federal Defenders of New York filed a

14  civil lawsuit in the Eastern District of New York, against the

15  Bureau of Prisons and Warden Herman Quay.  At a hearing held

16  yesterday morning, the Honorable LaShann DeArcy Hall granted

17  the Federal Defenders' request for a temporary restraining

18  order to the extent that she directed the Bureau of Prisons and

19  Warden Quay to reinstate lawyer visits at MDC.  Judge DeArcy

20  Hall explicitly declined to make findings of fact concerning

21  the conditions described by the Federal Defenders in their

22  lawsuit.

23       Today, after this hearing is over, I will be visiting

24  MDC.

25       We will start the hearing with witnesses to be called

1   by Mr. Spilke and Ms. Kunstler.

2            Mr. Spilke, call your first witness.  And I would like

3   you to keep your examination to ten minutes.

4            MR. SPILKE:  Thank you, your Honor.

5            Mr. Segura-Genao calls Rhonda Barnwell.

6            MR. JONES:  Your Honor, in case this wasn't explained

7   to your Honor, the BOP employees who have been directed to

8   appear are present, and they are waiting in an adjoining

9   courtroom's facilities, and Mr. Oestericher has just gone to

10  get the called witness.

11           THE COURT:  Would you please stand to be sworn.

12   RHONDA BARNWELL,

13       called as a witness by the defendant,

14       having been duly sworn, testified as follows:

15           THE COURT:  Please state your name for the record.

16           THE WITNESS:  Rhonda, R-h-o-n-d-a, Barnwell,

17   B-a-r-n-w-e-l-l.

18           THE COURT:  Would you please be seated.

19           And you may inquire.

20   DIRECT EXAMINATION

21   BY MS. KUNSTLER:

22   Q.  Good morning, Ms. Barnwell.

23   A.  Good morning.

24   Q.  Where do you work?

25   A.  MDC Brooklyn.

1    Q.  And what is your rank and position at MDC?

2    A.  I am the health information tech for medical records.

3    Q.  And how long have you worked there?

4    A.  17 years.

5    Q.  And what shift do you work currently?

6    A.  I am on day watch.

7    Q.  Day watch?

8    A.  8 to 4.

9    Q.  And in what building do you work?

10   A.  I'm in the West Building.

11   Q.  And on what floor is your unit?

12   A.  The third floor.

13   Q.  Can you tell me about the problems that the facility has

14   been experiencing over the past week or so.

15   A.  Over the past week we experienced some heat issues, as well

16   as we had no electricity.

17            THE COURT:  Ms. Barnwell, I'm having difficulty

18   hearing you, so if you would get closer or bring the microphone

19   closer and speak up.

20   A.  OK.  Over the past we've experienced heat -- no heat -- and

21   we also had an electrical fire.

22   Q.  Can you tell me when these problems started.

23   A.  Before the electrical fire, maybe a week before, we was

24   experiencing very cold temperatures inside the institution

25   before the fire.

1      THE COURT:  And when did those cold temperatures

2  start?

3      THE WITNESS:  I'm not sure of the date, but I know it

4  was a week before that Sunday, before the fire.  I'm not sure

5  of the date.

6      THE COURT:  About a week before the fire, you say.

7      THE WITNESS:  A week before the fire, yes, the

8  temperatures were cold.

9  Q.  And did those temperatures make it difficult for you to do

10  your job?

11  A.  Yes, we did wear coats.  The lieutenants had the officers

12  go on 3s, which is to make announcements to let the staff know

13  that it was cold in the building, and they also said for the

14  staff members to bundle up during that time.

15  Q.  And you saw staff bundled up throughout the facility?

16  A.  Yes, yes.

17  Q.  And were you bundled up to stay warm?

18  A.  Yes, I had my coat on.

19  Q.  And did you notice that heat was a problem for the

20  incarcerated people at the facility also?

21  A.  At that time, no, I wasn't sure.

22  Q.  At some point did you notice any incarcerated people having

23  problems with the heat?

24  A.  No.

25  Q.  Now, what can you tell me about the light at the facility?

1    When did that go out?

2    A.   The lights went out on Sunday.  I'm not sure of the exact

3    date, but it went out on Sunday, but I was at home, but I heard

4    that there was no electricity.  So, I went back to the

5    institution to try to assist or help in any way because they

6    had no lights.

7    Q.   And what kind of working conditions did that create for

8    staff?

9    A.   It was -- for me I felt as though it was a dangerous

10   environment, I stated, for the staff as well as for the

11   inmates, because we had blind spots, and officers were

12   stripping inmates in the dark.  They moved inmates from one

13   building to the other, and there was still dark spots and

14   dark -- blind spots inside the institution.

15            THE COURT:  Why is that dangerous?

16            THE WITNESS:  Because we're escorting inmates in blind

17   spots.

18            THE COURT:  So what makes that a problem?  In other

19   words, is there something that would happen as a result of

20   being in a blind spot?

21            THE WITNESS:  Well, there could be assaults.  Even I

22   worked in a housing unit, and some of areas have blind spots,

23   and staff could be assaulted as well as inmates could be

24   assaulted.

25   Q.   And what was done -- what was done to make things safer

1    during this time?  What did corrections officers do and staff

2    do to create a safer environment?

3    A.   We had two officers on the housing unit.  I think we were

4    on the generator, so we had emergency lights, but at that time,

5    before the media, nothing.

6    Q.   Do you think the problems with the heat and electricity put

7    lives at risk at the facility?

8              MS. BRETZ:  Objection, your Honor.

9              THE COURT:  Sustained.

10   Q.   Did you make any complaints about the lack of electricity

11   or lack of heat to your supervisors?

12   A.   No.

13   Q.   Did you see any -- did you see any work being done?  Did

14   you see any work being done at the facility to fix these

15   problems?

16   A.   I didn't see any work.

17   Q.   Did you see contractors in the facility to fix these

18   problems?

19   A.   We've had contractors, so I'm not sure exactly what they

20   was doing.  I'm not sure.

21   Q.   Were inmates locked down during this time?

22   A.   After the fire, when I came to work on Monday, I assisted a

23   housing unit feeding, so that on that Monday after the fire,

24   yes.

25   Q.   And why were they locked down?

1    A.  I'm assuming for their safety, but I'm not sure.  I would

2    think for their safety, as far as being that there was no

3    electricity, but I'm not really sure.

4    Q.  Do you know how many days they were locked down?

5    A.  Well, that was Monday the inmates were locked down, and

6    then I was assigned to a housing unit on Tuesday and the

7    inmates were out.

8    Q.  So the inmates were out in the --

9    A.  In the common area the inmates were out, they weren't

10   locked down.

11   Q.  When you were assigned the unit, did you speak to any of

12   the inmates about the cold?

13   A.  No.  I worked at housing unit G41, which is an intake unit,

14   so the inmates never mentioned to me that they were cold.  Upon

15   locking down my housing unit, which was G41, one of the inmates

16   stated to me he wanted me to move him because his cell, he

17   couldn't see inside of the cell, but there was something over

18   his window, and I moved him over two cells down, and he said

19   that he was able to see and he was fine with that move.

20   Q.  What do you know about the quality of the air coming out of

21   the vents?

22   A.  I'm not familiar with the quality of the air.

23   Q.  Do you know anything about the air temperature coming out

24   of the vents?

25   A.  No, I'm not.

1   Q.  Did you speak to me prior to this appearance about cold air

2   coming through the vents in the cells?

3   A.  I'm not sure.  I've spoken to a lot of people, so I'm not

4   really sure.

5   Q.  OK.  Did you speak to the press about inmates complaining

6   about heat?

7   A.  When I spoke to the press, I stated to them that the staff

8   members as well as the inmates was in cold temperatures,

9   because we were inside the building.

10  Q.  And when you said they're complaining about the heat as

11  well, they can't speak, their throats are hurting, were you

12  referring to the inmates or the guards?

13  A.  That is correct, that's after the media came, one of the

14  inmates came down, because I work on the third floor, and he

15  told me that his throat was hurting, that is correct.

16          THE COURT:  All right.  So you say that the fire was

17  on a Sunday.

18          THE WITNESS:  It was on a Sunday, yes.

19          THE COURT:  When is it that the media came?

20          THE WITNESS:  I can't -- I can't recall the exact day.

21  I don't recall.

22  Q.  And did you tell the press they're just waiting for a

23  disaster to happen?

24  A.  Absolutely, yes.

25  Q.  What did you mean?

1   A.  Because I felt as a staff member nothing was being done,

2   and I felt as though actually if the media didn't come we

3   probably still would be in the same situation.

4               THE COURT:  What needed to be fixed?

5               THE WITNESS:  The electricity and the heat are

6   separate, but for years we've been having on and off air; it's

7   been the norm.  But because those were the coldest days and we

8   didn't have any -- the heat was a separate problem; we just

9   didn't have the heat.  But the facilities department, I feel

10  they've been patching up these things for years, and it's not

11  just the inmates, it's the staff as well that have to work in

12  these environments, and if they're patching them up, eventually

13  we're going to have a problem like we had when that happened.

14  And they put everybody at risk, that's what I feel.  Everyone

15  was at risk.

16  Q.  And how long have there been problems with the heat and the

17  electricity at the facility?

18  A.  Not so much the heat.  It's been cold I would say for

19  years.

20  Q.  I'm not sure I understand that answer.  How long have there

21  been problems with the heating/cooling system at the facility?

22  A.  For years.  For years.  It has never come to that where we

23  had to wear coats, but it's been cold for years.

24  Q.  And how long have there been problems with the electricity

25  at the facility?

1    A.   That's the first time we had this type of situation.

2    Q.   And are there problems with leaks at the facility?

3    A.   Yes.

4    Q.   Can you tell us about the problems with the leaks at the

5    facility.

6    A.   It leaks throughout the institution, massive floods.  There

7    are leaks throughout the institution.  We just had a leak a

8    couple of days ago from several floors.

9    Q.   And in terms of the cold, when you were talking to the

10   press, did you describe the facility as a virtual ice box?

11   A.   No.

12   Q.   Did you talk to the press about corrections officers being

13   injured putting incarcerated people into their cells?

14   A.   No.

15   Q.   You didn't -- that wasn't a statement you made?

16   A.   No, my statement was that the staff members in R&D were

17   stripping out inmates in the dark.  That was what I said.

18   Q.   So that the statement "some of the officers got injured

19   today trying to lock the inmates back into their cells" --

20   A.   That is correct, yes.  That is correct, yes.  We had some

21   body alarms, yes.

22   Q.   And was that problem directly related to the heat and

23   electricity problem at the facility?

24        MS. BRETZ:  Objection, your Honor.  Just to clarify

25   between heat and electric.

Barnwell - Cross

1        THE COURT:  Sustained.

2   Q.  When you made that statement to the press, did you believe

3   those injuries were related to the electricity problem at the

4   facility?

5   A.  It would be just my guess.  I would guess that it's related

6   to the inmates being locked down, not because of the heat.

7        THE COURT:  You have reached the ten minutes.

8        MS. KUNSTLER:  Just one more question, your Honor.

9   Q.  While the COs had access to hats and gloves and coats, did

10  inmates have access to extra material to keep them warm?

11  A.  The inmates have blankets, but as far as while on my shift,

12  they didn't give out extra blankets, no.

13  Q.  And did inmates have access to hats and scarves and coats?

14  A.  No, no.

15       MS. KUNSTLER:  Thank you, your Honor.

16       THE COURT:  Cross-examination.

17       MS. BRETZ:  Just a few questions, your Honor.

18  CROSS EXAMINATION

19  BY MS. BRETZ:

20  Q.  Thank you, Ms. Barnwell.  When you were in the units on

21  Monday and Tuesday of last week, was there light in the common

22  areas?

23  A.  It was emergency lights.

24  Q.  You were there during the day, correct?

25  A.  Yes.

1    Q.  Could the inmates see in their cells during the day?  Was

2    it light enough?

3    A.  Yes.

4            MS. BRETZ:  No further questions.

5            THE COURT:  Any further questions, counsel?

6    REDIRECT EXAMINATION

7    BY MS. KUNSTLER:

8    Q.  Were you in cells during the day?

9    A.  One of the inmates, I went inside of the cell that the

10   inmate said he couldn't see out of because it had something

11   blocking it, so I went inside that cell, and no one -- I didn't

12   feel cold inside the cell, but I was moving around working, so.

13   Q.  Did you talk to inmates about their ability to see during

14   the day in their cells?

15   A.  No.  It was light in the day, no.

16   Q.  So you didn't have any conversation with inmates about

17   their ability to see.

18   A.  No, no.

19   Q.  Did you check all the cells on all the floors for the

20   quality of light in those cells during the day?

21   A.  I did not check that, no.

22           MS. KUNSTLER:  Thank you.

23           THE COURT:  You may step down.  Please call your next

24   witness.

25           (Witness excused)

J257SEG1                    Barnwell - Redirect

1          MR. SPILKE:  Your Honor, Mr. Segura-Genao now calls

2     Mr. Maffeo, the facilities manager at the MDC.

3          THE COURT:  Mr. Spilke, I would like you to be mindful

4     of the time.

5          MR. SPILKE:  Yes, your Honor.

6          While we are waiting, can I make a record about some

7     issues with some of our witnesses?

8          THE COURT:  Go right ahead.

9          MR. SPILKE:  As you know, we have a number of persons

10    who are currently incarcerated at the MDC who are willing to

11    serve as witnesses.  I believe other than our clients -- Sarah

12    Kunstler's client and mine -- only one of those inmates was

13    brought over, one is because he is in the hospital at long last

14    and that's Sean Daughtry.  The other is Mr. Tabb.  He is on the

15    witness list, Zimian Tabb.  He is very eager to inform the

16    Court about what he knows about the conditions, but he called

17    on the federal defender phone today.  He was brought down to

18    the R&D area -- that's where they're released to go to court --

19    and he was told that four of the six of you here are for court

20    and -- sorry -- four of the six of you are here for court or

21    just for a legal visit.  So only -- I'm not sure exactly what

22    that means, but he was trying to -- they tried to convince him

23    not to come, and Mr. Tabb said he wanted to come, and there

24    were words exchanged but no physical encounter.  Mr. Tabb is

25    still willing to appear later in the day, should that be

1    possible.

2              THE COURT:  I was told by the marshals that he refused

3    to come, that he assaulted one of the officers and that he spat

4    upon them.  I will look into this.

5              MR. SPILKE:  Thank you, your Honor.

6              THE COURT:  Is the next witness here?

7     JOHN MAFFEO,

8         called as a witness by the defendant,

9         having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. SPILKE:

12   Q.  Mr. Maffeo, what's your title?

13   A.  Facility manager.

14   Q.  And are you a correction officer?  Is that also -- are you

15   also a correction officer?  Do you go by Officer Maffeo or just

16   Mr. Maffeo?

17   A.  Mr. Maffeo.

18   Q.  And how long -- what's -- so how long have you been the

19   facilities manager at the MDC?

20   A.  I've been a facility manager for a little over a year and a

21   half.

22             THE COURT:  Sir, I'd like you to bring the mic closer

23   to you because I can't hear you.

24   Q.  Where did you work before that?

25   A.  MDC Brooklyn.

1   Q.  In a different role.

2   A.  Correct.

3   Q.  What was your role?

4   A.  General foreman.

5   Q.  And did you report to the facility manager as general

6   foreman?

7   A.  Correct.

8   Q.  So now you have foremen reporting to you?

9   A.  Correct.

10  Q.  From different systems, let's say, like plumbing, HVAC,

11  electrical?

12  A.  Correct.

13  Q.  OK.  And can you tell me who is reporting to you?  What

14  foremen for what systems are reporting to you?

15  A.  I have general maintenance staff, HVAC staff, power house

16  staff, electricians, plumbers, engineering tech, general

17  foremen and a facilities assistant.

18  Q.  And you mentioned power house.  What's that?

19  A.  Power house, they oversee the operation of the boilers and

20  the cooling systems.

21  Q.  And the engineers oversee what?

22  A.  Those are the power house operators, utility system

23  operators, that's their official title.

24  Q.  And the general foremen are just there to supervise those

25  more particularized foremen?

1    A.  Correct, there are three general foremen.

2    Q.  And how long -- withdrawn.  Was there a problem with the

3    heat at the MDC recently?

4    A.  Correct.

5    Q.  When did that start?

6    A.  We experienced issues I would say it was probably a week or

7    two prior to the fire.  I don't have the exact date without

8    looking at a calendar in front of me.

9    Q.  When was the fire?

10   A.  The fire was the 27th on a Sunday.

11               THE COURT:  What do you mean by you experienced

12   issues?

13               THE WITNESS:  Can you repeat that?

14               THE COURT:  What do you mean when you say you

15   experienced issues?

16               THE WITNESS:  The building is over 20 years old.  The

17   mechanical systems had some heating air handler units where the

18   water runs through for the heating system, and the pipe coils

19   on that heating unit had a leak on it, so we had to isolate the

20   unit so we could make repairs.

21               THE COURT:  I'm going to hand out a calendar to you,

22   sir.  You can see at the bottom there is January and February

23   2019.

24               And, counsel, you can repeat your question concerning

25   the dates.

1      MR. SPILKE:  Yes, your Honor.

2   Q.  I was asking when the fire happened, and I believe --

3   A.  The fire was on January 27, approximately one o'clock in

4   the afternoon.

5   Q.  Right.  And I think you said that about a week or two

6   before the issues with the heat began, and that's with the air

7   handler units?

8   A.  Correct.  We had on the 21st of January a couple of heating

9   coils experience some leaks on them, and we had to isolate them

10   to make repairs.

11   Q.  Did this affect the whole institution?

12   A.  No, it did not.

13   Q.  Where did it affect?

14   A.  Certain areas throughout the institution.  Each housing

15   unit has its own separate system.  One is for the inmates'

16   living quarters and one is for the common area of that

17   quarters.

18   Q.  Let me see if I understand.  So every unit has two?

19   A.  Correct, one would be where they sleep in their cells, and

20   one would be for the open common area.

21   Q.  And so just help me understand.  The air handler units for

22   what part were down?  What part of the facility was affected?

23   A.  I know the one particular unit was I62, it experienced an

24   issue.  Off the top of my head, another unit was for the unit

25   team areas experienced a leak.  The unit team area is a staff

 1    area.  I know for 62 it was for the cell area where they sleep.

 2    Q.  Any other cell areas?

 3    A.  There was, and I can't recall off the top of my head which

 4    one it was.

 5    Q.  Do you know how many additional other than -- I'm sorry.

 6    Withdrawn.  Do you know how many additional cell areas in

 7    addition to I62 were affected?

 8    A.  Off the top of my head, I can't come -- I don't have that

 9    number on the top of my head.

10    Q.  More than five?

11    A.  For the cell areas?

12    Q.  Yes.

13    A.  No, it was less than that.  It was a matter of maybe two,

14    at most three cell areas.

15    Q.  Two and at most three additional cell areas in addition to

16    I62, correct?

17    A.  62 and possibly two other ones.

18    Q.  And when you say issues, that I62 and these two additional

19    units experienced issues, what do you mean by that?

20    A.  Where the coil -- the heating coil had a hole in the

21    piping, in the copper tubing, and that froze, so we had to make

22    repairs.  It bursted, so we had to take the unit out of service

23    to repair it.

24              THE COURT:  When did you become aware of the problem?

25              THE WITNESS:  I became aware of the problem on January

1    21.

2    Q.  And is there partial functionality while these repairs are

3    being made?

4    A.  No.

5    Q.  So it's completely taken out, right?

6    A.  Correct.

7    Q.  And what's the effect of these systems being taken out?

8    A.  The units for the cells, we wouldn't be able to provide

9    heat in the cells during the time of the repairs.

10   Q.  Did you discuss any contingency plan for providing heat to

11   those cells that weren't going to get any heat?

12   A.  We did -- I did have staff stay behind after hours and make

13   the needed repairs and adjustment to the units as necessary,

14   and I do stay in contact with my supervisors, so if anything

15   needed extra, that they would be aware of it before lock-in

16   time at night.

17   Q.  Now, they were monitoring, but did they bring in any

18   portable heaters, anything that would provide warmth?

19   A.  They did bring in portable -- excuse me -- they did bring

20   in blankets, extra blankets to the housing units.

21   Q.  Is that the extent of it, or anything else?

22   A.  We cannot bring in portable heaters.

23   Q.  But nothing else in addition to the blankets?

24   A.  No, because the staff were working on that unit, and we got

25   it back up within 24 hours.

1    Q.  So, you found out about the issues with I62 and the other

2    cell units on January 31?

3              MS. BRETZ:  Misstated.  I believe that's a

4    misstatement of the date.

5              THE COURT:  I understood the 21st.

6              THE WITNESS:  Correct, the 21st.

7              MR. SPILKE:  I misspoke.  Yes, the 21st.

8    Q.  And it was repaired -- these issues were repaired within 24

9    hours?

10   A.  Correct.  We try to make any repairs needed immediately.

11   Especially we took priority for the cells where inmates sleep.

12   We made that a priority, so those were addressed first.

13   Q.  And so at the latest the repairs would have been completed

14   by the 23rd?

15   A.  Correct.

16   Q.  Any issues with heating after that at the MDC?

17   A.  No.

18             THE COURT:  Did you record the temperature while the

19   heating unit was not working?

20             THE WITNESS:  For the 21st, I don't believe we did on

21   the 21st.

22             THE COURT:  Thereafter?

23             THE WITNESS:  We did take temperature readings in

24   various different areas throughout the institution.

25             MS. BRETZ:  Your Honor, the government intended to

1    introduce as an exhibit a list of the temperature reports that

2    we have.  I don't know if you would like us to introduce it at

3    this time.  It would be helpful for Mr. Maffeo to look at.

4              THE COURT:  Well, is he familiar with this?

5              MS. BRETZ:  He is.  He created these documents, your

6    Honor.

7              THE COURT:  If they will refresh his recollection,

8    that's fine.

9              MR. SPILKE:  One moment, your Honor.  May I confer?

10             May I approach, your Honor?

11             THE COURT:  You may.

12   Q.  Mr. Maffeo, I'm handing you what is marked for

13   identification as Defense Exhibit A.  One moment.  YY?  Defense

14   Exhibit YY.

15             Do you recognize this.  Mr. Maffeo, do you recognize

16   that document?

17   A.  Yes, these documents, yes.

18   Q.  What is it?

19   A.  These are temperature readings that we took throughout the

20   institution.

21   Q.  And when you say we, who do you mean?

22   A.  Either myself or one of my supervisors or one of my line

23   staff took the temperatures.

24   Q.  And when -- and if anyone other than you took a reading of

25   the temperature, they would have entered it onto this document?

1    A.  Correct.

2           MR. SPILKE:  Your Honor, I'm not certain I can offer

3    it as a business record.  He didn't complete all the entries

4    himself.

5           MS. BRETZ:  I actually have a point of clarification.

6    Could I ask a question of Mr. Maffeo?

7           THE COURT:  You may.

8    BY MS. BRETZ:

9    Q.  Is it correct that your staff took the temperature readings

10   in the units and in the common areas?

11   A.  Correct.

12   Q.  But did you physically enter the numbers into the typed

13   spreadsheets?

14   A.  Correct.  I also took the temperatures as well.

15   Q.  But which days did you take the temperatures if you recall?

16   A.  I took the temperature readings on January 23, 2019,

17   January 30, 2019, February 1, 2019, February 2, 2019, February

18   3, 2019.  I started to with my other general foremen and at a

19   certain point I had to step away for another issue, and he

20   finished taking the temperature readings.

21   Q.  Is that his handwriting on the page dated February 3, 2019?

22   A.  Correct, you see there are two different handwritings.  I

23   stopped writing after J73.

24   Q.  Thank you.  And were these taken and recorded at or about

25   the same time that the temperatures were taken in the units in

1    the cells and the common areas?

2    A.   We wrote them down, correct, on this form.

3    Q.   At or about the same time that -- or shortly after you had

4    taken the temperatures?

5    A.   Correct.

6    Q.   And are these temperature reports things that are normally

7    kept in the business records of the Bureau of Prisons?

8    A.   No, we took the temperature readings because we wanted it

9    because we knew we were coming into the cold weather, and we

10   wanted to make sure that we had adequate heat in all the areas.

11   Q.   Do you ever take temperature readings in normal winter

12   seasons to make sure you maintain scheduled temperatures?

13   A.   If we get either inmates or staff telling us that there is

14   an issue or they're not comfortable, we will go up to that

15   particular area and see if there is an issue and take a

16   temperature reading to see if we need to make any adjustments,

17   and we do it on a case-by-case basis.

18              MS. BRETZ:  Thank you.

19              MR. SPILKE:  Your Honor, I will let the government

20   offer this exhibit when they have the witness.  I see the time

21   is up, but I would just ask for a few more minutes --

22              THE COURT:  OK.

23              MR. SPILKE:  -- to clarify a few things just in light

24   of the -- in light of this exhibit.

25

1    BY MR. SPILKE:

2    Q.  Now, let's just turn to the electrical issue.  By the way,

3    when you mentioned all of the, I guess, subcontractors under

4    you, or the trades under you, who report to you, the foremen,

5    which one of those foremen would be responsible for the

6    heating?

7    A.  HVAC.

8    Q.  And the power house who oversee the boilers, they have

9    nothing to do with the heating?

10   A.  They make sure the boilers is operating, that it's on and

11   is producing the hot water needed to go to the handler units.

12   Q.  Does that also provide hot water to faucets and showers?

13   A.  No, it does not.

14   Q.  Of those foremen that you mentioned, who would oversee

15   that?

16   A.  The power house oversees the hot water for the showers,

17   because it's a different system than the boilers.

18   Q.  Now just turning your attention briefly to the power

19   outage.  When did -- what happened?  How did the power go out?

20   A.  On January 27, approximately one o'clock, which was on a

21   Sunday, I was notified by my staff on shift from the power

22   house via phone -- I was home -- and told me that there is a

23   fire in the area of the building on the first floor, that he

24   thought it was on the first floor, and I told him to contact

25   the operations lieutenant and to get with the operations

1    lieutenant in regards to the emergency at hand, and I told him

2    I'm on my way in.

3    Q.  And what happened next?

4    A.  Upon my arrival, the fire department of New York City was

5    on site.  They made entry into the building, they extinguished

6    the fire located on the second floor mechanical room, in the

7    electrical room; they extinguished the fire, and at that time

8    the power was knocked off service because the fire interrupted

9    the service panel that serves distribution number 3 of the

10   building, priority 3 of the building.

11   Q.  After the fire department left, was Con Edison called?

12   A.  Correct.

13   Q.  Did you do that?

14   A.  The fire department contacted Con Edison prior to me being

15   there, and I followed up as soon as I got on site with Con

16   Edison, to have them come out and inspect the system, their end

17   of the system.

18   Q.  How long after the fire was that that you arrived on site

19   to coordinate?

20   A.  I was on site within an hour of the fire.

21   Q.  And ConEd told you that they would repair -- withdrawn.

22           How long did you understand it would take to restore

23   power to the facility?

24   A.  Well, with the extensive damage to the equipment that was

25   damaged, I knew it was going to be a prolonged issue.  My

1  background was electric.  I was the electrician at MDC Brooklyn

2  prior.  I am familiar with the type of equipment that had the

3  electrical fire in it, and there was significant damage to

4  cables to that portion that needed to be corrected.  So I knew

5  it was not going to be a quick overnight return to service type

6  of repair.

7  Q.  So given your background in the electrical system at the

8  MDC, how does the power outage affect the phones?

9  A.  When a building is designed, especially a facility of that

10 magnitude, there are different priority levels.  Priority 1 is

11 always life safety equipment, which would be your fire pumps,

12 your fire alarms, control panels for door patrols and equipment

13 like that.  And through engineering and Bureau of Prisons

14 construction guidelines, they figure what is needed to be

15 priority 1, priority 2 and priority 3.  The inmate telephone

16 system was put on priority 3 of the electrical load.

17 Q.  When was that?  When was it put on priority 3?

18 A.  When the building was built and designed.

19 Q.  Does the power affect the other phones -- the phones other

20 than the inmate phones?

21 A.  They're two completely different systems.

22 Q.  Can you elaborate on that.

23 A.  Inmate phones is a completely separate system from staff

24 phones for security reasons and for monitoring purposes.

25 Q.  So the power outage did not affect the staff phones?

1   A.  Correct.

2   Q.  And it did not affect the federal defender line?

3   A.  I believe the federal defender lines -- the federal

4   defender line was still active.

5   Q.  But only monitored lines were shut down?

6   A.  Correct.

7   Q.  Did you consider this power outage to be an emergency?

8   A.  Of course.

9   Q.  When did you believe it to be an emergency?

10  A.  The second I was notified of the fire.

11  Q.  And were you aware that -- help me understand.  The

12  power -- was there still power to certain parts of the West

13  Building?

14  A.  Correct.

15  Q.  And what parts were those?

16  A.  It was anything that was priority 1 or priority 2.  Like I

17  stated, priority 1 is our life safety equipment, door patrols,

18  our security systems, our cameras, our elevators.

19  Q.  And where were the sources -- what was the source of that

20  power?  Withdrawn.

21          What was the source of power to power those systems,

22  priority 1 systems?

23  A.  They all come from the same mechanical room located on the

24  second floor.

25  Q.  But I thought the fire knocked it out.

1    A.   The fire knocked out priority 3 equipment, distribution

2    number 3 equipment.

3    Q.   And what about -- and so distribution 3, it's synonymous

4    with priority 3?

5    A.   Right.

6    Q.   And I think you mentioned there was a priority 2?

7    A.   Correct.

8    Q.   But that wasn't being powered either, right?

9    A.   That was powered.  Priority 1 and priority 2 were powered

10   throughout the whole incident.

11            THE COURT:  Is that because the fire did not affect

12   priority 1 and 2?

13            THE WITNESS:  Correct.  The way the room is laid out,

14   priority 1 and 2 is on a straight line, priority 3 is set on

15   pretty much like an L of the room, and it's a little bit --

16   there is a space between where priority 1 and 2 and priority 3

17   equipment is because of spacing.

18   Q.   Is there a way to divert power from the priority 1 and

19   priority 2 plants to other areas, to say priority 3?

20   A.   Can you repeat that question.

21   Q.   Sorry, yes.  Is there a way to divert power from the source

22   that powers priorities 1 and 2, to divert that to priority 3?

23   Is there a way to do that?

24   A.   Priority 3 is the one that was damaged.

25   Q.   Right.  If that is out, is there a way to divert power from

1   the power sources for priority 1 and priority 2?

2   A.   If the equipment wasn't damaged, we can't -- priority 1 is

3   priority 1.  Priority 2 is priority 2.  Priority 3 is priority

4   3.  They don't intermingle.

5   Q.   There is no way to borrow power from priority 1 and

6   priority 2 for priority 3 purposes.  Is that what you're

7   saying?

8   A.   I don't think I understand what you're trying to say,

9   because the system doesn't operate like that.  I don't know if

10  I'm not understanding how it's coming out.

11  Q.   Right, I am not an expert in electrical, so I'm just trying

12  to really understand.

13          Priority 1 and priority 2 power sources were

14  unaffected by the fire.

15  A.   Correct.

16  Q.   Were they working at full operation?

17  A.   Correct.

18  Q.   Was there a way to borrow power from those sources for

19  priority 3 uses?

20  A.   No, because the extent of damage that happened to the

21  equipment on priority 3, we couldn't just transfer stuff over

22  to that.

23  Q.   And is there a way to get generator power to power the

24  priority 3?

25  A.   No, there was not because of the fire damage.

1   Q.  And the phones are powered by priority 3?

2   A.  Which phones?

3   Q.  The inmate phones.

4   A.  Yes, they're powered by priority 3.

5   Q.  And the computers are powered by priority 3?

6   A.  For the inmates?

7   Q.  Yes.

8   A.  Correct, it's the same system.

9   Q.  And it's called priority 1 because it's the most pressing

10  priority?

11  A.  Correct.

12  Q.  And priority 3 -- is there a priority below priority 3?

13  A.  No.

14  Q.  So priority 3 is the lowest priority?

15  A.  Correct.

16          THE COURT:  What is the status of the current

17  electrical repairs?  Is that a temporary fix, or is it

18  permanent?

19          THE WITNESS:  It is a temporary repair until we can

20  have -- we already had an engineering firm come on site, and

21  they are coming back to do further engineering work.  The

22  design -- because the equipment that's there is 25 years old,

23  so they have to come back, engineer what we need so it can be

24  manufactured.  Right now we're on temporary electrical service,

25  but the building is fully powered at this time.

1    Q.  How long can that temporary --

2    A.  As long as needed.  As long as until we get the new

3    equipment in place.

4    Q.  And that could be months or years?

5    A.  We are currently actively working on replacing it, and it

6    can possibly take up to a year to get the parts in.

7                 THE COURT:  Who provided the temporary power?

8                 THE WITNESS:  A contractor.

9                 THE COURT:  And when did you contract the contractor?

10                THE WITNESS:  He was contacted -- he was contacted

11   late Sunday night.  Once I realized where the fire was, what

12   the issue was and that it was going to be a long-term issue, I

13   immediately contacted an electrical contractor and had them

14   come in on site, evaluate what we need to do to get us to the

15   next step of restoring power.

16                THE COURT:  Did they offer more than one way of fixing

17   it?

18                THE WITNESS:  Correct, there was talk of having

19   different ways of doing it.  Both ways were lengthy.  We went

20   with the most safest, the most quickest way possible to get

21   power back up to the building, and we also worked in

22   conjunction with the local utility company, Con Edison.

23                THE COURT:  Any further questions, counsel?

24                MR. SPILKE:  Not at this time, your Honor, no.

25                THE COURT:  Cross-examination.

J257SEG1                    Maffeo - Cross

1    CROSS EXAMINATION

2    BY MS. BRETZ:

3    Q.  Thank you, Mr. Maffeo, just a few questions.  The document

4    you have in front of you, I believe it was previously marked

5    Defense YY, but we're going to enter it, so we will mark it as

6    Government's 1.  The five pages you have in front of you, does

7    that accurately summarize your findings -- you and your staff's

8    findings of the temperature readings at MDC Brooklyn?

9    A.  For those time periods, yes.

10             MS. BRETZ:  The government would like to move to admit

11   Exhibit 1.

12             THE COURT:  Any objection?

13             MR. SPILKE:  No, your Honor.  No objection.

14             THE COURT:  It is admitted.

15             (Government Exhibit 1 received in evidence)

16   Q.  If you could turn to that first page, it should be MDC

17   Brooklyn temperature for 1/23/19.  Do you see that?

18   A.  Yes.

19   Q.  Underneath G43, underneath that line, there are several

20   lines:  Education, food service, medical, LT's office and then

21   several floor team units.  Do you see those?

22   A.  Correct.

23   Q.  Are any of those staff units?

24   A.  Correct.  Education, food service, medical, lieutenant's

25   office, eighth floor unit team, seventh floor unit team, sixth

1    floor unit team, fifth floor unit team, fourth floor unit team,

2    are all staff areas.

3    Q.  Great, thank you.

4         And after the electrical fire took place, was there --

5    what areas of the facility still had power?

6    A.  Various locations throughout the building, per life safety

7    code, have emergency lights that are on priority 1 for egress

8    purposes.  We maintain those lights throughout the whole time.

9    So lights sporadically would be on in an area.  Exit lights

10   were maintained on.  Certain wall packs between each cell would

11   remain on, and some of the lights in the common area would stay

12   on.

13             MS. BRETZ:  No further questions.  Thank you.

14             THE COURT:  Any redirect?

15             MR. SPILKE:  Yes, your Honor, very briefly.

16   REDIRECT EXAMINATION

17   BY MR. SPILKE:

18   Q.  Mr. Maffeo, let's just look at the Government Exhibit 1.

19   Now, did you or anyone on your staff take the temperature

20   where -- withdrawn.

21        Did you or anyone on your staff take the temperature

22   in the medical records area?

23   A.  Yes.

24   Q.  And is that reflected in your -- in your notes in Exhibit

25   1?

1    A.  Yes.

2    Q.  Can you point me to where.

3    A.  Where it says medical.

4    Q.  And what time of day was that reading taken?

5    A.  On January 23 I do not have what time the temperature was

6    taken.  I didn't start writing the time that we started taking

7    the temperature until February 1 when I realized that we should

8    be noting what time we take the temperature readings.

9    Q.  And what instrument did you use to take temperature

10   readings?

11   A.  We used a Fluke point-and-aim -- I'm sorry -- a laser

12   point-and-aim measuring gun.

13   Q.  Something like this?

14   A.  Something similar.

15   Q.  I'm holding a Nicety infrared thermometer -- N-i-c-e-t-y --

16   infrared thermometer.

17            And may I approach and hand the witness the

18   thermometer?

19            THE COURT:  You may.

20   Q.  So the thermometer was something that looked like that?

21   A.  Correct.

22   Q.  Was it exactly -- was it actually that model?

23   A.  No, it was not.

24   Q.  And you can take readings -- explain to me how you would

25   take a temperature reading with that instrument.

1    A.  You could point it to any location you want within an area.

2    Q.  Can you demonstrate that now.

3    A.  Where would you like it?

4    Q.  Perhaps on the wall.

5    A.  74.4.

6    Q.  And can we see the laser when you pointed it?  And that's

7    about let's say how many feet up from the floor?

8    A.  Probably six feet by the marshal.

9    Q.  I see you're moving it along the wall.

10   A.  Well, I was trying to get a gauge of the height of the

11   officer standing.

12   Q.  But when you are taking a reading, you wouldn't move it

13   around like that?

14   A.  No, I would keep it in one spot.

15   Q.  Can you show me now.  You would hold it like that.

16   A.  Correct.

17   Q.  What's the reading there?

18   A.  73.7.

19   Q.  And could you please point it to where the wall meets the

20   ceiling.

21   A.  73.7.

22   Q.  And could you please point it -- well, point it toward the

23   floor in front of the podium.

24   A.  73.6.

25   Q.  And is it your experience that where you point the laser

1   dot can change what temperature reading you get?

2   A.  Can you repeat that?

3   Q.  Where in the room you point the laser dot, could that

4   change what temperature reading you get?

5   A.  You point it toward the general area in the room.  We

6   usually point it in the middle of the room.

7   Q.  Meaning the middle of the floor or the middle of the

8   ceiling?

9   A.  No, we would do it at the mattress or the floor area right

10  in front of the beds.

11  Q.  You say usually.  Is there any reason you wouldn't do that?

12  A.  If an inmate is standing in front of the door and he

13  doesn't step to the side, we will take it right where we can

14  get it.

15  Q.  If an inmate had just gotten out of the bed, would that

16  affect the temperature reading you get?

17  A.  It can affect it slightly, but nothing by great degree.

18  Q.  In what direction up or down?

19  A.  It could be either or.

20  Q.  An inmate leaving the bed could make the bed colder?

21          MS. BRETZ:  Objection, your Honor.

22          THE COURT:  Overruled.

23          You may answer.

24  A.  Can you repeat that again?

25  Q.  An inmate leaving the bed -- withdrawn, your Honor.

1        One last question.  The only way you recorded -- you

2   or your staff recorded -- these temperatures was by writing it

3   down, right?

4   A.  Correct.

5        MR. SPILKE:  Nothing further.

6        THE COURT:  Prior to January 27, was there any

7   indication that the priority 3 electrical equipment would fail?

8        THE WITNESS:  We did have an issue with the circuit

9   breaker prior on, I would like to say, your Honor, I believe it

10  was January 21, where we experienced an electrical problem with

11  that distribution.  At that time we had a contractor come in

12  and look at the equipment from the manufacturer, which is

13  Square D, and they evaluated the system, and we were able to

14  get the system back online.  We inspected all areas of the

15  equipment, and we found no indication that we would have

16  further problems at that time.

17       THE COURT:  All right, sir, you may step down.

18       (Witness excused)

19       Counsel, you may call your next witness.

20       MS. KUNSTLER:  Your Honor, defense would like to call

21  Miguel Cruz.

22       MR. JONES:  If I may, may Mr. Maffeo be excused for

23  the day?

24       THE COURT:  Yes.

25       MR. SPILKE:  May I approach the witness stand to get

1   my thermometer?

2               THE COURT:  You may.

3               MS. KUNSTLER:  Your Honor, this is a witness who is

4   currently a defendant in this district.  For all witnesses who

5   are either incarcerated or not -- or non-incarcerated witnesses

6   who were previously incarcerated at the MDC and are defendant

7   witnesses, we just wanted to talk about the scope of their

8   testimony.  They're not going to be testifying about their

9   cases, their criminal histories, and we expect that they won't

10  be asked any questions in those areas.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      MIGUEL CRUZ,

2           called as a witness by the Government,

3           having been duly sworn, testified as follows:

4                THE COURT:  Be seated.  I want you to get close to the

5      microphone because you are speaking in a very low voice.

6                THE WITNESS:  All right.

7                THE COURT:  Speak up.

8      DIRECT EXAMINATION

9      BY MS. KUNSTLER:

10     Q.  Good morning, Mr. Cruz.

11     A.  Good morning.

12     Q.  Mr. Cruz, were you recently incarcerated at MDC Brooklyn?

13     A.  Yes.  I was released on the 30th.

14     Q.  The 30th of this month?

15     A.  Yes, Wednesday.

16     Q.  When did you arrive there?

17     A.  The 17th.

18     Q.  The 17th of what month?

19     A.  Of --

20                THE COURT:  Would you like to look at a calendar?

21                THE WITNESS:  Yes, please.  I'm pretty sure it was

22     January.

23                January 17.

24     Q.  You arrived on January 17?

25     A.  Yes.

J25nseg2                        Cruz - Direct

1    Q.   And what unit were you in?

2    A.   53.

3    Q.   While you were at the MDC, were there issues with the heat

4    and electricity?

5    A.   Before that, no, there was not.

6    Q.   While were you there?

7    A.   While I was there?  No, there wasn't.

8    Q.   There were not issues with the heat and electricity at MDC?

9    A.   When I first got -- when I first went in, the lights went

10   off.  The lights was off, and they locked us in until the next

11   day, the lights went back on, which was on the 17th.

12   Q.   I want to direct your attention to Sunday, January 27.

13            You were at MDC that day, right?

14   A.   Yes.

15   Q.   And can you tell me what happened on that day?

16   A.   That day was -- we was -- it was like around 1:44 that we

17   was on the, on the -- out of our cells, and the lights went

18   off.  The lights went off and they locked us in.  They said

19   that there is a fight or something going on, an emergency.  So

20   they locked us in, and we was locked in till -- till the next

21   day, until the next day in the morning -- no, not even.  I

22   apologize.  To the next day probably by the afternoon, yeah.

23   They came to our cells with our food, our breakfast, with our

24   breakfast.  They came with a banana, a banana and a cake.

25   Q.   So you were locked in your cell all day from 1:44 on --

1    A.   Yeah.

2    Q.   -- on January 27 until the next day?

3    A.   Yes.

4    Q.   How do you know that it was about 1:44?

5    A.   Because I went inside my cell and I looked at my radio and

6    it said 1:44.  I told my bunkee that I wanted to know how long

7    we were going to be locked up because he was already there for

8    a long time.  And I asked him does this, like, happen, you

9    know?

10          He was like, yeah, sometimes it happens, but not all

11   the time.

12          And I was like, all right.

13          So, you know, I was expecting to be released out of

14   our cells again, and, you know --

15   Q.   When were you next released from your cell?

16   A.   Excuse me.

17   Q.   When were you released from your cell?  What time on the

18   following day?

19   A.   Yes.  The next day we was released from our cells, but I am

20   not sure what time.

21   Q.   Do you know how long you were out the following day?

22   A.   It was after -- after -- after lunch we was out.  So that's

23   like, by 12-- 1 o'clock.

24   Q.   What was it like in your cell?

25   A.   It was, you know, it was -- it was cold.  They didn't have

1    have AC like that first day.  It was -- they didn't -- once the

2    lights went off, there was no heat.  There was AC.  There was

3    no heat.

4            And I was saying to my bunkee, like -- because he said

5    you know what you should do, just take a blanket off the, bed,

6    you know, because we was going to sleep.

7            I couldn't sleep because it was cold.  So he said,

8    listen, I am going to try to cover up the vents with a book

9    cover.

10           So he covered up the vents, and he said hopefully it

11   gets warmer.  But since it's like a metal room, you know,

12   the -- the walls is cold.  So inside, you know, they're going

13   to stay cold.  So I was sleeping with my jumpsuit, my jumpsuit,

14   and I was completely dressed.  I had two pairs of socks on.  I

15   slept with the sheet on the bed.  I took the sheet off the bed,

16   I slept with that blanket and -- the two blankets that they

17   give you, so it was cold.  I was uncomfortable.

18   Q.  So you said that your bunkee was putting book covers over

19   the vents?

20   A.  Yeah, over the vents, yeah, because it was blowing out cold

21   air, so he put like a book cover on the vent.

22   Q.  The problem with the cold air coming through the vent, was

23   that -- how many days did that last?

24   A.  Until I was out.

25   Q.  What day were you released?  I think you said this already.

1   A.  1/30.

2   Q.  The problem with the electricity, how long did that last?

3   A.  I am not sure, because I was released on the 30th, you

4   know.

5   Q.  But there was still no electricity when you left?

6   A.  Right.

7   Q.  And were you locked in your cell every day?

8   A.  Not every day.  We got -- we got released on our -- out of

9   our cells for like an hour.  We only got like an hour out and

10  an hour out.  They always said -- every time the lieutenant

11  comes inside the house, you know, we are locked in.  So it was

12  like, we -- 45 minutes the most we get to be out.

13  Q.  So you were all bundled up in your cell?

14  A.  Yeah.

15  Q.  And did you see COs wearing coats?

16  A.  Yeah.

17  Q.  Hats and scarfs?

18  A.  Yeah.  There was one CO we talk to, like a cool guy, he

19  used to tell us like, listen, this ain't supposed to be out in

20  public.  He didn't want to talk to us that much, but he was

21  talking to us, he know.

22  Q.  He said --

23          THE COURT:  What was he wearing?

24          THE WITNESS:  What he was wearing?

25          He was wearing -- he was wearing his jacket, his vest

1    over it, and he had -- he had a little skully on.

2    Q.  And what was the -- you were eating your meals in your

3    cell?

4    A.  Yeah.

5    Q.  And how were the meals?

6    A.  Two sandwiches, a baloney and a cheese and another one,

7    yeah.  And it was bags, we had bags.

8    Q.  Did you receive hot meals?

9    A.  No, we didn't have hot meals.

10   Q.  What was it like?  Was it dark only at night or was it dark

11   during the day in your cell as well?

12   A.  It was always dark in there.  We only got one window, and

13   that window wasn't -- I was in the back like towards the water,

14   so I didn't have that much light.

15   Q.  Was there air coming from the window also, cold air?

16   A.  No.

17   Q.  No?  But your cell was dark during the day as well as at

18   night?

19   A.  Yeah.

20          THE COURT:  Are you asking the witness whether the

21   electricity was on?

22          Is that your question?

23          MS. KUNSTLER:  Yes.  I wanted to know --

24   Q.  During the day the sun was up, right?

25   A.  Right.

1    Q.  But it was still dark in your cell?

2    A.  Yes.

3    Q.  And during the day --

4    A.  There wasn't no light inside the cell.

5    Q.  What?

6    A.  There wasn't no light in the cell.

7    Q.  Even during the day there was no electricity and no light?

8    A.  Right, right.

9    Q.  And whats's it like to be locked in your cell in the dark

10   with no heat?

11   A.  Being locked in, it's horrible, you know.  That's -- I

12   don't know.  It's horrible.  I don't like it.  Nobody else

13   would.

14            THE COURT:  What is horrible about it?

15            THE WITNESS:  Everything.  You're in a cell with

16   another person, and you don't know how he feels, you know,

17   like, he could be in a mood, and you could be talking -- you

18   know, anything could happen.  You're locked in your cell you

19   can't even press the emergency button, because, you know, no

20   one would respond.

21   Q.  Did you press the emergency button?

22   A.  No, not at all.  I just -- there wasn't much we could do

23   but talk and just go by the day.

24   Q.  Did you get clean laundry during this time?

25   A.  No.  No laundry.

J25nseg2                    Cruz - Direct

1   Q.  Were you wearing dirty clothing during this time?

2   A.  I wasn't wearing dirty clothes.  It was just the usual --

3   they asked us to take a shower, if you want to take a shower,

4   you are going to take a shower every 72 hours or something.  I

5   didn't want to -- I wanted to take a shower, but I didn't want

6   to take a shower because the water was -- I wasn't going to

7   take a shower in frozen water.  It was already cold in our

8   cell.  I wasn't going to take a cold shower.

9           THE COURT:  You are saying there was no hot water in

10  the shower?

11          THE WITNESS:  No, there was no hot water at all.

12          THE COURT:  How long did that last?

13          THE WITNESS:  I can't tell you.  I got released on the

14  30th.

15  Q.  Was it still a problem when you left, the hot water?

16  A.  There was no hot water at all, period.

17  Q.  What about the toilets?  Were there any issues with the

18  toilets?

19  A.  No.  The toilets, no, the toilets was flushing.

20  Q.  What about, did you notice any issues that any other

21  inmates were having with food?

22  A.  We was eating the same thing, everybody, everybody.

23  Q.  What about people with special diets?  Were they getting

24  the food they needed?

25  A.  Yeah.  They wasn't getting nothing.  They was eating what

we was eating.  I was actually talking to a Hindu guy.  He said

that when he came in that he put a slip in for the nurse and he

was supposed to be on a diet, a special diet, and he said he

haven't ate nothing, just water and bread all those days.  I

was trying to give him, like, some of my soups and my

commissary, you know, but he said he can't eat most of the

things, so he couldn't eat much.

Q.  What was it like not being able to -- well, were the phones

working on your unit?

A.  No.  No phones was working, no computers was working.  And

the only phone working was the attorneys' phone.  It was just

that phone that was working.  The other phones wasn't working.

Q.  Was it a phone you could use to call your attorney?

A.  Yeah, that was working.

Q.  What was it like -- you could call your attorney on that

phone?

A.  Yeah.  But I didn't call.  I didn't make no calls.

Q.  Were you able to get in contact with your family?

A.  No.

Q.  What was it like not being able to get in contact with your

family?

A.  Stressful.  That's -- it was stressful.  Like, they are the

only people that make me feel comfortable, you know -- uh-huh,

like, when I talk to them and stuff, I go about my day by

talking to them.

1   Q.  When you said that you were allowed out of your cell daily

2   for about an hour --

3   A.  An hour, yeah.  No longer than an hour.

4   Q.  Were you able to go to recreation?

5   A.  What you mean?  Like to -- to -- to outside?

6   Q.  Yes, to outside.

7   A.  They didn't let us go outside.  They didn't want us to go

8   into the yard.

9   Q.  Were you able to go to the law library?

10  A.  No.

11  Q.  Were you able to get commissary?

12  A.  No.  I was -- I was signed up for commissary.  On Monday we

13  were supposed to get our commissary, and, yeah, they didn't

14  take the sheets.

15          THE COURT:  Counsel, your ten minutes are up.

16  Q.  What was it like -- how did it feel to be released?

17  A.  It feels great, you know.

18  Q.  Can you describe your reaction.

19  A.  I was surprised.  I was crying.

20  Q.  Why were you crying?

21          THE COURT:  Ms. Kunstler, I don't know if you heard

22  me.  Your ten minutes are up.

23          MS. KUNSTLER:  Thank you.

24          THE COURT:  Cross-examination?

25          MS. BRETZ:  We have no questions for this witness.

1          THE COURT:  I assume there is no redirect then.

2          All right.  You may step out, and you can call your

3    next witness.

4          THE WITNESS:  Thanks.

5          (Witness excused)

6          MR. SPILKE:  The defense calls Vivianne Guevara, a

7    mitigation expert with the Federal Defenders of New York.

8     VIVIANNE GUEVARA,

9        called as a witness by the Defendants,

10       having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. SPILKE:

13   Q.  Ms. Guevara, where did you work?

14   A.  I work at the Federal Defenders of New York in the Eastern

15   District.

16   Q.  And that's in Brooklyn?

17   A.  Yes.

18   Q.  And what do you do there?

19   A.  I am the director of social work.

20   Q.  Very briefly, what is your background in -- withdrawn.

21        Very briefly, what are your qualifications for that?

22   A.  I have a master's degree in social work, and I am a

23   licensed master of social work.

24   Q.  Did you come to know that there was a an issue with living

25   standards at the MDC?

J25nseg2                    Guevara - Direct

1   A.  Yes.

2   Q.  How did you know that?

3   A.  I learned that over the weekend.  I am trying to think back

4   to the date, a week ago this past Sunday.

5           THE COURT:  Would you like to look at a calendar?

6           THE WITNESS:  Yes, please.

7           THE COURT:  There is a calendar right there.

8           THE WITNESS:  Thank you.

9           THE COURT:  On the very bottom you will see January

10  and February on the left.

11          THE WITNESS:  Around January 27 or 28th our office was

12  alerted that there were issues at the jail, and that's when I

13  became alerted.

14  BY MR. SPILKE:

15  Q.  And do you usually visit clients at the jail there?

16  A.  Yes, I do.

17  Q.  And that's the MDC?

18  A.  Yes.

19  Q.  Did you attempt to visit during that week?

20  A.  No, I did not attempt to visit.  I -- we kept getting

21  updates as an office that there were no visitations allowed,

22  and so I did not try.

23  Q.  Who notified you generally?

24  A.  The director of my office, Deirdre von Dornum.

25  Q.  Right.  Did you learn that why there were no legal visits?

1   A.  Yes.  I believe the e-mail said that there were -- there

2   was a power outage due to a fire, and that was the reason.

3   Q.  Right.  And at some point did you go down to the MDC to see

4   for yourself?

5   A.  Yes.  On Friday, February 1, I went to the MDC.

6   Q.  And what did you do when you were there?

7   A.  I went to the MDC.  I heard that the director of my office

8   was going there, and I also wanted to check on conditions, not

9   believing that I would be able to go in, but just to check on

10  how things were going on the outside.  When I arrived, I

11  arrived at the corner of 29th Street and Third Avenue --

12  Q.  Sorry to interrupt you for one moment.

13              At what time was that?

14  A.  That was between 5:15 p.m. and 5:30 p.m.

15  Q.  Right.  Please continue.

16  A.  When I first arrived and turned the corner at 29th Street

17  and Third Avenue, I immediately started to hear the echoing of

18  clicking or -- it sounded like clicking echoing off the walls

19  that are there.  And as I started to walk down 29th Street I

20  realized that it was people banging from inside the west

21  building.

22  Q.  And did you make a recording of that?

23  A.  Yes, I did.

24              MR. SPILKE:  I'm showing the witness what's in

25  evidence -- I'm sorry, what's marked for identification as

1   Defense Exhibit CC.

2   Q.  Did you take this video?

3   A.  Yes, I did.

4          MR. SPILKE:  I would offer it, your Honor.

5          THE COURT:  Counsel, then you will have to get it

6   authenticated.

7          MR. SPILKE:  Yes, your Honor.

8   Q.  Is it a true and correct copy of a video you took?

9   A.  It's -- yes.  It seems like it's -- it's not playing here.

10  I don't know if it's playing there.

11         MS. BRETZ:  Objection, your Honor.  She hasn't seen

12  the video.  How does she know if it is a true and correct copy?

13         THE COURT:  Well, we could play the video first and

14  then have her authenticate it.

15         MR. SPILKE:  Thank you, your Honor.

16  Q.  Is this the video you took?

17  A.  Yes.

18  Q.  It is a true and correct copy of that video?

19  A.  Yes.

20         MR. SPILKE:  I would offer it.

21         THE COURT:  You should ask her what it depicts.

22  Q.  Does it fairly and accurately depict what you saw?

23  A.  Yes.  This is actually a later video.  There was an earlier

24  video where you could not see the lights coming out because it

25  was daylight.  But this video shows -- you can hear the

1  clicking sound that I mentioned and you can hear what I later

2  learned were reading lights that not everybody had, but whoever

3  had a reading light and wanted to light that through the

4  window, they were doing that, and that's what that shows.

5  Q.  This depicts the scene that you were describing?

6  A.  Yes.

7          MR. SPILKE:  I would offer it, your Honor.

8          THE COURT:  Any objection.

9          MS. BRETZ:  No, your Honor?

10          THE COURT:  It is admitted.

11          What is the label that goes with that?

12          MR. SPILKE:  It is Defense Exhibit CC.

13          (Defendant's Exhibit CC received in evidence)

14          MR. SPILKE:  Your Honor, just for the sake of

15  efficiency, we have four additional videos that Ms. Guevara

16  made and that depict what she witnessed the night of February

17  1.

18          THE COURT:  Are they different from what we've already

19  seen?

20          MR. SPILKE:  They are.

21          THE COURT:  So are you seeking to admit them?

22          MR. SPILKE:  I am seeking to offer all of them.

23          MS. BRETZ:  Your Honor, we haven't seen these videos.

24  I don't think we can agree to see them -- are you going to ask

25  to have her authenticate them all?

1          MR. SPILKE:  I was hoping for the sake of efficiency I

2     could offer them.

3          MS. BRETZ:  We haven't seen them.  We don't know what

4     is on them.

5          MR. SPILKE:  I will show them one by one.

6          THE COURT:  Counsel, they are not cumulative?

7          MR. SPILKE:  No, they are not, your Honor.

8          THE COURT:  All right.  Then what's the next one.

9          MR. SPILKE:  This is Defense Exhibit GG.

10    Q.  Does this depict what you witnessed at the MDC?

11    A.  Yes.

12         THE COURT:  On what date and at what time?

13    Q.  On what date and at what time?

14    A.  On February 1, between 5:30 and 5:45.

15    Q.  You took this video?

16    A.  Yes, I took this video.

17    Q.  At that time?

18    A.  Yes.

19         MR. SPILKE:  I would offer it.

20         THE COURT:  Any objection?

21         MS. BRETZ:  No, your Honor.

22         THE COURT:  What title, what label shall it be?

23         MR. SPILKE:  Defense Exhibit GG.

24         THE COURT:  It is admitted.

25         (Defendant's Exhibit GG received in evidence)

1   BY MR. SPILKE:

2   Q.   What is that noise that we were hearing?

3   A.   That's the sound of incarcerated people banging on the

4   window from the inside.

5           MS. BRETZ:  Objection, your Honor.

6           THE COURT:  Sustained.

7           MR. SPILKE:  Your Honor, we would ask for some leeway.

8           THE COURT:  Counsel, she's hearing a noise, and she's

9   now essentially guessing how the noise was produced.

10          MR. SPILKE:  You can take that down, Ms. Bass.

11  BY MR. SPILKE:

12  Q.   How long were you outside the MDC?

13  A.   I was outside from about 5:30 -- 5:15, 5:30 to 7, 6:30 or 7

14  p.m., and I can tell you that in visiting the MDC multiple

15  times I have never heard that sound outside of the MDC ever.

16  And I've never seen people shine lights from inside the window,

17  and I've -- I don't have any other explanation for why there

18  would be multiple clicking sounds echoing off the walls at the

19  MDC.

20  Q.   How did that make you feel?

21          MS. BRETZ:  Objection.

22          THE COURT:  Overruled.  You may answer.

23  A.   It was shocking to hear.  It's not a sound that you

24  normally hear when you are walking to visit people at the jail.

25  I mean, there's lots of things down there, there's lots of cars

1   and there's an overpass and there's a shipyard or something,

2   but you never hear that sound when you walk down there.  It

3   doesn't sounds like birds; it doesn't sound like anything

4   human.

5          It's -- to me as a social worker and working with my

6   clients, it sounds like -- it sounded like a cry for help, and

7   I don't know Morse code or anything, so I couldn't tell if

8   anybody was trying to send a message, but it sounded desperate,

9   and it sounded like people who wanted to be heard.

10  Q.  Did it ever stop that whole time were you there?

11  A.  No, it never stopped.

12          MR. SPILKE:  No further questions.

13          THE COURT:  Cross-examination?

14          MS. BRETZ:  No questions.

15          THE COURT:  You may step out.

16          (Witness excused)

17          THE COURT:  Please call your next witness.

18          MS. KUNSTLER:  Your Honor, the defense calls

19  Correction Officer June Bencebi.

20   HAI JUNE BENCEBI,

21       called as a witness by the Defendants,

22       having been duly sworn, testified as follows:

23  DIRECT EXAMINATION

24  BY MS. KUNSTLER:

25  Q.  Good afternoon, your Honor -- good afternoon, Ms. Bencebi

1    rather.

2              Ms. Bencebi, can you tell us where you work.

3    A.  I work at MDC Brooklyn.

4    Q.  What is your rank and position at MDC?

5    A.  I'm the case manager.

6    Q.  For what unit?

7    A.  For the G unit.

8    Q.  And where is G unit?

9    A.  It's on the fourth floor.

10   Q.  And do you also have a position with your union?

11   A.  Yes.  I'm the local treasurer.

12   Q.  How long have you worked at MDC?

13   A.  18 years 7 months -- 19 years, 7 months.

14   Q.  And what shift do you work?

15   A.  I work during the day, 6 a.m. to 4 p.m.

16   Q.  And what building do you work in?

17   A.  In the west building.

18   Q.  Have there been problems with the heat and electricity in

19   the west building at the MDC?

20   A.  Yes.

21   Q.  When did the problems with the heat start?

22   A.  On the first day that it was going to be really, really,

23   really cold, where the temperature dropped like 20 degrees.

24             THE COURT:  There's a calendar right there and --

25             THE WITNESS:  I couldn't even tell you.

1             THE COURT:  OK.

2             THE WITNESS:  I really don't remember the exact day.

3   I just remember it was supposed to be the coldest day of the

4   year.

5   Q.  Was that in January?

6   A.  Yes.

7   Q.  Did that predate the fire in the facility?

8   A.  Yes.

9   Q.  And how long -- and what was the problem at that time?

10            MS. BRETZ:  Objection.

11            THE COURT:  Overruled.  You may answer.

12  A.  It just got really cold in the building.

13  Q.  Was it cold throughout the building to your knowledge?

14  A.  I wouldn't know.  I don't really go throughout the

15  building, so on my floor it was cold.

16  Q.  Were you on any floors where you noticed the cold?

17  A.  On the fifth floor I did.  I was on the fifth floor, and it

18  was cold.

19  Q.  And were you wearing outerwear?  What did you do to protect

20  yourself from the cold?

21  A.  First I kept my scarf on, and then a couple of hours later

22  I might have put on my winter hat.  A couple of hours after

23  that I put on a pair of gloves.  And then towards the end, you

24  know, I put on a coat.

25  Q.  Did you see other staff members bundling up?

1    A.  Yes.

2    Q.  How long did that problem last?

3    A.  It might have been a day or two, and then when the weather

4    got warmer then it went back to normal.

5    Q.  And when was the next problem with the heat at the

6    facility?

7    A.  The next time I remember was Martin Luther King's holiday.

8    It was extremely cold that day.

9    Q.  There was no heat in the facility?

10   A.  On my floor in my office.

11   Q.  So the first time -- the first incident you are talking

12   about was before Martin Luther King Day?

13   A.  Yes.

14   Q.  But in the month of January?

15   A.  I believe so.

16   Q.  And the second incident was around Martin Luther King Day?

17   A.  Well, I remember on Martin Luther King Day it was extremely

18   cold.

19   Q.  And how long did that incident last?

20   A.  Probably for like two days.

21   Q.  And then when was the next time you noticed --

22          THE COURT:  How did you dress on Martin Luther King

23   Day?

24          THE WITNESS:  I had on my hat and my gloves, my two

25   scarfs and my coat.

J25nseg2                        Bencebi - Direct

1              THE COURT:  And did you observe other people in your

2    working area?

3              THE WITNESS:  I observed -- not in my area, on the

4    fifth floor they had a little space heater, so they used their

5    little space heater.  I didn't have one.

6              THE COURT:  Who was using a space heater?

7              THE WITNESS:  Some of the unit team staff that worked

8    on --

9              THE COURT:  You are saying people who were employed --

10             THE WITNESS:  Yes, employed --

11             THE COURT:  -- at the MDC?

12             THE WITNESS:  Yes.

13             THE COURT:  They had a heater, but you did not have a

14   heater?

15             THE WITNESS:  No, I did not.

16             THE COURT:  Go ahead.

17             MS. KUNSTLER:  Thank you.

18   BY MS. KUNSTLER:

19   Q.  You are on the -- the problem, was it also a problem for

20   the incarcerated people on your unit?

21   A.  A couple of the inmates stated that they were cold.  Some

22   of my elderly inmates stated that they were cold.

23             THE COURT:  Other than what they said, was there any

24   physical manifestation of the cold?

25             THE WITNESS:  I am not on the units, so it was just

1    when I would go make rounds and they would come and speak to

2    me.

3    Q.  Did you speak to inmates during both the early January

4    incident and the Martin Luther King Day incident?

5    A.  The Martin Luther King Day incident I don't believe I spoke

6    to them.  I was running around that day.  I don't believe I got

7    on a unit that day.

8    Q.  When was the next time it was cold?

9    A.  Maybe the Sunday of the fire incident.

10   Q.  What do you attribute to this?  I mean, is it that the heat

11   goes out?  Like, what is your understanding of what's happened?

12          MS. BRETZ:  Objection.

13   Q.  Is there any heat at all coming into the fourth floor area

14   where you are?

15   A.  Yes.

16          MS. BRETZ:  Objection.

17          THE COURT:  Overruled.

18          So you feel heat?

19          THE WITNESS:  Yes.

20          THE COURT:  And where did the heat come from?

21          THE WITNESS:  I would assume the vents.

22   Q.  And during these incidents you felt no heat coming into

23   your area?

24   A.  During what incidents?

25   Q.  When the heat went out in January, in the early January

1   incident and the mid-January incident.

2           MS. BRETZ:  Objection.

3           THE COURT:  Sustained.

4           You described three cold days.  Was there heat coming

5   out of the vents?

6           THE WITNESS:  No.

7   Q.  And when was the next time it was cold on the unit?  The

8   third incident you described was, began on June -- excuse me,

9   your Honor -- January 27?

10  A.  Yes.  It was a little cold.  It wasn't extremely cold, just

11  a little colder.

12  Q.  Were you on the -- were you at the facility on January 27?

13  A.  Yes.

14  Q.  And it was a little cold?  Was there heat coming through

15  the vents?

16  A.  I wouldn't remember.  It was a crazy day.  I wouldn't

17  remember too much.

18          THE COURT:  What were you wearing on that day?

19          THE WITNESS:  A jacket, a scarf, I am not even sure if

20  I had a hat on.

21          THE COURT:  When you say a jacket, you mean

22  something --

23          THE WITNESS:  This.

24          THE COURT:  Something that you wear outside?

25          THE WITNESS:  This jacket.  No.  This is a jacket.

1          THE COURT:  An indoor jacket?

2          THE WITNESS:  Yes.

3    BY MS. KUNSTLER:

4    Q.  How long did that problem with the heat last?

5    A.  I couldn't tell you.  I was running around, so, you know,

6    when you're moving, it gets --

7    Q.  Was it just that one day, or was it over a series of days?

8    A.  I just remember that one day and for me just that one day.

9    Q.  When you spoke to the press, to the New York Times and you

10   said you -- you told the New York Times they just stay huddled

11   up in bed, you were talking about the inmates?

12   A.  Yes.

13   Q.  And when did you observe the inmates huddled up in bed?

14   A.  On one of the extremely cold days.

15   Q.  Was that after the January 27 fire?

16   A.  No.

17   Q.  So you were talking about an earlier incident --

18   A.  Yes.

19   Q.  -- where you saw them huddled up in bed?

20   A.  Yes.

21   Q.  When you told the New York Times, I have several inmates

22   that are very elderly, one of them complained that he had been

23   sick for the last few days, he looked sickly, he's walking

24   slower, talking slower, when were you referring to?

25   A.  Before the January 27 incident.

1          THE COURT:  In what areas of the building did you

2    observe the inmates huddled?

3          THE WITNESS:  In their cells on the fourth floor.

4          THE COURT:  On the fourth floor.

5    Q.  What measures were taken to ameliorate the situation, to

6    make it better for the incarcerated people you observed on the

7    units?  Were they given extra blankets?

8    A.  I don't know.

9    Q.  Did you see any extra blankets being given to them?

10   A.  No.

11   Q.  Were there any space heaters on the unit?  Did you see

12   portable heaters on the unit?

13   A.  No.

14   Q.  Did you see any extra clothing provided to them?

15   A.  No, I didn't see.

16         THE COURT:  So you were wearing more clothing than

17   they were, is that correct?

18         THE WITNESS:  I couldn't really say.  They have sweat

19   suits, they have thermals.  So I couldn't say what they were

20   wearing under their jumpers.

21   Q.  Now, on the day of the fire, it also caused a problem with

22   the electricity?

23   A.  Yes.

24   Q.  And was electricity out on your floor?

25   A.  Partial, yes.

1    Q.  Were the lights out on the unit that you are -- on your

2    unit?

3    A.  Partially.

4    Q.  And when you say partially, what lights were on?

5    A.  What I have been told, they're called twenty -- emergency

6    lights, emergency 24-hour lights.

7    Q.  Did those provide full illumination, or is it a dim light?

8    A.  It's a dim light.

9    Q.  Is this a safe situation for staff on the unit to be --

10            MS. BRETZ:  Objection.

11            THE COURT:  Overruled.

12            She can opine as to the safety as she sees it.

13   A.  I would say no.  It is not a safe situation for the staff.

14   Q.  As a union rep --

15            THE COURT:  Why is it not safe?

16   Q.  Why is it not a safe situation?

17   A.  Since the government shutdown, we have been working a lot

18   of hours.  When you have staff that are working multiple days,

19   more hours than they're used to, then they are not as alert as

20   they can be, and because of the lighting, it is a little

21   darker, so it creates an atmosphere where it makes you more

22   tired.

23   Q.  As a union rep, in your capacity as a union rep, did you

24   hear complaints from union members about either the lights or

25   the heat?

 1    A.  I did.  A few members complained about that it was cold,

 2    particularly at night.

 3    Q.  And as a union rep is it your job to do anything with those

 4    complaints?

 5    A.  I spoke to the union president and let him know what the

 6    complaints are.

 7    Q.  Now, without light, without electricity, what were the

 8    cells like?  Were the cells on your unit dark?

 9    A.  I don't know, because I'm there during the day, and there's

10    light from the windows during the day.

11    Q.  Do you know if any portable generators were brought to

12    bring electricity to the units?

13    A.  I wouldn't know.

14    Q.  Did you see any?

15    A.  I didn't see anything.

16    Q.  Now, were there any issues with medical, with inmates

17    getting to their medical appointments?

18    A.  Not that I am aware of.

19    Q.  Were inmates taken to rec?

20    A.  They rec on the unit.

21    Q.  Were the incarcerated people on your unit allowed out of

22    their cells after the fire, if you know?

23    A.  Yes.

24    Q.  Were they locked in their cells for any period of time?

25    A.  They were locked in the cells during their normal periods,

1   and they were let out a little later than we normally let them

2   out.

3   Q.  So for most of the time they were out of their cells?

4   A.  While I was there, we let them out after breakfast until it

5   was time to lock in for the count.

6   Q.  Were incarcerated people able to go to the law library?

7   A.  I don't know.

8   Q.  You don't know?

9   A.  No.

10          MS. KUNSTLER:  One moment, your Honor.

11  Q.  How do inmates request medical attention?

12  A.  They can do an inmate request to staff on paper and put it

13  in the mailbox, or they can request it through the computer.

14  Q.  Were computers available after the fire -- during the week

15  of the fire after the fire?

16  A.  Sometime after the fire I believe the computers were out.

17  I don't know when they went out.

18  Q.  During the week after the fire, were there family visits?

19  A.  Not that I am aware of.

20  Q.  Have family visits been restored, to your knowledge?

21  A.  I have no idea.

22  Q.  During the week after the visit, after the fire were there

23  legal visits?

24  A.  I don't believe there were.

25  Q.  During the week after the fire, were inmates able to

J25nseg2                    Bencebi - Direct

1   shower?

2   A.   Yes.

3   Q.   Do you know -- strike that.

4        Do you have any inmates on your unit who use

5   respirators or ventilators?

6   A.   I wouldn't know.

7   Q.   Do you have any inmates on your unit who take multiple

8   medications.

9   A.   I wouldn't know.  I don't distribute medication.

10            THE COURT:  Your time's up, counsel.

11            MS. KUNSTLER:  Yes.  No further questions.

12            THE COURT:  Cross-examination?

13            MS. BRETZ:  We have no questions, your Honor.

14            THE COURT:  All right.  Thank you.  You may step out.

15            THE WITNESS:  Thank you.

16            (Witness excused)

17            THE COURT:  Please call your next witness.

18            MR. SPILKE:  Your Honor, the defense calls Anthony

19   Sanon.

20            While the government is getting Mr. Sanon, I just had

21   a question about whether the Court is going to be putting on

22   Ms. von Dornum.  If not, we'll do so.

23            THE COURT:  If you would like to call her, that's

24   fine.

25            MR. SPILKE:  OK.  Thank you, your Honor.

1          THE COURT:  Will you also be calling Inspector Ross?

2          MR. SPILKE:  No, your Honor.

3   ANTHONY SANON,

4        called as a witness by the Defendants,

5        having been duly sworn, testified as follows:

6   DIRECT EXAMINATION

7   BY MR. SPILKE:

8   Q.  Mr. Sanon, where do you work?

9   A.  Excuse me?

10  Q.  Where do you currently work?

11  A.  I work at the Metropolitan Detention Center in Brooklyn,

12  New York.

13  Q.  And what do you do there?

14  A.  I am a senior officer specialist and I am also the

15  president of the union.

16  Q.  Of the local chapter?

17  A.  Yes.

18  Q.  Which union is that?

19  A.  The FGE Local 2005.

20  Q.  As the president of the union, people report to you?

21  A.  Yes, they do.

22  Q.  Regularly?

23  A.  Yes.

24  Q.  That is part of your job?

25  A.  Yes.  That is part of my job as well.

1    Q.  Any member of the union can approach you?

2    A.  Yes.

3    Q.  And bring any grievance they might have or any fear they

4    might have to you, right?

5    A.  That's correct.

6    Q.  And you are aware of the problems at the MDC, right?

7    A.  Yes, I am.

8    Q.  Now, when did the problems with the electricity start?

9    A.  It started I believe -- if I'm not mistaken, two weeks

10   prior of the fire that took place.

11              THE COURT:  Sir, I have a calendar that's sitting

12   there.  On the lower left you will see January and February.

13              You can consult that you would like.

14              THE WITNESS:  Thank you.

15   Q.  The fire was on what day --

16   A.  The fire was on --

17   Q.  -- to your memory?

18   A.  -- Sunday, the 27th.

19   Q.  So the problems with the electricity started a couple of

20   weeks before that?

21   A.  That's correct.

22   Q.  And you learned that from your members or working there?

23   A.  Actually, I was out of the institution when I received a

24   call, and I was told that the institution was in blackout.

25   Q.  Was it how long did that blackout last?

1    A.  It wouldn't --

2              THE COURT:  When did you receive the call?

3              MR. SPILKE:  Yes, your Honor.

4    Q.  When did you receive the call?

5    A.  I am not too sure of the date that I received the call.  I

6    don't have the exact date, but I did receive the call that the

7    institution actually -- actually the power actually went down.

8    Q.  That was approximately two weeks before the fire?

9    A.  Yes.  That's correct.

10   Q.  And you said you don't know how long that outage was?

11   A.  No.  I wasn't in the institution at the time.  That was

12   passed on to my chief and my deputy chief steward of the local

13   to handle the situation.

14   Q.  And do you know what floors were affected?

15   A.  From what I was told, they told me that the entire building

16   was affected at that time.

17   Q.  That includes staff-only floors?

18   A.  That includes everybody.

19   Q.  And does that include security -- withdrawn.

20              Does that include cameras?

21   A.  I am not too sure, because I didn't inquire about the

22   cameras.  I know when the power usually goes down we supposed

23   to be running in some type of emergency power.  So I am not

24   sure -- I'm not sure regarding what was actually on because I

25   can't attest to it because I wasn't at the institution at the

1    time.

2    Q.  And let's just go to the fire on the 27th.

3         When did you first hear about that?

4    A.  As soon as it happened that Sunday I was called around 12

5    p.m., around 12, 12:30 p.m., and I was told that we had a fire

6    the institution.

7    Q.  What systems did that affect?

8    A.  What do you mean, systems?

9    Q.  Meaning electrical.  Did it affect electrical?

10   A.  Well, they told me that the electrical panel actually

11   caught on fire when I received the call.  So I immediately I

12   rushed to the institution to see what was happening.

13   Q.  When you got there, what did you see?

14   A.  When I got there I saw the institution pretty much in the

15   dark.  We had partial lighting, the emergency lights were

16   actually on, and all of the other lights, the main lights were

17   actually off.

18   Q.  Main lights meaning what?

19   A.  Meaning that we have, we have about four or five lights

20   let's say in the hallway, we probably would have at least one

21   or maybe two that was on that would give us enough light until

22   we could see where we were going, because it wasn't completely

23   bright.

24   Q.  What about the cells?

25   A.  The cells, to my knowledge, when I inspected the cells the

1   cells had no lights at all.

2   Q.  So you inspected the jail yourself, right?

3   A.  Yes.  When I came in, I went upstairs, I checked on the

4   officers and I got a full detail of basically what was going on

5   within their working environment, and I was told that the cells

6   had no lights.

7   Q.  And what day was that?

8   A.  That was on Sunday.

9   Q.  Sunday what date?  The date of --

10  A.  The 27th, the date of the fire.

11  Q.  On this tour, who accompanied you?

12  A.  On this tour I did it myself.  When I came in, I

13  immediately went to the fourth floor.  I saw the officers

14  there.  They had additional officers.  I believe that they,

15  they had held up the shift prior because of the situation, and

16  I spoke to them and they were giving the information that they

17  had.

18  Q.  And what was your understanding of -- withdrawn.  Did you

19  receive any complaints about the power outage from your

20  members?

21  A.  Yes.  My members suffered a great deal throughout this

22  power outage as well.  You know, they were complaining of the

23  working conditions, and they were asking me as the union

24  president what was I going to do regarding these conditions

25  that they are working in.

1        THE COURT:  What were their specific complaints?

2        THE WITNESS:  Well, they were complaining that they

3   were actually working without any lights, that it was actually

4   a very dangerous situation for them as well, working inside of

5   the prison, and they were asking me for answers which I didn't

6   have -- I mean, questions -- I mean, they were asking me

7   questions, which I didn't have any answers at the time because

8   the emergency actually just had taken place.  I didn't even get

9   a chance to speak to the management officials yet.

10       THE COURT:  What is the danger if there is not

11  sufficient light?

12       THE WITNESS:  Well, it's a security issue, because we

13  need the lighting to actually see for any type of contraband

14  that's coming into the institution.  So we can see, so we could

15  do our job efficiently.

16  Q.  Were your members also worried about lockdowns?

17  A.  Yes.  During the lockdowns we spoke -- I spoke to a couple

18  of my members during the lockdown, and they were also worried

19  about, about the lockdowns and the movements that was taking

20  place in the institution.

21  Q.  Can you just explain briefly what a lockdown is?

22  A.  A lockdown is when we have an emergency situation in the

23  institution and not only for the officers' safety but also for

24  the inmates' safety that we have to lock down the institution

25  so we could actually have some type of control of the prison.

1   Q.  And were your members also -- did you receive complaints --

2   withdrawn.  Did you receive complaints about inmate morale as

3   well?

4   A.  Inmate morale, yes.  My concern was also for the inmates,

5   for the inmates' morale, because of the security of the

6   institution.  I mean, all of that affects the running of an

7   institution from the inmate population and also to -- also the

8   correction officers as well.

9           I spoke to management officials regarding that, but we

10  needed to, because of the lighting, I guess they needed to

11  actually keep the institution locked down to protect not only

12  the staff, but also the inmate population.

13  Q.  So are you saying that inmate morale affects your members

14  as well?

15  A.  Yes.

16          MS. BRETZ:  Objection.

17          THE COURT:  Overruled.

18  Q.  And were you concerned about efforts being undertaken to

19  restore power to the cells?

20          MS. BRETZ:  Objection.

21          THE COURT:  Overruled.  You may answer.

22  A.  Yes, I was very concerned about the power coming back on.

23  Q.  And did you think that management was taking it seriously

24  in your opinion?

25          MS. BRETZ:  Objection.

1          THE COURT:  Sustained.

2    Q.  Did you bring those concerns to the attention of

3    management?

4    A.  Yes, I did.

5    Q.  And did anything happen?

6    A.  Well, to my knowledge, management told me that they were

7    going to take care of it.  I don't have the power as the

8    president to actually know what management actually is doing.

9    My powers are limited.  It is just to actually ask a question

10   and making sure that things are being done, but from my end I

11   could only hear what they tell me.

12   Q.  And as local president, were you satisfied with the

13   responses you were getting from management?

14   A.  No, I was not.

15   Q.  And on your tour -- how many tours did you do while the

16   lights were out.

17   A.  I did many tours.  I did a tour Sunday throughout the

18   entire day.  I came back Monday.  I did tours Tuesday with

19   Congress officials.  I did many tours.

20   Q.  And what is the temperature like on those tours?

21   A.  Well, it varies.  When we actually did the tour, some areas

22   were cold, and some areas were actually normal temperatures.

23   Q.  Can you just briefly -- what areas would you describe as

24   colder?

25   A.  Well, we have numerous cells inside of the ins -- inside of

1    these housing units.  Some of these cells were actually colder

2    than others within the same unit, and that was a concern.

3    Q.  And were the cells colder than the -- were -- withdrawn.

4    Were the cells colder than elsewhere on the unit?

5    A.  Well, we had two -- I mean, if you are asking for the

6    temperature we had actually two separate issues.  We had a

7    power issue, and we also had a heating issue.

8              I specifically informed management prior of the fire

9    that we had a heating issue in the institution so they could

10   fix it.

11             THE COURT:  When did the heating problem arise?

12             THE WITNESS:  I would say sometime between January 14

13   to the 16th, if I am not mistaken.

14             THE COURT:  Could you describe the problem?

15             THE WITNESS:  When I spoke to management regarding the

16   heating issue, they informed me that they had an actual -- the

17   coil actually froze up, which caused the heating not to

18   actually give any heat.  But my main concern is that the air

19   that was blowing into the institution was actually cold air,

20   and I spoke to the -- I spoke to the warden about it, and I

21   told him that the air that's coming into the institution is

22   actually cold air.  I was instructed by management that they

23   couldn't close -- for some reason, something was going on

24   mechanically with the system, they couldn't close the air

25   vents, so which was allowing the air from outside to actually

1    come inside of the institution.

2              THE COURT:  From what date until what date was there

3    cold air blowing?

4              THE WITNESS:  I'm not too sure, your Honor.  I'm

5    really not too sure of the dates.

6              THE COURT:  You can estimate.

7              THE WITNESS:  I would say between the 14th through the

8    16th, I believe, between those three days, if I'm not mistaken.

9    BY MR. SPILKE:

10   Q.  How many units were affected by these heating problems?

11   A.  Well, at the very beginning the entire building was

12   affected by that.  I had gotten complaints from the officers

13   themselves that they were actually cold.  Then the issue was

14   somewhat fixed.

15   Q.  When?

16   A.  After I spoke to the warden, it was somewhat fixed.  I

17   believe maybe about -- don't quote me because I'm really -- you

18   know, everything -- there's been a lot of things going on, so

19   I'm really, like, the dates are really confusing to me right

20   now.  But I believe that maybe sometime on Thursday, maybe the

21   17th, if I'm not mistaken, you know, we had actually got some

22   type of heat coming into the building.  But the middle of the

23   building, which had the unit team officials the case managers

24   and the unit managers and so forth, that part didn't have any

25   heat.

1          I immediately called the regional vice president and

2     informed them, which he called the regional director, and it

3     just went up the chain from there.

4          I've gotten a call by the warden after those calls

5     were made to actually tour the institution to check the heating

6     within the institution, which we did.  I did that with the

7     warden and the facilities manager, Mr. Maffeo.

8     Q.  About how long ago?

9     A.  We did this last week, the week prior of the fire, I would

10    say Wednesday, the 23rd, or Thursday, the 24th, we did this

11    tour.

12    Q.  And did you say that the heat is temporarily fixed right

13    now?

14    A.  The heat is completely fixed right now.  The institution

15    has -- I went in there today, and the institution has heat.

16    Q.  Have there been chronic issues throughout the years with

17    the heat during winter?

18    A.  I mean, from my knowledge, this is the first time that we

19    actually had this problem in the institution when it comes to

20    heat.

21          MR. SPILKE:  I have nothing further, your Honor.

22          THE COURT:  During the periods when there was no heat,

23    how were the corrections officers dressed?

24          THE WITNESS:  All the corrections officers were

25    actually with scarfs and coats and their hats.

1          Numerous of the correction -- I would say maybe all of

2     the correction officers actually called and were complaining

3     that it was freezing in the building.

4          THE COURT:  How many days do you think that the

5     correction officers were wearing their coats and their scarfs

6     and their hats?

7          THE WITNESS:  I would say about two or three days.

8          THE COURT:  And what about the inmates?  What were

9     they wearing?

10         THE WITNESS:  Well, the inmates were wearing their

11    clothing, they had blankets that they had, they wrapped

12    themselves with blankets that we usually give them when they go

13    to sleep.  They wrap themselves with it as well.  To my

14    knowledge, I can't really say for sure because I don't work the

15    housing unit, but that's what I was told.

16         THE COURT:  Can you tell me what the initials SHU

17    stand for?

18         THE WITNESS:  That's special housing unit.

19         THE COURT:  And what is that?

20         THE WITNESS:  This is where we keep inmates that don't

21    oblige by the rules and regulations of the Bureau of Prisons.

22    It's like a jail within the jail.

23         THE COURT:  So is it a form of punishment?

24         THE WITNESS:  I wouldn't say it is a punishment, but

25    it's a form -- it's a segregation where we keep the inmates

1    that don't really want to behave themselves accordingly inside

2    of the prison.

3            They will go through some type of disciplinary action

4    where we have a disciplinary officer which is called a DHO,

5    which would come out and do a hearing and see if they actually

6    are found guilty of the charges that they have been charged

7    with in the facilities.

8            THE COURT:  Do you know anything about the conditions

9    in the SHU?

10           THE WITNESS:  Somewhat.

11           THE COURT:  In terms of the heat?

12           THE WITNESS:  Well, I haven't really heard the SHU

13   complaints about the heat.  Now, if they did, to my knowledge,

14   your Honor, I didn't get any complaints from the SHU myself.

15           THE COURT:  Any other types of complaints concerning

16   the conditions?

17           THE WITNESS:  The conditions, yes.

18           The special housing officers usually have a lot of

19   complaints regarding special housing.

20           THE COURT:  I am talking about the physical or the

21   ambient conditions.

22           THE WITNESS:  I mean SHU is ran -- I mean, you have

23   two officers there that actually conduct rounds every half an

24   hour that check on the inmates.  They note that into their

25   logbook on the computer system, and if anything would happen or

J25nseg2                    Sanon - Direct

1    anything would -- if any needs, the officers would have any

2    needs to have any complaints, they usually have a SHU

3    lieutenant which is there, which is a management official,

4    where they could actually address their situation for them.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          THE COURT:  Call your next witness.

3          MR. SPILKE:   The defense calls City Coucil member

4   Jumaane Williams.

5    JUMAANE WILLIAMS,

6        called as a witness by the defendant,

7        having duly affirmed, testified as follows:

8          DEPUTY COURT CLERK:  Please state and spell your full

9   name for the record.

10          THE WITNESS:  Jumaane Williams, J-u-m-a-a-n-e,

11   Williams.

12          THE COURT:  You may inquire.

13   DIRECT EXAMINATION

14   BY MR. SPILKE:

15   Q.  Council Member Williams, good afternoon.

16   A.  Good afternoon.

17   Q.  Where do you work?

18   A.  New York City Council.

19   Q.  And in what borough?

20   A.  I represent the 45th District in Brooklyn.

21   Q.  And that encompasses what neighborhoods?

22   A.  East Flatbush, Flatbush, Midwood and Flatlands.

23   Q.  And at some point did you tour the MDC?

24   A.  Yes.

25   Q.  And why did you want to tour the MDC?

J257SEG3                    Williams - Direct

1    A.  We heard about -- saw some things in the news that things

2    weren't going well there, and a lot of people I know were at

3    the scene, and it didn't sound too good, and we went down to

4    check it out for ourselves.

5    Q.  And you actually entered the institution, right?

6    A.  Yes.

7    Q.  Now, were you admitted right away?

8              THE COURT:  On what day did you visit?

9              THE WITNESS:  Saturday.  I don't remember the date.

10             THE COURT:  There is a calendar right there.  On the

11   lower left you will see January and February.

12             THE WITNESS:  I guess that's Saturday the 2nd.

13   Q.  Now, on February 2nd, about what time did you get there?

14   A.  Roughly 2, 3ish.

15   Q.  And how did you get in?

16   A.  How did I get in?

17   Q.  Yes.

18   A.  When we got there, there were some electeds that were led

19   by a delegation of Congressional members, and we went in with

20   them.

21   Q.  Who were those other electeds?

22   A.  Congress members Velazquez, Nadler and Maloney, Council

23   Member Brad Lander, State Senator Zelma Myre, Council Member

24   Keith Powers.  And I may be forgetting someone.

25   Q.  All right.  And were you led around the institution by BOP

1    staff?

2    A.   Yes.

3    Q.   And who is that?

4    A.   There was a few people.  The only one that I remember was

5    Warden Quay.

6    Q.   And how long were you in the institution?

7    A.   I would imagine it was over an hour.

8    Q.   And where did you go in the institution?

9    A.   I don't remember the floors.  I know we went to two

10   different places, one where people were I believe were serving

11   some sort of time and one where people were pretrial.

12   Q.   And how were the conditions there?

13   A.   Wasn't very good.  By then most of the folks had been on

14   lockdown for about 40 hours and hadn't showered in a few days.

15   Q.   So you talked to some people incarcerated there?

16   A.   Yes, a number.  We just went to try to talk some folks

17   through the doors.  We got into a few.  It was pretty

18   astonishing actually.

19   Q.   What jumped out to you the most?

20   A.   Well, just seeing how long people hadn't had showers, how

21   long they were on lockdown.  There were people who we tried to

22   connect to get medical attention.  There was one gentleman

23   physically who had an eye infection, and we tried to connect

24   with him.  There was one person who was told he would be able

25   to see a psychiatrist; he hadn't seen one since he got there.

1  Probably the most astonishing thing was the lack of urgency

2  from anyone.  It was literally amazing.  There was no urgency

3  to fix the conditions that were there.  That was evidenced by a

4  lot of questions that were asked.  Congressman Nadler asked the

5  warden what about CPAP machines, and the warden said he hadn't

6  thought of that.

7  Q.  What's a CPAP machine?

8  A.  It's for people with sleep apnea.

9  Q.  And why would that have been affected by the conditions?

10  A.  Because electricity was out.  We asked a lot of questions

11  about -- in particular the city had offered emergency blankets

12  and emergency warmers, and we kept asking why would you not

13  receive those.  There wasn't an answer for a while, and then he

14  finally said it wasn't an emergency; now that it's an

15  emergency, perhaps we will.  It was just astonishing.

16  Q.  As a council member, you were involved in trying to deliver

17  that aid to the MDC?

18  A.  Yes.  After we found out the answer, I reached out to the

19  Mayor's office to say we need to push again, just get the

20  trucks there, at least have them there.  And apparently that

21  night they finally did receive them, but when we went the next

22  day they had not even distributed them the next day.

23       One of the things that was most astonishing as well

24  was there seemed to be no emergency plan, and there seemed to

25  be no plan to create a plan, just a matter of waiting.  The

1    warden kept saying the contractor came, left, may be back on

2    Monday.  We were like, what are you talking about?  Like get

3    another contractor out here.  There are people who don't have

4    adequate heat and hot water and haven't showered and medical

5    attention; get it done.

6            Also, there was no plan at all to communicate with

7    people who were there and let their families know that they

8    were OK.  Just no one cared about that.  And I took as many

9    numbers as I could and connected with those families, and they

10   were very grateful because they had heard absolutely nothing to

11   that point.

12   Q.  Were they surprised by what you had witnessed?

13   A.  They were.  But they were just thankful.  I just tried to

14   get across from what I could see to loved ones at least

15   physically were OK except for the two people I saw.

16   Q.  Let's just go back to the attempts to deliver materials to

17   the MDC.  You said let's just get the trucks there, or

18   something like that.  The trucks were carrying what?

19   A.  Hundreds of blankets and hand warmers, from what I

20   understood, and generators, some portable generators.

21   Q.  And what agency arranged that?

22   A.  I reached out to the Mayor's office.  I assumed it was OEM.

23   Q.  And how quickly after you reached out to the Mayor's office

24   were those trucks ready to go?

25   A.  Very quickly.  So my understanding is they had offered them

J257SEG3                    Williams - Direct

1    before and they didn't receive them.  I'm sure a lot of other

2    folks made calls in addition to myself, but when I called they

3    said they're working on it, you have to call back, that they

4    were on their way.  It was probably less than an hour, to be

5    honest.

6    Q.  And on February 2, when you're doing the tour with Warden

7    Quay, and he said now it's an emergency --

8    A.  Yes.

9    Q.  -- did you ask whether he considered it an emergency before

10   that day?

11   A.  He wouldn't answer some of my questions.  There were

12   repeated asking now it's an emergency?  The question is where

13   is your plan, you don't seem to have a plan, this doesn't seem

14   to be urgent to you at all.  He seemed to -- there was just

15   motions -- some folks seemed to be annoyed that we were there,

16   even annoyed that we cared about the prisoners and the people

17   who were there.  He went through the motions of allowing us

18   there but it just rose to the level of an urgent situation.

19   Q.  And what did Warden Quay say he would do?

20          MS. BRETZ:  Objection.

21          THE COURT:  Sustained.  Counsel, let's get to the

22   condition at the prison.

23          MR. SPILKE:  Yes, your Honor.

24   Q.  Now, I believe you mentioned that a common complaint was

25   the lockdowns.  What did you learn the length of the lockdowns.

1    To be?

2              MS. BRETZ:  Objection.

3              THE COURT:  Sustained.

4    Q.  Now, you spoke to how many -- approximately how many

5    inmates?

6    A.  I would say in the neighborhood of eight to ten.

7    Q.  And was there any light in the cells?

8    A.  There didn't seem to be any light.  We happened to go in

9    during the day, but there was no -- it didn't seem like any

10   lights worked.  Some of the cells ranged from one person saying

11   it was too hot, there was another person saying there was

12   inadequate heat.  When we went in to at least two of the cells

13   it did seem to have inadequate heat, and I can imagine if it

14   was a few days before they would have been freezing.

15   Temperatures fell that night.

16             There were also boarded up vents in most of the cells.

17   We asked them why, and they said because cool air keeps coming

18   through, they were trying to stop the cool air from coming

19   through.

20   Q.  What did they use to block the vents?

21   A.  It seemed like some sort of cardboard.  They made some kind

22   of makeshift way to hold it.  That was kind of ubiquitous from

23   what we saw.  We got one of them lifted up, and we did feel --

24   I can't say it was freezing cold, but it did feel cool.  It

25   didn't feel like there was really heat coming through.

1  Q.  And when you were touring, did you see any inmates out of

2  their cells?

3  A.  No.  They said they were on lockdown.  At that point, at

4  the point we had been there -- for 40 days -- sorry, 40 hours,

5  and they hadn't showered for three days.

6           THE COURT:  Counsel.

7           MR. SPILKE:  My time is up Council Member Williams.

8           THE COURT:  Cross-examination.

9           MS. BRETZ:  We have no questions, your Honor.

10           THE COURT:  You may step down.

11           (Witness excused)

12           MS. KUNSTLER:  Your Honor, the defense calls Donnell

13  Murray.

14   DONNELL MURRAY

15           MR. OESTERICHER:  Your Honor, if I might just raise a

16  scheduling issue before the witness testifies.  We have an

17  assistant warden here who is also under order to testify in the

18  Eastern District at 2:30.  We were not affirmatively planning

19  to call the assistant warden, but we bought him here in case

20  there were questions he could answer, and I don't know if they

21  intend to call him.  But if we could take him out of turn after

22  this witness, we would greatly appreciate it.

23           MR. SPILKE:  No objection.

24           THE COURT:  All right.

25

1

2    DONNELL MURRAY,

3         called as a witness by the defendant,

4         having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MS. KUNSTLER:

7    Q.  Good afternoon, Mr. Murray.  I'm right here.  So are you

8    incarcerated at MDC Brooklyn?

9    A.  Yes.

10   Q.  And when did you arrive there?

11   A.  January 13th of 2017.

12   Q.  And what unit are you on?

13   A.  Unit 51.

14   Q.  And can you tell me about your experience -- were you aware

15   of a fire at the facility on January 27?

16   A.  Yes.

17   Q.  Can you tell me about your experience after that fire?

18   A.  The lights was out, the heat was off, and we was locked in.

19   Q.  And what was that like for you, sir?

20   A.  It was pretty bad.

21        THE COURT:  How so, sir?

22        THE WITNESS:  Well, it was hard on me because it was

23   dark, it was cold, I was nervous because I didn't know what

24   really was going on.

25   Q.  Were you able to shower during this time?

1   A.  No, I wasn't.

2   Q.  How long were you without a shower?

3   A.  I didn't get a shower until that -- until Monday.

4   Q.  So you didn't get to shower until the following day?

5   A.  No, until Monday of this week.

6   Q.  So from Sunday, January 27 to Monday of this week you went

7   without a shower?

8   A.  Yes.

9   Q.  Now what about the temperature?  What was the temperature

10  in your cell during this time?

11          MS. BRETZ:  Objection.

12          THE COURT:  Overruled.  If he knows.

13  Q.  If you know.

14  A.  30 to 40 degrees.

15  Q.  How do you know the temperature in your cell was 30 to 40

16  degrees?

17  A.  A CO came in there with a temperature reader, and he told

18  us.

19          MS. BRETZ:  Objection to the response, your Honor.  We

20  believe that's hearsay.

21          THE COURT:  I'm going to allow the answer.

22  Q.  So the CO took a reading in your cell?

23  A.  Yes.

24  Q.  And he told you what that reading was?

25  A.  Yes.

1   Q.  Now, what was the CO wearing at this time when he came into

2   your cell?

3   A.  He had on a hood, a jacket, and he like a skull cap over

4   his head.

5   Q.  And what were you wearing?

6   A.  A sweat suit.

7   Q.  Did you see COs bundled up during this time other than this

8   one CO who came to your cell?

9   A.  Yes.

10  Q.  What were they wearing?

11  A.  Jackets, hoodies, hats.

12  Q.  Were you bundled up during this time?

13  A.  No.

14  Q.  Why not?

15  A.  I didn't have anything to bundle up with.

16  Q.  Did you have access to commissary during this time?

17  A.  No.

18  Q.  Now, apart from the CO checking the temperature, did you

19  notice the temperature changed during the week, or was it

20  consistently cold?

21  A.  Yes, it was cold.

22  Q.  Did it get any better?  Do you know what day the CO tested

23  the temperature?

24  A.  No.

25  Q.  Did you notice during the course of the week the

1  temperature in your cell get better?

2  A.  Get better?

3  Q.  Yes, improve.

4  A.  No.

5  Q.  What was the air -- was there air coming from the vent in

6  your cell?

7  A.  Yes.

8  Q.  What was that air like?

9  A.  Cold air.

10  Q.  How was your mental health during this period?

11  A.  I was struggling trying to stay -- you know, like stay warm

12  and stay, you know -- keep my spirits up.

13          THE COURT:  How did you stay warm?

14          THE WITNESS:  We had to like walk around in a cell and

15  wrap my blanket around me and get under the covers.

16  Q.  And this situation continued for how many days?

17  A.  It didn't improve until Sunday.

18          THE COURT:  So how many days was that?

19          THE WITNESS:  About a week.

20  Q.  Did you ask for medical attention during this time?

21  A.  No.

22  Q.  Did you ask for mental health treatment during this time?

23  A.  Yes.

24  Q.  When did you ask for mental health treatment?

25  A.  Monday, yesterday.

1    Q.  And have you received mental health treatment?

2    A.  No, I didn't.

3    Q.  Now, you're about to go to trial, sir; is that correct?

4    A.  Yes.

5    Q.  When is your trial scheduled to start?

6    A.  February 19.

7    Q.  When was the last time you saw your lawyer?

8    A.  The beginning of January.

9    Q.  Have you seen the 3500 material in your case?

10   A.  No, I haven't.

11   Q.  Is this a cause of stress for you not seeing your lawyer

12   and not seeing the 3500 material in your case?

13   A.  Yes, it is.

14   Q.  Is this the reason that you asked for mental health

15   treatment?

16   A.  Yes.

17   Q.  Now, how many days of trial are scheduled, if you know?

18   A.  I don't know.

19          MS. KUNSTLER:  One moment, your Honor.

20   Q.  How many weeks of trial are scheduled, if you know?

21   A.  I don't know.

22   Q.  Did you have access to -- what was the water like in your

23   cell?

24   A.  It was cold.

25   Q.  Did you have access to hot food during this period?

J257SEG3                    Murray - Direct

1    A.  The food was cold when it came to my cell.

2    Q.  Do you feel ready for trial in your case, sir?

3    A.  No, I don't.

4           MS. KUNSTLER:  No further questions.

5           THE COURT:  Did you observe other inmates while you

6    were feeling cold?

7           THE WITNESS:  Only the person that was in my cell.

8           THE COURT:  And what was that person wearing?

9           THE WITNESS:  He was wearing the same thing,

10   sweatshirt.

11          THE COURT:  Did you complain about the cold to anyone?

12          THE WITNESS:  Yes.

13          THE COURT:  Who did you complain to?

14          THE WITNESS:  To the officer that was on duty at the

15   time.

16          THE COURT:  And when did you make your complaint?

17          THE WITNESS:  I told him it's cold, and he said --

18          THE COURT:  When?  When did you complain?

19          THE WITNESS:  On that -- on that Monday, the 28th.

20          THE COURT:  Cross-examination.

21          MS. BRETZ:  We have no questions, your Honor.

22          THE COURT:  Sir, you may step down.

23          (Witness excused)

24          MR. SPILKE:  The defense calls the assistant warden,

25   to be identified by the government.

J257SEG3                    Garcia - Direct

1

2    ELEAZAR GARCIA,

3         called as a witness by the defendant,

4         having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MR. SPILKE:

7    Q.   Mr. Garcia, where do you work?

8    A.   MDC Brooklyn.

9    Q.   What's your title?

10   A.   Associate warden of operations.

11   Q.   Associate warden of operations?

12   A.   Correct.

13   Q.   How many associate wardens are?

14   A.   There's three.

15   Q.   And there is operations and what else?

16   A.   Custody and programs.

17   Q.   And operations also -- operations oversees the facilities?

18   A.   Correct.

19   Q.   And the function of the facilities?

20   A.   Correct.

21   Q.   And I imagine that you toured the facility after the fire

22   on January 27, right?

23   A.   I was actually there at one o'clock and left at one

24   o'clock.  I left and I got the phone call that there was a

25   fire, and I immediately responded.

1    Q.  At one o'clock p.m. or a.m.?

2    A.  P.m.

3    Q.  And you immediately got there?

4    A.  Yes.

5    Q.  And what did you observe?

6    A.  I observed NYPD fire department there.  Correction on the

7    time.  The time was I think approximately 3 p.m. when I left my

8    home to get to MDC Brooklyn.

9    Q.  And operations also oversees phone systems, right?

10   A.  Correct, which falls under inmate trust fund.

11   Q.  All right.  So after the fire, some phones were still

12   operational, right?

13   A.  Staff phones were operational.

14   Q.  And phones to the Federal Defenders?

15   A.  Yes.

16   Q.  And what about inmate phones?

17   A.  They were not.

18   Q.  And why is that?

19   A.  They are on a software which is accessed through 2 Net

20   which are monitored, because we monitor those phone calls for

21   security concerns.

22   Q.  And can you please just explain more why that would affect

23   the functionality of the phones.

24   A.  Can you explain that a little bit in regards to that?

25   Q.  Yes.  So I asked why the inmate phones weren't working, and

J257SEG3                    Garcia - Direct

1    I think it might be fair to summarize that there is a software

2    system that operates those phones.  My question is why would

3    the software system affect the phone's functionality?

4    A.   To explain to you, they're on a different breaker system, I

5    guess you call it the number 3 system, which provides the power

6    to that software system or computer system.  It's a very big

7    computer system.  It also covers commissary and other areas

8    that inmates function -- inmate trust fund part of it.

9              In order to monitor the phone, we have to monitor for

10   the safety of staff and inmates alike and public officials

11   because inmates could actually use these phones to solicit, you

12   know, other crimes or threats to the community.  Those were

13   down.  That's why the inmates didn't have access to those

14   phones.

15   Q.   So let me just see if I understand.  The outage -- the

16   power outage knocked out the computers.

17   A.   Yes.

18   Q.   And not having the computers meant that the facility

19   couldn't monitor the phone calls.

20   A.   Correct.  But it wasn't that -- the reason there was no

21   power to the computer system.

22   Q.   No power to the computer system.

23   A.   Correct.

24   Q.   But the phones could have still worked without being

25   monitored during that time?

1    A.  I'm not the expert in that area, sir.

2    Q.  Understood.  And the computers are out because of the power

3    outage.  How long did the power outage last?

4    A.  From the fire until yesterday.  So we had the power

5    effective with Super Bowl Sunday, right before the Super Bowl

6    kicked off.

7    Q.  So February 3.

8    A.  Correct.

9    Q.  So 1 p.m. January 7 -- January 27 through February 3?

10   A.  When I was notified it was about 3 p.m. there was a fire,

11   so I responded.  I would say from 3 until 1:30 p.m. Super Bowl

12   Sunday.

13   Q.  OK.  And the computer systems, you said there is no

14   commissary when the computers are down, right?

15   A.  That's right.

16   Q.  Does the facility distribute thermal underwear to the

17   inmates?

18   A.  I don't want to speculate in regards to that, whether if we

19   have them or not to distribute to the inmates.  I know they're

20   made available for purchasing through the commissary.

21   Q.  Not for free?  Withdrawn.

22        Certain things like socks and shoes are provided?

23   A.  Socks, shoes, are standard basic issue, correct, we do make

24   those available.

25   Q.  Thermals are not standard basic issue.

1    A.  Correct.

2    Q.  You would have to get them through commissary?

3    A.  You would purchase them through commissary.

4    Q.  Now, what else do you need to do with the computers as an

5    inmate?

6    A.  You also utilize the e-mails through the computer system

7    also.

8    Q.  And those e-mails are used to communicate with lawyers and

9    family?

10   A.  Yes.

11   Q.  And friends, I imagine.

12   A.  Yes.

13   Q.  So no computer means no e-mails.

14   A.  Correct.

15   Q.  Whatsoever.

16   A.  That is correct.

17   Q.  Does the facility distribute stamps?  Withdrawn.

18            Outside of commissary, does the facility distribute

19   stamps?

20   A.  To inmates they distribute stamps to indigent inmates upon

21   request if the inmate does not have stamps.

22   Q.  How many?

23   A.  Depends.  It depends on the situation.  I mean if the

24   inmate has a legal package that weights a certain thing that

25   they need to weigh it, that's going to take more stamps than a

1    letter that goes out, just a basic letter.

2    Q.  Do you know if the facility was sending more than average

3    letters out during the week of the outage?

4    A.  Mail was still being sent out.  There was normal operations

5    for mail.

6              THE COURT:  Counsel, let's keep to the conditions.

7              MR. SPILKE:  Yes, your Honor.

8    Q.  Now, no computer means no commissary, no e-mail, no phone.

9    What else?

10   A.  No intelligence for us.  If we had to do some form of

11   intelligence research, we were not able to use the system.  It

12   also ties our hands to if an incident were to happen, we were

13   unable to generate an incident report that we have to report.

14             THE COURT:  What do you mean by intelligence?

15             THE WITNESS:  For example, if we received an inmate

16   that comes in from another institution, if we had to do some

17   research on that particular inmate as to any type of -- if he

18   was either an STG, which is gang affiliated to any other gangs,

19   or if he was involved in any other incidents or disturbance, we

20   would utilize this system to look into it, which is called True

21   Links.

22   Q.  Now, the loss of intelligence functionality, was that the

23   reason for 20 plus hour lockdowns every day?

24   A.  No, sir.

25   Q.  What was the reason for that?

1    A.  In regards to the lockdown, after the fire we did a

2    modified operation in the institution.  Inmates were allowed to

3    come out for breakfast one tier at a time, and if breakfast

4    went fine, then the inmates were allowed to be out among the

5    flats, which is the common areas to shower, to use the public

6    defender phone, sit around and play cards or anything they

7    wanted to do.  That's how we started operating after Monday.

8    Throughout the night and the afternoon, because we had access

9    to hot meals, inmates were given hot meals for lunch and

10   dinner, and that was the protocol, the standard practice.  That

11   was the field for Monday.

12           Now we went into Tuesday.  If we didn't have any

13   issues, we opened up, inmates were allowed to be out and about.

14   Once the count cleared, they came out and ate breakfast and

15   were able to sit at the common area tables.  That was the

16   process throughout the week, until Friday when the elevator

17   system went down.

18           I was acting warden at the time, ma'am, and once we go

19   to one elevator I secured the institution due to security and

20   safety concerns of staff and inmates.  That's when I decided to

21   secure the institution.

22   Q.  Now, turning back to the computers.

23   A.  Yes.

24   Q.  Can you explain to the Court what a cop-out is?

25   A.  Inmate cop-out, there are two forms of putting out a

1    cop-out.  I have been doing this for over -- it will be 24

2    years in July.  Before the inmates used to submit a form on a

3    cop-out.  They also can do it on a plain piece of paper,

4    requesting anything they wanted.  If it had to do with, you

5    know, stamps or anything like that, we would put it in there,

6    it's called an inmate request to staff.  That's the main title

7    of the form.  Now they have access to e-mail, they submit it

8    electronically.

9    Q.  But e-mail is down.

10   A.  The e-mail is down, but they can also submit it in writing.

11   Q.  And were inmates doing that?

12   A.  To my knowledge, without walking through the units, a

13   couple of inmates handed me handwritten notes to see what the

14   issues were, and they were explained to them when I was there.

15   Q.  And the handwritten notes were cop-outs?

16   A.  Cop-outs, that's what they're called.

17   Q.  And there are medical cop-outs?

18   A.  The ones I received, they just wanted to say, hey, what's

19   going on, can you tell me what's happening.

20   Q.  Did they get a response?

21   A.  Yes, right there in person.

22   Q.  But no medical cop-outs were submitted?

23   A.  Not to me, sir.

24   Q.  So you don't know.

25   A.  I'm not going to speculate or respond to that.

1  Q.  Right.  And what about refills of medication?

2  A.  When staff coming to the units, they were passing out

3  medication.  They would go around and provide medication, and

4  while another staff member went around and picked up cop-outs

5  or what we call sick call forms.

6  Q.  Can you explain the difference between the pill line and

7  refills?

8  A.  If an inmate -- depends on the situation.  If an inmate is

9  allowed to carry, med carry, and he needed a refill, he would

10  turn that refill in, and they would bring that refill back to

11  the inmate.  OK?

12        If the inmate is on pill line, then he would have to

13  come out to the pill line and say now we have pill line, or the

14  staff member, if they were secured in their cells, they would

15  actually physically bring the pills to the inmate's cell.

16  Q.  Right.  So is it fair to summarize that for a refill you

17  can keep those -- that medication in your cell?

18  A.  That is correct.

19  Q.  But for a pill line, that's not medication you can keep in

20  your cell, you have to take it right there, right?

21  A.  Yes.

22  Q.  Pill line was still going, right?

23  A.  Pill line was still going.  Now, if we're on modified

24  operation, if the inmates were out and about and they were

25  delivering the pills and they see the inmates are out and

J257SEG3                    Garcia - Cross

1    about, the inmates would come to the staff member to receive

2    the pills.  Now, if they were still secured, the staff member

3    would go to the cell.

4    Q.  Now, as far as you know, the people incarcerated at the MDC

5    were still able to refill their prescription.

6    A.  Correct.

7    Q.  But they couldn't request it over the computer.

8    A.  That is correct, sir, the computers were not operational.

9           MR. SPILKE:  Nothing further.

10          THE COURT:  Cross-examination?

11   CROSS EXAMINATION

12   BY MS. BRETZ:

13   Q.  Good afternoon.  I believe you mentioned there was a

14   lockdown on Friday, February 1; is that correct?

15   A.  That's correct, ma'am.

16   Q.  Why did the institution go on lockdown?

17   A.  It went on lockdown due to the operations of the elevators.

18   We were limited to one operator at the time, and we had an

19   agreement with the local union that should we go down to one

20   elevator, we will secure the inmates in their cell for security

21   and safety concerns.

22   Q.  Can you explain what those security and safety concerns

23   would be.

24   A.  Should we have an emergency, for example, if we had an

25   inmate on the seventh floor, if the elevator was being utilized

1     for other things like to run food carts, that would tie it up.

2     It would also impede staff to respond to the seventh floor,

3     including medical and the operations lieutenant, so that would

4     impede the staff member in responding and providing that

5     emergency aid, so that's why we limit it to one.  If we are

6     limited to one elevator, we secure the inmates in their cells.

7     Q.   Thank you.  And how long did that lockdown go on?

8     A.   The lockdown went on the Friday.  Then we opened up for a

9     modified operation as soon as the count cleared, and that's

10    when we started having a lot of these issues in regards to

11    assaults.  We had a couple of emergency situations, and that

12    caused a lot of problems and we went into a secure lockdown.

13    Q.   So the lockdown was reinstated?

14    A.   Correct.

15    Q.   When was that?

16    A.   That was later on that evening, Friday.

17    Q.   And how long did that go on for?

18    A.   It went on until the next day, because then that's when the

19    protests and everything else started, and the threats towards

20    of course myself, the administration, the institution, so we

21    went ahead and locked the institution down.

22              MS. BRETZ:  Thank you very much.

23              THE COURT:  Redirect?

24              MR. SPILKE:  No, your Honor.  None.

25              THE COURT:  You may step down.

1          (Witness excused)

2               MS. KUNSTLER:  Your Honor, the defense calls Dierdre

3     von Dornum.

4      DIERDRE VON DORNUM,

5          called as a witness by the defendant,

6          having been duly sworn, testified as follows:

7     DIRECT EXAMINATION

8     BY MS. KUNSTLER:

9     Q.  Good afternoon, Ms. von Dornum.

10    A.  Good afternoon.

11    Q.  Ms. von Dornum, where do you work?

12    A.  The Federal Defenders of New York.

13    Q.  And what is your title at the Federal Defenders of New

14    York?

15    A.  Attorney in charge.

16    Q.  And how long have you been attorney in charge?

17    A.  Three years.

18    Q.  And how long have you been at the Federal Defenders of New

19    York?

20    A.  16 years with a two year hiatus to teach law at NYU School

21    of Law.

22               MS. KUNSTLER:  Your Honor, I have here what is marked

23    as Defense Exhibit C.  May I approach?

24               THE COURT:  You may.

25               MS. KUNSTLER:  The government has consented to the

1    admission of this document, but I will authenticate it with the

2    witness.

3    Q.  Ms. von Dornum, have you had a chance to review the

4    document in front of you?

5    A.  I have.

6    Q.  And can you tell us what it is?

7    A.  Yes, it's a declaration I submitted in support of a civil

8    suit filed on behalf of the Federal Defenders in the Eastern

9    District of New York yesterday.

10   Q.  And are there -- aside from the declaration, are there any

11   other documents appended at the back?

12   A.  Yes, there are a number of exhibits, most of which

13   constitute e-mails sent by my office by Adam Johnson and Nicole

14   McFarland, the legal department of the BOP.  Also on the

15   e-mails are several assistant United States attorneys including

16   Mr. Oestericher, Mr. Eichenholtz who sits there in the back,

17   and other defense lawyers and prosecutors.

18   Q.  And were you a party to these e-mails either on cc or as

19   the author of these e-mails?

20   A.  I was.

21          MS. KUNSTLER:  Your Honor, I move to admit Defense

22   Exhibit C.

23          THE COURT:  It is admitted.

24          (Defendant's Exhibit C received in evidence)

25   Q.  How did you become aware, Ms. von Dornum, that there was a

1   fire at the MDC?

2   A.  I first became aware that on Sunday, January 27, in the

3   afternoon when lawyers began contacting me saying that they had

4   been in the visiting room of the MDC when they were alerted

5   that a fire had occurred.  All of the clients they had been

6   meeting with were herded into a single room together and locked

7   in in the visiting room.  The lawyers were made to line up

8   against the wall.  They started to smell acrid electrical

9   smell.  And after about half an hour they were led out.  There

10  were firefighters trying to get in, but there were I guess

11  issues with how to do the security on that.  Then when the

12  lawyers went out, there were four fire engines outside.

13  Q.  And how did this fire affect your ability to do your job?

14  A.  It affected it in several ways.  First of all, from that

15  point on, after the lawyers were escorted out, there were no

16  legal visits permitted to MDC Brooklyn until yesterday.  So,

17  for a full week we were not able to visit with our clients,

18  including people that we had hearings for, sentencings for,

19  preparing for trial, and people in my personal case who I was

20  trying to file first act motions on behalf of people with

21  medical and psychiatric problems who I would ordinarily visit

22  with.  Obviously, that then is multiplied by all the other

23  people in our offices.  We have between 500 and 600 clients

24  there at any one time, so a large part of the population is

25  represented by my office.  None of us were able to see a

1    client.

2    Q.  And what is your measure of the BOP's response to this

3    situation?

4    A.  Well, I would say the first problem with the response was a

5    lack of information.  We were not notified about the fire by

6    the BOP at all.  What we were told is a simple e-mail saying

7    legal visiting is canceled tomorrow.  And I wrote back

8    immediately and said I've heard there is a fire; are the

9    inmates OK; what are the conditions there; was anyone injured;

10   were any COs injured?  And there was no response, and then a

11   subsequent response that was like there is an institutional

12   situation.  No response on how the inmates were.  No

13   information about other conditions, heat, or light, or

14   lockdown.

15        And as the clients got let out occasionally and our

16   federal defender phone was working, we were hearing truly

17   alarming reports.  Most of our information came from defendants

18   who were brought to court for a prescheduled court appearances,

19   and they were still able to come.  I was in the middle of a

20   multi-day bail hearing on an inmate at the MDC who has only one

21   kidney and already the magistrate judge in Brooklyn was very

22   concerned even before all of this happened and was asking for

23   reports, so Judge Orenstein in Brooklyn was pursuing the

24   conditions already, and we were hearing from the inmates about

25   being on lockdown and the heat and the lack of light, no food.

1   And the BOP still was telling us nothing.  So we were asking

2   repeatedly can you just let us know how long is it going to go

3   on, what's happening, what's the conditions there.  And the

4   response we got was, you know, either none, or to say heat has

5   not been affected, yes, some of the lights are out, but we have

6   emergency lights, and medical care is fine.

7            And it was hard to reconcile what we were hearing.  I

8   was hearing from inmates all over the building with no

9   connection to each other, English, French and Spanish speakers,

10  all saying the same things, and that gave me a real feeling of

11  this is not an isolated unit who is upset, or one problem.  And

12  I felt badly for the prosecutors in our criminal cases because

13  they would read from their phones and say Nicole McFarland says

14  there are no problems at the institution, your Honor, and the

15  judges would just be puzzled about how to reconcile that.

16           So I would say to me the problem with the BOP response

17  to us was the lack of information and then the denial, which

18  turned out to be some of it not true.

19           And then I guess there is the other part of the

20  response that when Chief Judge Arrizar ordered me and

21  investigator Ross into the institution on Friday, if anything,

22  more alarming, the Bureau of Prisons may have no responsibility

23  to report to me on conditions and they may not be able to

24  control power, but I do think they can provide blankets; they

25  can provide flashlights.

1          MS. BRETZ:  Objection, your Honor.  I just would move

2     to strike a few parts of this response.  The first I believe

3     Ms. von Dornum mentioned that some of the responses were not

4     true.  That's conclusory.  Then there is some lack of personal

5     knowledge that's been indicated in this response, including

6     where we were I believe just going.

7     Q.  Well, did you have a basis to know that the responses were

8     untrue?

9          THE COURT:  You may answer.  I will rule, but you may

10    answer.

11    A.  I did, yes.

12    Q.  And what was that basis?

13    A.  Well, for example, Nicole McFarland represented that

14    medical care continued without problem.  I spoke to clients

15    with open wounds not getting treatment.  I spoke to clients who

16    had bloody sheets from colitis and couldn't change their sheets

17    and couldn't get care for the colitis.  I spoke to numerous

18    clients not getting psychiatric medications.  And I spoke to

19    some of those clients with Nicole McFarland standing next to me

20    indifferently, and so I had personal knowledge.

21         At the time I was taken aback.  As to other

22    statements, I mean Warden Quay informed the Southern District

23    District Executive directly that the heat was unaffected.  I

24    went in the building.  On the side facing the water, the Upper

25    New York Bay, there was frost on people's windows.  They were

1    covered in blankets, in towels and on their beds.  It was pitch

2    black, and people were begging me to call their lawyers.  And

3    inspector Ross and I went cell to cell taking down people's

4    names and lawyer numbers.  So, I have personal knowledge that

5    what the warden said was false.

6             THE COURT:  The objection is overruled.

7             MS. KUNSTLER:  Thank you, your Honor.

8    Q.  Now, can you describe -- what reports did you get about

9    lack of medical treatment and how medical treatment was

10   working, if at all, on the units?

11   A.  So, one basic problem was that because the computer system

12   was down, the Core Link system, that's the way in which inmates

13   request medical care and request refills of their

14   prescriptions, so I saw one when Investigator Ross and I were

15   there -- and we were there for almost four hours together -- I

16   saw what they call the pill line, which is a guard coming

17   around with a cart of pills, and people were receiving those

18   medications.  But Lieutenant Ramos, the SHU lieutenant, who

19   also joined us on some of the other floors, confirmed that

20   people who were out of their medication, people who have it in

21   their cells -- and that's usually high blood pressure, heart

22   medication, some psychiatric medications -- if they had run

23   out -- and they don't give them large supplies for reasons you

24   can understand -- they were unable to get refills because the

25   computer system was down.

1          Also people who had medical needs, usually you put in

2     that request to get a wound cared for, or something else

3     through this computer system, and so there was not a system in

4     place for that.

5          I talked to people who said they had seizures and

6     pressed the emergency button and no one came.  I talked to a

7     man, there was one unit where -- everybody was mostly on

8     lockdown, but there was one unit where the inmates were let

9     out, I believe it was 61 when I visited, unit J61, and a man

10    came over to me, a young African American man, with his hand

11    wrapped in bandages, and you could see the puss coming through

12    it, and he said it hadn't been changed in the two weeks since

13    he had been there; that he had been shot in the hand during his

14    arrest, taken to Kingsbrook Hospital, and that he kept asking

15    for someone to change it because he was so scared of the

16    infection.  And I turned to Nicole McFarland and said, can we

17    help him?  And she just wrote something down on her piece of

18    paper.  I spoke to him yesterday when he called our office, and

19    his bandages had not been changed, and that was as of

20    yesterday, when, yes, the lights were on, but the medical care

21    problems have continued.

22    Q.  I'm going to ask you to look at page 5 of your declaration.

23    On that page you have a report from Warden Quay about the

24    conditions at MDC that was issued on -- when was that report

25    issued?

1          THE COURT:  Does your declaration make specific

2    references to individuals who are identified?

3          THE WITNESS:  Your Honor, in the affidavit, because it

4    was publicly filed, I did not reference for their privacy

5    reasons the client's name.  I filed a formal memorandum with

6    Chief Judge Arrizar, which contains the same information but

7    specifies person by person the inmate's name, register number

8    and lawyer.  And the government at least in the Eastern

9    District has a copy of that memorandum as well, and it goes

10   through each person, and I can certainly provide a copy of that

11   to the Court.  I didn't want to publicly file that.

12         THE COURT:  Go ahead.  Back to the warden.

13         MS. KUNSTLER:  Thank you, your Honor.

14   Q.  So, when was that statement issued?

15   A.  My understanding is that Warden Quay spoke directly to the

16   District Executive here in the Southern District on February 1.

17   That was at the time when Chief Judge McMahon and Chief Judge

18   Arrizar were concerned about the conflicting reports, and

19   District Executive Ed Friedland had called Warden Quay and

20   asked him for a report of what was happening, and this was what

21   Mr. Friedland reported to our chief judge.

22   Q.  Now I'm going to ask you to look at that.  And could you

23   identify for us how many inconsistencies you see with what you

24   saw on your tour of the facility or what you learned from phone

25   calls with inmates, not just how many, but what the

1   inconsistencies are.

2   A.  I guess the first place I would at least pause over is in

3   the third to fourth lines of Warden Quay's statement, which

4   says "What this means is that there is no power to the outlets,

5   which includes lighting in the cells, however, the rest of the

6   cell blocks have lights."  So, I would say that's not false but

7   misleading.  When I was there, the emergency lights were on,

8   and so there was lighting, but it was dim, and it was pitch

9   black in the cells.  The showers were also dark, and a lot of

10  the other auxiliary rooms like the recreational rooms, so it

11  was a lot more than just outlets, because there was no way for

12  the emergency lights to penetrate the cells or showers or other

13  areas.

14      The second part which I would say is false is the

15  continuing on, "Inmates have not been confined to their cells

16  and are still allowed leisure recreational activities."

17      It is my understanding from talking to over 60 inmates

18  that from the time of the fire that inmates were confined for

19  about 24 hours entirely, and then over the next few days let

20  out for brief periods to eat or have showers, and then confined

21  again, starting Thursday afternoon.  Starting Thursday

22  afternoon they were confined or over 24 hours.

23      I can confirm that through what I would call is strong

24  circumstantial evidence, which is the only phone that was

25  working in the jail was our federal defender phone.  Every unit

1    has a white phone on the wall that says Federal Defenders over

2    it, and it rings directly to my front desk, and I can tell you

3    that every single morning that I've worked there 16 years at

4    nine a.m. that phone starts ringing because people immediately

5    want to call as soon as they have access to us, and this is

6    just on a normal day.  From the time of the fire until Tuesday,

7    the phone did not ring at all, not once, and then on Tuesday it

8    would ring in these one hour blocks, just everybody over and

9    over gathering around the phone talking to us, and then it

10   would go dead again.  And then I got worried because on

11   Thursday it went totally dead and nobody called, not even -- I

12   mean I have people who have called me basically every morning

13   for years, and not even they called.  So I believe it is false.

14         And I will say when I was walking around with the

15   assistant warden and Ms. McFarland, and Ms. Prutazy, who I

16   believe may be here from MDC legal, when I was walking around,

17   the line COs were saying it's awful when we have to lock them

18   down on this; it's hard on us, it's hard on them; it really

19   makes things difficult on everyone.  And Lieutenant Ramos on

20   SHU certainly confirmed that there had been lockdowns.

21         And then I guess next in terms of what is false, "Heat

22   has never been impacted."  I mean not only were there

23   consistent reports of it being very cold in there, but

24   certainly on the western side of the building facing the water

25   when I was there, inside the cells it was quite cold.  And I

1   know that --

2             THE COURT:  When were you there?

3             THE WITNESS:  I was there on February 1.  I was inside

4   the facility from 4:30 p.m. until 8 p.m.  And Investigator Ross

5   and I went into many cells, a lot of them on the east side the

6   heat seemed fine, and inmates were dressed what I would call

7   normally, just a thermal and a shirt.  But on the west side

8   facing the water, you could feel the cold wind coming out of

9   the door, and people were just wrapped and wrapped in clothes.

10  And obviously the inmates hadn't known we were coming, so it

11  wasn't as though they were dressing for us.  They were covered

12  up.

13            So certainly in that period, which is the afternoon of

14  what Warden Quay is speaking of, it was quite cold, and I know

15  that the day before that obviously was the coldest day of the

16  year, so I was not in there then, but the inmates certainly

17  reported a lot of cold.

18            THE COURT:  How were the correction officers dressed?

19            THE WITNESS:  So, when I first entered the lobby, the

20  first correction officer I saw had her head fully wrapped in

21  her winter scarf and was layering three or four layers.

22  Another CO came from the door in the back, from the back of the

23  facility or up to the units.  I don't know where she was coming

24  from, and she also was wearing a winter hat pulled down and

25  several jackets.  When we were on the units, anything

1   Ms. McFarland, all the employees seemed to be wearing several

2   layers.

3           THE COURT:  So you personally observed this on

4   February 1.

5           THE WITNESS:  Yes.

6           THE COURT:  But did you receive complaints of severe

7   cold with respect to other dates?

8           THE WITNESS:  Yes.  In particular, Thursday, January

9   31, when the inmates -- before they were locked down in the

10  afternoon, when they were out in the two hour block, I mean

11  people were frantic, and I contacted the U.S. Attorney's office

12  about it.  I contacted Nicole McFarland immediately and said

13  they say they're freezing, what's happening, can you help.

14          THE COURT:  What makes you draw the conclusion that

15  they were frantic?

16          THE WITNESS:  Because they would get on the phone and

17  beg.  And these are not clients who ordinarily talk to me in

18  that way.  People said things like I'm scared; I don't have

19  anymore clothes.  There were a few personal clients of mine who

20  don't have any money and could never have afforded extra

21  clothes -- whether the commissary was up or not -- and they

22  were expressing real terror in a way I haven't heard.  And

23  these are people who I've talked to about facing very long

24  sentences and other things, and I haven't felt that kind of

25  emotional reaction.  And I got very scared for them given the

1    temperature outside.

2            And on that day, on Thursday, we were hearing it from

3    several floors, but particularly the sixth and seventh floors

4    were reporting just extremely cold temperatures.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  So you received the reports concerning the

2     31st, and your personal observations were on February 1?

3          THE WITNESS:  Correct.

4          THE COURT:  Please continue with regard to the

5     warden's representations.

6          THE WITNESS:  Yes.

7          So, continuing on, getting past heat has never been

8     impacted, hot water has not been impacted, as it is on the same

9     system as the heat.

10          When I was there, there were some showers -- we ran

11     several of the showers, Investigator Ross and I -- there were

12     some showers that after they ran for a bit did get hot water,

13     but other showers never got over tepid, really sort of, you

14     know, camping-temperature water.

15          So I certainly -- there was not hot water in some of

16     the showers.  There are no problems with meals.  Prisoners are

17     still receiving hot meals.

18          Now, this is something that we got calls on from the

19     start, of people saying, you know, we are only getting cold

20     meals, there's no hot meals and the meals are severely delayed

21     while we are on lockdown, some days not getting any food at all

22     until 2 p.m.

23          When I personally visited on February 1, when we went

24     to the 8th floor unit, all the inmates were on lockdown except

25     for three orderlies, and they were working on the food to

1   serve.  And I asked them directly, you know, have you guys been

2   getting hot food, and they said today is the first day that we

3   are getting hot food.  On the prior days it was all cold

4   sandwiches.

5        Then they looked -- the associate warden came and said

6   we are not going to get in trouble for saying that, are we,

7   because she had said to me in front of them they are getting

8   hot food every day.

9        So this was a consistent complaint, particularly for

10  people with special meals, people with kosher meals.  We got a

11  lot of calls from the people with kosher meals saying all they

12  had to eat was sardines from the can.

13       "There is no problem with medical."

14       I mean, to me that -- I have already spoken about

15  that, but I think that was the most disturbing and harrowing

16  thing that I saw was the problems with medical and the people

17  describing -- I mean, elderly people, people with longstanding

18  conditions, people with heart conditions just really hoping

19  that they could get care.

20       And I think one thing the inmates were expressing on

21  that point is they didn't know when this would end, so they

22  didn't have a sense of when that might change, when they might

23  be able to get care for their seizures and their colitis.

24  There is a guy who told me he had Crohn's disease who just

25  looked frail and had big circles around his eyes.

1          THE COURT:  What do you mean by frail?

2          THE WITNESS:  He was about my height, about five eight

3     or five nine.  He looked to me like he was weighing about 120

4     pounds, and his arms were very skinny and his eye sockets were

5     hollowed out, and he told me he thought he lost about five or

6     six pounds in the last few days and really needed treatment and

7     hadn't been taken to medical.

8          THE COURT:  Did he say that he had requested

9     treatment?

10          THE WITNESS:  He said he had repeatedly requested

11     treatment, as did each of these people that I spoke to, and

12     when I asked Nicole McFarland about it, the lawyer, she said,

13     again, that because the computer was down that it was hard to

14     get that, the medical care, that they were doing the best they

15     could.

16          And I said that I understood that, but couldn't they

17     have a person go around and talk to the people in each cell, as

18     I assume they did before it was on the computer system.  And

19     she told me they were working on that, but the men I talked to

20     with the medical problems said that they had repeatedly asked,

21     repeatedly pressed the emergency buttons.  Some said that COs

22     had come and opened the door and looked at them and then just

23     shut it again.  There was one man who was gasping for breath,

24     and they told me he needed an oxygen mask.  And his cellmate

25     said that he was really worried about him because he could hear

1   him gasping at night.  And that man had asked repeatedly for

2   care.  And, in fact, my office represents him and we had

3   repeatedly asked legal if he was receiving care.

4        Another man, the one with colitis and the bloody

5   sheets and the open wound, he had personally asked for medical

6   care, and his lawyer had spoken to Ms. McFarland the morning I

7   was there, February 1, and Ms. McFarland had told his lawyer

8   that he was receiving care.

9        And then when Investigator Ross and I saw him you

10  could see the open wound with pus on it and he needed

11  antibiotic cream and they couldn't bring it to him.  And he put

12  his medical records through the door so we could see what his

13  issues were and his medical records from Brooklyn Hospital

14  reflected that he had colitis, this open wound that would not

15  heal.  I guess it's called an ulcerative wound that won't heal

16  plus seizure disorder.  Investigator Ross and I both looked at

17  the medical records and asked Ms. McFarland to make sure this

18  man received medical care.

19        It was a constant refrain, particularly for people

20  with psychiatric medications.  There seemed to be a lack of

21  ability to provide that, which worried me for them, for my

22  other clients, for the other inmates and for the correctional

23  officers.

24        THE COURT:  With respect to this deprivation of

25  medical care, how long did that last?

1          THE WITNESS:  So, my understanding from speaking to my

2     clients is it lasted from the time of the fire, so Sunday

3     afternoon, January 27, until today.

4          THE COURT:  Do you know the status of these

5     individuals at this point?

6          THE WITNESS:  So, the individuals that I particularly

7     identified in my memorandum to chief Judge Irizarry, I have

8     spoken to each of their lawyers about them.  Some of them I

9     know -- for example, the man with colitis and the open wound,

10    he did not -- I sent my memo to the chief judge on the weekend,

11    and the government received it on Sunday.  He was put on the

12    defense witness list yesterday, and then he went to the

13    hospital last night, so he's not available to testify here

14    today.

15         Some of the other people -- another man who I

16    identified was taken to the hospital as well on Thursday.  Some

17    of the -- I'm sorry, not on Thursday, on Sunday.

18         Some of the other people have called me or called

19    their lawyers and said they still haven't received the care.  I

20    do understand -- I know that our United States Attorney from

21    the Eastern District went there personally on Sunday, and he

22    said he saw two-person medical teams going around and talking

23    to people.  It later turned out that that was not a doctor, but

24    a medical assistant, but they were apparently Sunday evening

25    trying to get on top of the situation.

1          And that was when the U.S. attorney was there

2     personally and witnessed that.

3          THE WITNESS:  Sorry.  Should I continue on the

4     warden's statement?

5          THE COURT:  Yes.  Go ahead.

6     A.  "Medical still can be requested through their units."

7          I mean, that is accurate in the sense that it can be

8     requested, but that it wasn't able to always be provided.

9          "The attorney visiting should be up today."

10          That was February 1.  We were not allowed into the

11     facility to visit until February 3.

12          MS. KUNSTLER:  Your Honor, I have -- it's not marked,

13     but it's been admitted into evidence as the Government's

14     Exhibit 1.

15          May I give this Exhibit to Ms. von Dornum?

16          THE COURT:  You may.

17     BY MS. KUNSTLER:

18     Q.  Ms. von Dornum, have you seen this exhibit or any part of

19     it previously?

20     A.  Yesterday, in the hearing in the Eastern District, the

21     second, third, and fourth pages were offered to Judge DeArcy

22     Hall, and I saw it then.  I haven't seen the first or last

23     pages before.

24     Q.  And what does this exhibit purport to show?

25     A.  It shows readings, temperature readings on each housing

1   unit in the cells, and then in the common room, at least as to

2   the first page -- there's no time reflected for the second

3   page, but on some of the later pages it gives a time

4   approximation of when it was read.  There is no indication of

5   how those were taken, but it does list by unit the

6   temperatures.

7   Q.  I am going to direct your attention to the report page from

8   February 2, the day you were at the facility?

9   A.  I was there February 1.

10  Q.  I'm sorry.  Excuse me.  February 1.

11          Do these temperature readings comport with your

12  experience at the facility?

13          MS. BRETZ:  Objection, your Honor.

14          THE COURT:  Overruled.  You may answer.

15  A.  Yes.  I mean, anticipating Ms. Bretz, I can speak obviously

16  only to the units I was personally on and not to the other

17  units.  I was on all of the SHU, the eighth floor, the seventh

18  floor, and the sixth floor as well as the lobby.  I was not in

19  other areas, so I can't speak to that.

20          I would say that as to the common areas, it generally

21  reflects my experience of it.  Of course, it is a little hard

22  to gauge temperature, but I purposely did not wear a coat into

23  the facility.  I was dressed basically as I am now, and I would

24  say, based on that, it was slightly cool in parts of the common

25  areas, but not uncomfortable.

1          In the cells, obviously most of the cells I was not

2    able to go into, but the officers did help us by opening some

3    of the cells, and then for empty cells they let us go in.  I

4    would say there was a great temperature variation.  There

5    were -- certainly on each of the floors I went into on the west

6    side of the building, it was significantly lower than recorded

7    here.  For example, in the SHU on the west side, there may not

8    be even a recording here for that -- sorry.  Let me just see.

9    So I won't speak to that because I think SHU is not recorded

10   here.

11         On the eighth floor we only approached a couple of

12   cells because the count was happening at that time, but on the

13   west side, I could feel cold air coming from the cells and

14   people were wrapped up quite significantly.

15         On the east side of the building which, faces Third

16   Avenue, it felt OK.  Again, if you were dressed as I am, I

17   think you would have been fine in the cells on that side.

18         THE COURT:  Does the chart distinguish between east

19   and west side?

20         THE WITNESS:  It does, your Honor, in the sense that

21   different housing units are on different sides of the building,

22   so that if you had a chart it would show you which side.  What

23   is odd to me about this is it's showing basically the same

24   range of temperatures in both sides.

25         THE COURT:  If you could just specify for me where you

 1   feel that this chart is incorrect, that it's inaccurate.

 2           THE WITNESS:  Yes, your Honor.

 3           Where I think it's inaccurate is as to the west side

 4   units -- I would have to look at the floor plan, but, for

 5   example, on the sixth floor, which I'm most familiar with in

 6   terms of the unit numbers and their placement, if I had the

 7   layout of it I could be more specific.

 8           THE COURT:  One moment.

 9           Do we have a chart showing the layout?

10           MS. BRETZ:  We don't.

11           THE COURT:  Is there a witness who could testify as to

12   the layout?

13           MS. BRETZ:  I believe they may have left.  I can

14   check.  I know that the warden had to go to the Eastern

15   District.  I am not sure if Mr. Maffeo is still here.  I can

16   certainly check.

17           THE COURT:  I would appreciate that.  Thank you.

18           MS. KUNSTLER:  Your Honor, Adam Johnson, who is in the

19   courtroom, may be able to testify as to the layout.  He's part

20   of the legal team for the BOP.

21           THE COURT:  Mr. Johnson, can you testify as to the

22   layout.

23           MR. JOHNSON:  No, your Honor, I cannot.  I am actually

24   located at MCC New York, so my knowledge of the housing units

25   and the cells I wouldn't be able to recall where all of the

1   housing units are located.

2                  THE COURT:  Very well.

3                  MS. BRETZ:  Can I check, your Honor, and see if

4   Mr. Maffeo is here?

5                  THE COURT:  Yes, please do.

6                  MS. KUNSTLER:  Is there an attorney here from MDC,

7   Ms. Pertazi?

8   Q.  Perhaps Ms. von Dornum can continue to identify areas she

9   sees --

10                 THE COURT:  I want to permit counsel to come back

11  before we move forward.

12                 MS. KUNSTLER:  May I ask another question of the

13  witness while we are waiting?

14                 THE COURT:  No.  I want to allow Ms. Bretz -- I want

15  her to have the opportunity to be here during the entire

16  proceeding.

17                 (Pause)

18                 THE COURT:  Ms. Bretz.

19                 MS. BRETZ:  Your Honor, according to Adam Johnson,

20  Holly Pertazi, who is the attorney at MDC, Holly has been only

21  working at MDC for six weeks.  She does not feel competent to

22  testify as to the specific location of all the units.  The

23  other attorney who has been referenced, Nicole McFarland, I

24  have been advised is testifying right now in the Eastern

25  District, as are many, if not all of the management officials.

1    We are trying currently to get on the phone of somebody at MDC,

2    who is not in court who would be available to give the layout

3    to your Honor.

4             THE COURT:  When you say testifying, do you mean they

5    are before the board of judges?

6             SPEAKER1:  It was my understanding that Judge Garaufis

7    had ordered several management officials to appear at a hearing

8    before him.

9             THE COURT:  All right.

10            So to the extent that you can, identify the units that

11   you say you are on and seem to have an inconsistent

12   temperature --

13            THE WITNESS:  Yes, your Honor.

14            THE COURT:  -- as compared to the chart?

15            THE WITNESS:  Yes, your Honor.

16            So, the sixth floor is the -- first of all, I will

17   just note that SHU is not represented on February 1.  I am not

18   quite aware of the temperatures there, but it is not reflected

19   there.

20            Unit 62, which is reflected, I know to be on the west

21   side of the building, and I do note that on this chart that one

22   does have the lowest reading, 63.8.  However, even that I think

23   overstates, at least for the cells in the corners, where

24   throughout the building there are leaks coming down from the

25   roof in the corners of the building, and water is coming down.

1    And those cells tend to be much colder because of this leak

2    problem.  So I do not believe that the temperature reflected

3    here, 63.8, even though it's lower than the others, I believe

4    that there are cells that were lower than that.

5           Similarly, if I am remembering the layout correctly,

6    72 is also on the west side, and in 72, again, I remember

7    there's one cell in the corner, 723, where there was a

8    significant leak and where the temperature felt to me to be far

9    closer to 50 degrees when I was there and it is reflected on

10   this chart as 68.2.

11          Now I will say there was variation, your Honor, that

12   some cells, particularly on the east side, seemed to have heat,

13   and other cells, particularly on the west side, seemed to have

14   less heat and that there seemed -- some of the cells I and

15   Investigator Ross went into had cold air blowing from the

16   vents, and I believe that was on the sixth floor.  I pointed

17   this out to the Associate Warden King, and she said that she

18   would call mechanical and have them take a look at that.

19          THE COURT:  Ms. Bretz, I would like you to find a

20   floor plan for me today.

21          Go ahead.

22   BY MS. KUNSTLER:

23   Q.  Now, Ms. von Dornum, your office, as you testified, has a

24   federal defender's phone on the units --

25   A.  Correct.

J25nseg4                    von Dornum - Direct

1    Q.  -- that your clients can call?

2    A.  On every unit except for SHU.

3    Q.  What about clients, people incarcerated at the MDC who are

4    not your clients?

5    A.  People who are not our clients -- so, the federal defender

6    phone is a free unrecorded line that, when the inmates are out

7    on the unit, they can use it at any point to call our office.

8          The other inmates who are represented either by CJA

9    lawyers or private lawyers have to use what we would call the

10   social phone or the regular phone, which is a monitored line,

11   and you have to have money on your commissary in order to make

12   calls there.

13         From the calls we were receiving in our office, which

14   ordinarily really is quite limited to federal defender clients,

15   there's a lot -- it seems like there's inmate self-policing on

16   that.  Last week there was not.  Everybody called, and I talked

17   to many CJA and private clients who said they had no way to

18   contact their lawyers, no way to contact their families, and

19   asked if we could give messages to their lawyers and families

20   that they were OK.

21   Q.  To your knowledge, from the time of the fire until now,

22   when was the first time that incarcerated people at the MDC who

23   had private or CJA lawyers were able to speak with or visit

24   with their attorneys?

25   A.  Yesterday Lieutenant Ramos, who walked around with us,

1   confirmed that that social phone, which has some connection

2   that I am not sure of to the electrical system, unlike the

3   federal defender phone, that social phone along with the

4   CorrLinks e-mail system was out of commission until the power

5   went on.

6   Q.  Has legal visiting been restored at the MDC?

7   A.  Legal visiting was restored for a brief period on Sunday

8   and then ended after about three hours.  Each lawyer was able

9   to see one client each.

10          Ordinarily, when we go, we try to see as many people

11  as possible in a visit for efficiency, and obviously we hadn't

12  seen people in a long time so we were hoping to see more

13  people.

14          Yesterday legal visiting was started around 8:30 a.m.,

15  and then was again suspended around 10:30 a.m. for a security

16  reason.  It is happening today, and I have spoken to lawyers

17  who were in the facility today, and they were able to visit,

18  family were able to visit for the first time last night, which

19  was great.

20  Q.  Now, you discussed a number of issues at the facility.  You

21  have gone through issues that you observed.  Did you make any

22  suggestions to the BOP about ways to ameliorate these

23  conditions?

24  A.  I did.

25  Q.  And --

1    A.  I and others in my office, as well as we have lawyers that

2    represent us in the civil suit, and they had reached out to the

3    government to make suggestions, so initially on the legal

4    visitation problems there had already been issues during the

5    shutdown which we had already been in communication with them

6    about, and then there, you know, started to be the issues with

7    the fire immediately after that.

8            So we had asked if we could see clients in the east

9    building, where the women are housed, and whether inmates could

10   be brought over there.  That's already done regularly when you

11   have a codefendant meeting.  Often the codefendants are brought

12   over to that building.  So we had asked if it would be possible

13   to bring them there.

14           First there was no response to that, and then

15   Ms. McFarland responded I believe on Wednesday the 30th that if

16   visitation was not back up by Monday, so another five days,

17   that they would start to use that procedure.

18           I know at least two judges in the Eastern District

19   ordered in specific cases with defendants preparing for trial

20   or hearings that that be done this weekend that those

21   particular clients be brought over.  So that was the suggestion

22   we made on legal visitation.

23           It was not ever instituted, and to my understanding

24   there was never a problem with light or heat in the east

25   building.  They did have phone problems, but there was never a

1    light or heat problem there.  So that was the suggestion we had

2    made on legal visitation.

3           On medical care there wasn't such an ability to make

4    suggestions because we had heard it was fine.  When I was

5    there, I asked Ms. McFarland and the assistant warden when I

6    was there on February 1 whether, when they said it was a

7    computer problem, whether people could go around in person.

8    And I indicated that if they needed help we have social

9    workers, we have paralegals, they could take down the

10   information and pass it along, whatever would be useful or, you

11   know, get other help from outside.  That was not responded to.

12          On the family visits, we also asked if it would be

13   possible for those to be conducted in the east building.  That

14   was not responded to.

15          On the food, you know, there was nothing we were

16   really able to offer on that.  I know part of the problem is

17   that the heating units themselves, usually the food is prepared

18   in the kitchen at the MDC, and then each floor, each unit has

19   its own heating unit, like a small, almost, you know, warmer,

20   like you see at hospitals, and when the food comes out they

21   usually heat the food on each unit Lieutenant Ramos explained

22   to me for about an hour before serving it.

23          So, instead of doing that, they were bringing it up

24   from the kitchen and trying to serve it as fast as they can, so

25   it was often cold before it got there.

J25nseg4                    von Dornum - Direct

1          You know, as to the heat, the question I asked several

2     times was whether they could be given additional blankets or

3     clothing.  They said there wasn't a problem with the heat, so

4     that wasn't necessary.

5          As to the light, which I know we haven't really

6     touched on, but my impression from the inmates I spoke to was

7     that the darkness in their cells actually was very difficult

8     because they were locked in with another person in the pitch

9     black.

10          I asked if they could have flashlights.  A few of the

11    inmates had been able, prior to this, to purchase from the

12    commissary battery-operated lights.  By the time I got there on

13    the 1st they reported to me that they were all out of batteries

14    and they weren't able to get more.

15          I was asking, if they could purchase battery-operated

16    lights at the commissary why can't they be given flashlights or

17    battery-operated lights?

18          Also, when I came in through the lobby, the part where

19    you show your hand for the security stamp, I had noticed that

20    there was a big light source there, and I had asked if those

21    could be placed on the units, but they said they thought the

22    power would be fixed shortly, and that was on Friday.

23    Q.  Now, on February 1, when you visited the facility, who else

24    visited the facility?

25    A.  I arrived there at the same time as Congresswoman Nydia

1    Velazquez, who was also there to visit the facility, and she

2    asked Ms. McFarland if she and I and Investigator Ross from the

3    Eastern District U.S. Attorney's Office could walk around

4    together.  Ms. McFarland said that Investigator Ross and I

5    could not go with the congresswoman, that she had to go on her

6    own.

7            So Investigator Ross and I went in together.  The

8    entire time we were escorted by Ms. McFarland, Holly Pertazi

9    from legal, and assistant -- I apologize, I don't know whether

10   it's assistant or associate -- but A.W. King.  At certain times

11   Lieutenant Ramos from SHU, who I will say was very concerned

12   about the inmates and very straightforward about wishing he

13   could do more, he was with us at various times, and then in

14   particular units there would be different COs who were

15   escorting us.

16           THE COURT:  What did you observe specifically in SHU?

17           THE WITNESS:  So, in SHU obviously it is a different

18   situation because people ordinarily are locked down all the

19   time, although usually with light.

20           So I noticed on the west side that it was quite cold.

21   There was one inmate -- I believe it was cell 114 but I can

22   look that up in my notes -- who reported that there was water

23   dripping actively from the top floor of the building, water

24   dripping actively either from rain or melting snow or

25   condensation onto his bed, and because there was no clean

1    laundry he hadn't been able to get dry sheets and he was

2    wrapped up quite a bit and said that sleeping on the wet sheets

3    in the cold was very uncomfortable.

4            Lieutenant Ramos from the SHU confirmed that there are

5    a number of leaks in the SHU on the roof and some of those are

6    directly over people's beds.  I asked Lieutenant Ramos if the

7    people on those beds could be moved somewhere else, and he said

8    he would, you know, see if he could figure that out.  But from

9    what the inmates reported, that had been continuing throughout

10   this period and without the heat.

11           On the SHU, I also spoke to several inmates with

12   medical issues who had not been treated.  There was a man there

13   who was not there for any disciplinary reason, but because he

14   had come into the facility several days before with sickle cell

15   anemia and they didn't want to put him into the general

16   population until he was checked by a doctor.  So that meant he

17   was held in the SHU cell with no medical treatment in the dark

18   for that period.

19           The SHU lieutenant told me that ordinarily they are

20   allowed out for one hour a day for rec, and I think that's

21   actually by BOP regulation, but that they hadn't taken them out

22   the entire week so no one had been out of their cells.  The

23   lieutenant confirmed there was no clean laundry, which also

24   means several inmates pointed out they were wearing the same

25   underwear the entire week, the same socks, and they weren't

1    able to make any legal calls.  Ordinarily each SHU inmate gets

2    one family call a month.  Obviously that hadn't happened that

3    week either.

4           And the SHU head told me that day laundry was

5    delivered and he hoped to distribute it.  I did see hot meals

6    being passed out when I was there on the cart.  I felt them,

7    and they were warm, so I was glad to see that.  And that

8    lieutenant seemed to be speaking to each inmate individually to

9    know of their condition and to wish he could do more, which I

10   very much appreciated.

11   Q.  Why did you want to tour the facility with Congressperson

12   Velazquez?

13   A.  I wanted to tour it with her I guess for two reasons.  My

14   Spanish is pretty good, but hers is a lot better, and many of

15   the inmates are Spanish-speaking, so I thought that would be

16   useful.

17          The other reason was I had a concern that, since she

18   had never been in the facility before, that she wouldn't know

19   what to ask or where to go or how to assert herself in that

20   situation.

21   Q.  Did you compare notes with Congressperson Velazquez after

22   your visit?

23   A.  I did.

24   Q.  And after you compared notes, what was Congressperson

25   Velazquez' response?

1    A.  She said that they had told her that she was unable to

2    speak to any inmate directly because of the count and that she

3    could not approach anyone's cell.  The count only lasts 20 to

4    30 minutes, so obviously she could have waited it out, or -- I

5    mean, they told me the same thing when I first got there.  I

6    said, Fine, let's go to the SHU because I know that in the SHU

7    the count operates differently, since people are locked in all

8    the time.  So I said let's go to the SHU, and by that time the

9    count will clear and I can go to the other units.

10            And she had been told by the person who took her on

11   the tour that they were only locked in because of the count and

12   that otherwise they had been out all day.  She then went back

13   the next day and talked to many people herself.

14   Q.  How did you feel after leaving the facility on February 1?

15   A.  I felt like I wished I could do more.  The inmates kept

16   asking me when it would end, and I think part of what was

17   happening for them is they had been given very little

18   information.  Some knew it was from a fire.  Some of the COs

19   were talking to them, but they weren't told exactly what was

20   happening and when it would end.  At least for me tough

21   situations are harder if I don't know what's coming.  So I felt

22   badly that I couldn't answer them.  I felt badly that I

23   couldn't speak to everybody, because everyone really wanted to

24   talk to me and tell me what was happening for them.  So I felt

25   powerless and, you know, wishing I could do more.

1    Q.   What do you think needs to happen now?

2    A.   I mean --

3              MS. BRETZ:  Objection, your Honor.

4              THE COURT:  Sustained.

5              MS. KUNSTLER:  One moment, your Honor.

6              Your Honor, we have no more questions for this

7    witness, although we ask to be able to re-call this witness if

8    a chart is made available so this witness is able to take us

9    through her experience at the facility using that chart.

10             THE COURT:  Ms. von Dornum, what would you have this

11   Court do?

12             THE WITNESS:  It is hard to know I guess would be my

13   first answer to that.  I think, you know, to me the biggest

14   problem here is the lack of transparency.  The inmates starting

15   reporting problems on Tuesday when they were able to get to the

16   phones, and I think if the MDC had said there was a fire, we

17   are having a hard time coping with it, here's what we're going

18   to try to do, you know, we are going to call in FEMA, whatever,

19   that would be one thing.  But here, for them to say everything

20   is fine, I think it made it, at least in the Eastern District,

21   very difficult for the courts to know how to help.

22             So I think if your Honor -- I don't have a creative

23   idea on this, but you might -- could think of a way for there

24   to be a reliable source of information, you know, we rely on

25   MDC legal and the warden to tell us what's happening, and they

didn't do that here.  And I repeatedly heard in Court from
AUSAs -- well meaning, I'm sure -- well, I wouldn't trust an
inmate over a lawyer.  That turned out not to be an appropriate
assumption.

       So I think if there is a way, you know, the MDC, BOP
generally is unusual, unlike Rikers or other institutions there
he's no overseeing body, there's no one who can arrive
unannounced and see what's happening.  Even at Rikers there's a
committee where lawyers can go in and do that.  Here the Bureau
of Prisons has no oversight body, and I think the U.S.
Attorney's Office is in a difficult position in that regard
because the BOP is their client.

       So, at least in our hearing yesterday, I certainly saw
the civil division attorneys having a hard time, because they
had to represent the interests of their client while also
explaining to a federal judge why people were kept in these
conditions.  So I think it could be useful to have a neutral
person who had the Court's authority to enter the facility at
irregular periods and see what's happening.

       We had raised this last year, as your Honor may be
aware.  There were a number of forcible rapes at the MDC last
year.  Two lieutenants and a guard were convicted of raping a
number of female inmates, and at that point we had asked,
because the inmates had been describing this to us for
sometime, and my office brought it to the U.S. Attorney's

J25nseg4                    von Dornum - Direct

1   Office, we asked isn't there a way for someone to go in at 9

2   p.m. occasionally and see what's going on here.

3          I do think if the guards knew, if the management knew

4   that someone could show up at any time, things might be

5   different, but also that person could report to your Honor or

6   the courts generally so that we could have a neutral person

7   describing the condition there.

8          THE COURT:  So you're looking to have the Court

9   establish a new position?

10         THE WITNESS:  Not a new position, your Honor.  I think

11  the Court has frequently in other situations, including at the

12  request of this U.S. Attorney's Office for Rikers, put special

13  masters in place, and I think that's obviously an established

14  procedure.  Someone could be appointed and approved.  It's

15  understood what their role is.  That is exactly what the U.S.

16  Attorney's Office -- I'm so glad -- asked for to happen at

17  Rikers, and I think there has been progress at least on

18  information thanks to that.

19         And I think here, if there were a special master,

20  which there has never been for the MDC, despite an

21  unfortunately long history of problems there, that that's

22  something that the Court knows how to manage.  There are people

23  who could do it, including former AUSAs with great familiarity

24  already with the facility, and I think that would certainly be

25  a step forward and one well within this Court's authority.

1              THE COURT:  Any further questions?

2              MS. KUNSTLER:  No, your Honor.

3              I make the same request, that we can re-call Ms. von

4    Dornum should the schema of the facility become available.

5              THE COURT:  Yes.

6              MS. BRETZ:  Can we just have a moment, brief moment to

7    confer?

8              MR. OESTERICHER:  Your Honor, we would like just about

9    five minutes just to confer.  Is it possible to take a brief

10   break and resume?

11             THE COURT:  Yes.  We will take a ten-minute break.

12   You may step down.

13             MR. JONES:  Your Honor, if I may, this won't affect

14   the proceedings, I have a hard stop for a family medical

15   proceeding that I need to be at.  I will try to do that

16   unobtrusively, but I wanted the Court to know.  I mentioned it

17   to chambers staff previously.

18             THE COURT:  All right.  Good luck.

19             MR. JONES:  Thank you, your Honor.

20             (Recess)

21             THE COURT:  Please be seated.

22             MR. JOHNSON:  Your Honor, Ms. Bretz is in the Hallway.

23   I am going to go get her and take my leave.

24             Thank you.

25             THE COURT:  All right.  Thank you.

1           (Recess)

2                THE COURT:  Please be seated.

3                Are you going to cross-examine at this time?

4                MS. BRETZ:  Yes.

5                THE COURT:  Go right ahead.

6    CROSS-EXAMINATION

7    BY MS. BRETZ:

8    Q.  Good afternoon?

9    A.  Good afternoon.

10   Q.  Just a few questions.

11               Are you aware of the current conditions at MDC

12   Brooklyn?

13   A.  I am aware of the conditions until I took the stand from

14   some units.  I was receiving phone calls from inmates while I

15   waited outside as well as receiving some reports from people in

16   my office.

17   Q.  Before you took the stand this morning, were you aware that

18   the power was back on at MDC?

19   A.  Yes, it was back on before this morning.

20   Q.  Great.  And that includes phones?

21   A.  Correct.

22   Q.  Lights?

23   A.  Correct.

24   Q.  Computers?

25   A.  Correct.

1    Q.  Were you aware that the heat was generally back on?

2    A.  Yes.  I heard there was some inconsistency, but yes.

3    Q.  And were you aware that legal visitation had fully resumed?

4    A.  I am aware that some lawyers got in today, yes.

5    Q.  And what about social visits?

6    A.  Yes, social visits were held last night.

7    Q.  And were you aware that the heating issues at MDC were

8    separate and apart from the electrical fire that took place on

9    January 27?

10   A.  Yes.  I had heard that the heating issues started

11   significantly beforehand, and, in fact, I have had an e-mail

12   exchange with Nicole McFarland at least a week before the fire

13   when she e-mailed and said legal visiting was cancelled because

14   the power was out, and I wrote back and asked, OK, but do the

15   inmate have heat and light and she wrote back we have backup

16   generators.  That turned out to be a true statement, but the

17   inmates weren't receiving heat from those backup generators.

18   Q.  When was that?

19   A.  I can find the e-mail for you, but I believe it was Martin

20   Luther King Day weekend, which you may recall Martin Luther

21   King Day itself was quite cold.

22           MS. BRETZ:  Thank you very much.

23           THE COURT:  Any redirect?

24           MS. KUNSTLER:  Just briefly, your Honor.

25   REDIRECT EXAMINATION

1    BY MS. KUNSTLER:

2    Q.  You said that you were aware of conditions from phone calls

3    that you received in the hallway?

4    A.  Yes.

5    Q.  Are there any conditions that you didn't cover on your

6    cross-examination?

7    A.  Yes.  My understanding is that there still are several

8    people who are waiting for medical care, particularly for

9    medications, and most of those were our clients who were

10   calling, so I informed their lawyers.  And for the people for

11   whom it was CJA lawyers, I have informed those lawyers as well.

12        I also learned while I was out in the hallway that

13   Congresswoman Velazquez last night had visited two inmates in

14   the SHU who she was told by the inmates that they had been

15   placed in SHU from unit 53 because of protesting, nonviolently,

16   but protesting vocally the conditions and that Congresswoman

17   Velazquez had visited them yesterday evening.

18   Q.  When do you normally find out that visiting or legal

19   visiting has been suspended?

20   A.  Well, normally it's not suspended.  But when it is, like

21   throughout the shutdown I think there were 13 days in January

22   when there was no legal visiting.  We would learn often the

23   morning of.  Adam Johnson is usually the first one to arrive,

24   and he would contact us between 7 or 8 a.m. and let us know if

25   it was up or not.

1          If we hadn't heard from him, we would reach out

2    affirmatively, and I certainly appreciated that.  And I will

3    say here that I believe Mr.Johnson has made every effort to be

4    helpful in this situation based on the information he

5    personally had.

6          But, for us, when we have experts, interpreters, court

7    dates, to learn the morning of is not helpful because we have

8    to plan when we are going, and it can take three or four hours

9    to see one client, and we have to arrange for interpreters and

10   experts to go with us, so learning the morning of is difficult.

11         I would imagine that it is even more difficult for CJA

12   lawyers, who often are solo practitioners, whereas at least I

13   have a staff.  So one of the things we had asked about,

14   including I think Mr. Ostericher, we had inquired about whether

15   it would be possible, even if there was a need to curtail

16   attorney visits whether for shutdown or for fire whether it was

17   possible to have set periods when we would know when it would

18   happen, even if that was just 10 to 2, whenever it was, so we

19   could be sure of that.

20         Obviously the other part of that is it frays the

21   attorney-client relationship if we tell the client I'll see you

22   tomorrow, I'll be there, and then we can't come and they don't

23   know why we can't come, particularly people who already have

24   appointed counsel.  They already have trust issues with us,

25   understandably, and to not show up when you say you will,

J25nseg4                          von Dornum – Redirect

1    especially when someone has a court date coming up, can really

2    fray that relationship.

3                    (Continued on next page)

1    BY MS. KUNSTLER:

2    Q.  And is this the reason that you thought there was a need to

3    seek a TRO in the EDNY?

4    A.  Yes.  We sought the TRO in the EDNY because there was

5    repeated denial of attorney/client visitation, or such late

6    notice that we weren't able to get there, and no plan for

7    remediating that.

8            So, while Ms. McFarland said on Wednesday the 30th if

9    things aren't better in five days, we will think about bringing

10   people to the West Building, from my practice and my

11   understanding of the case law and the APA, we have a right to

12   see our clients every day, and not just a right but a necessity

13   to see them.  They are facing a lot of time, and it's a very

14   hard situation.

15           So, we sought the TRO because we need to be sure we

16   can get in there, and we were unfortunately no longer able to

17   trust the representations of the MDC legal department about

18   when we would get in or why we weren't getting in.  And Judge

19   DeArcy Hall put a procedure in place where there will be a

20   cancellation -- which at times there may be for security or

21   other reasons -- that if the facility does that, a facility

22   official has to put in a sworn statement to the court within 24

23   hours justifying why that closure took place, and we will have

24   an opportunity to challenge it if necessary, but that way it

25   can't just be we don't have enough staff -- which was

1    understandable during the shut-down, but we still needed to see

2    the clients.  So some other plan needed to come about.  The

3    same with the fire, obviously that made things hard on the

4    facility, but legal visitation should be a priority and,

5    instead, they were just saying, sorry, we can't do it.

6              MS. KUNSTLER:  Thank you, your Honor.

7              THE COURT:  You may step down.

8              THE WITNESS:  Thank you, your Honor.

9              THE COURT:  The Court calls Inspector John Ross of the

10   Eastern District U.S. Attorney's office.

11    JOHN ROSS,

12        called as a witness by the Court,

13        having been duly sworn, testified as follows:

14             THE COURT:  Inspector Ross, where are you employed?

15             THE WITNESS:  I'm a supervisory special agent with the

16   Department of Justice U.S. Attorney's Office Eastern District

17   of New York.

18             THE COURT:  And can you give me information concerning

19   your employment history.

20             THE WITNESS:  So, from January of 1983 through March

21   of 2003 I was a New York City police detective, and then from

22   March 2003 to present I'm with the Department of Justice as a

23   supervisory special agent.

24             THE COURT:  What are your responsibilities?

25             THE WITNESS:  I supervise the special agents assigned

1   to the U.S. Attorney's office of the Eastern District of New

2   York and any of the investigations that they're involved in.

3           THE COURT:  I understand that you made a visit to the

4   MDC on February 1; is that right?

5           THE WITNESS:  Yes.

6           THE COURT:  I would like you to first comment about

7   the temperature inside the building.  And if you will describe

8   where you were and what you observed in terms of temperature.

9           THE WITNESS:  In general, or throughout each area?

10          THE COURT:  Well, each area.

11          THE WITNESS:  OK.  So on initial entry into the main

12  lobby in the West Building, the 29th Street entrance, it was

13  cool to cold in the intake area where the visitors come in.

14  And then after I met other people who were going to accompany

15  me on the tour, I think the first floor we went to was the

16  eighth floor, we visited the various units on the eighth floor,

17  the inmate units.  The temperature seemed, you know, fine to

18  me.  It was normal, I would say.

19          After that, we went up to the special housing unit on

20  the ninth floor.  There were two units up there, or two ranges

21  they call it, on either side of the building, and that's when

22  we started to walk through the common hallway where the cells

23  are all located.  The temperature up in the common areas seemed

24  OK to me.  I was able to go into I think one cell to check the

25  cell itself, and the temperature was also OK.

1          After that, I believe we proceeded down to the seventh

2   floor, and again we visited the various units on the seventh

3   floor, and as far as the temperature goes, the temperature

4   seemed fine to me.  We were in the common areas.  I also

5   believe I might have checked a cell, an open cell in that

6   floor, and the temperature was OK also.

7          Then we went down to the sixth floor, and again we

8   went to the various -- the units on the floor.  For the most

9   part all those areas seemed OK, normal.  One unit -- I believe

10  it's I62 -- seemed cooler -- or was cooler.  The common area

11  was cooler.  But I also noticed that they had -- they have a

12  door that lets out to the rec -- outside rec area, and that

13  door was propped open.  There was a smoke condition, so there

14  was just some smoke, so that door was open, which I think

15  caused the temperature obviously to be cooler because it was

16  cold that day.

17         And then we never got into a cell on that particular

18  unit, so I couldn't check the temperature myself within a cell.

19         THE COURT:  And did you go anywhere else in the

20  facility?

21         THE WITNESS:  Let's see, we went to the SHU, the

22  eighth, the seventh and the sixth.

23         THE COURT:  And how were the correction officers

24  dressed on that day?

25         THE WITNESS:  Well, the corrections officers in the

1    main lobby had winter coats on.  The officers throughout the

2    building, you know, in various states of dress.  Some just

3    had -- some had vests on, long sleeve shirts.  I didn't notice

4    them walking around, you know, bundled up.  There may have been

5    one or two with coats on.

6            THE COURT:  So definitely coats in the entrance.

7            THE WITNESS:  Yeah, the entrance I'm sure they had

8    winter coats on.

9            THE COURT:  Maybe some coats elsewhere.

10           THE WITNESS:  Yes.

11           THE COURT:  But there was a mix of dress you're

12   saying.

13           THE WITNESS:  Yes.

14           THE COURT:  What about the inmates, how were they

15   dressed?

16           THE WITNESS:  Again, there was a mix on the different

17   units.  I mean the only thing I would say is the inmates within

18   the cells, the ones that we looked into, some had T-shirts on,

19   some were dressed, some were dressed, you know, had blankets

20   over their heads.  Unit 62 probably had the most inmates that I

21   noticed that had, you know, more clothes on within the cells.

22           THE COURT:  What about with respect to medical

23   treatment, do you have any observations concerning medical

24   treatment for the inmates on that day?

25           THE WITNESS:  Yes.  I mean many of the inmates we

1  spoke to complained about the lack of their medicine, you know,

2  their prescriptions, and a lack of medical attention.

3          THE COURT:  Did you observe any obvious medical

4  problems?

5          THE WITNESS:  Yes, some of the inmates who we saw, I

6  think maybe one was on unit 61, one inmate had what he said was

7  a gunshot wound to the left hand.  He had a wrap on it, and

8  said it hadn't been changed in two weeks, the bandage hadn't

9  been changed.

10         There were other inmates who were showing their asthma

11 inhalers and saying that they were empty, or they had one more

12 puff, you know, dose on it, and they were concerned that they

13 were going to run out.  There was another inmate on unit 62

14 named Daughtry who was very concerned.  He passed his medical

15 papers out.  He was fairly recently hospitalized and had

16 colitis.  He had open wound on his leg.

17         THE COURT:  Did you observe this?

18         THE WITNESS:  He was trying to show us, and I couldn't

19 really see because it was dark, but I don't have a doubt that

20 he had an issue.  He was worried about the cleanliness, not

21 being able to clean the wound with soap and water.

22         THE COURT:  Do you have any other further observations

23 concerning the temperature or the medical treatment of the

24 inmates?

25         THE WITNESS:  No.  I mean the temperature, I mean I

1   would say for the most part was fine, but the medical issue was

2   what concerned me most.

3               THE COURT:  Counsel, do you have any questions for

4   this witness?

5               MS. BRETZ:  No, your Honor.

6               MS. KUNSTLER:  Just briefly, your Honor.

7   CROSS EXAMINATION

8   BY MS. KUNSTLER:

9   Q.  Mr. Ross, how were you dressed during your tour of the

10  facility?

11  A.  I had a suit on as I have now and a light offer coat.

12  Q.  Do you have that offer coat with you today?

13  A.  No.

14              MS. KUNSTLER:  No further questions.

15              THE COURT:  All right, you may step out.

16              THE WITNESS:  Thank you.

17              (Witness excused)

18              THE COURT:  Counsel for the Bureau of Prisons, do you

19  have witnesses?

20              MS. BRETZ:  We have no further witnesses beyond those

21  two that have already testified today.

22              THE COURT:  All right.  Then I am going to visit MDC

23  at this time, and I indicated to the attorneys that I would

24  like them to come along with me, as well as Inspector Ross and

25  Ms. Von Dornum, and we may be resuming the hearing after the

1   visit, depending how things unfold.

2           UNIDENTIFIED REPORTER:  Excuse me, on behalf of the

3   journalists present, is it possible for one of us to accompany

4   you on your trip?

5           THE COURT:  No.  Anything further?

6           MR. SPILKE:  Yes, your Honor.  We just ask that the

7   Court take judicial notice of the weather the week starting

8   Sunday, January 27 through February 3.  And we have an Exhibit

9   HH that we passed up that records the temperature taken from

10  The Weather Channel.

11          THE COURT:  Have you shown that to your adversary?

12          MR. SPILKE:  Yes.

13          THE COURT:  Is there any objection?

14          MS. BRETZ:  No, your Honor.

15          THE COURT:  All right then, if you would hand up the

16  exhibit, it's been marked as Defendant's Exhibit HH, it is

17  admitted, and I will take judicial notice of the temperature

18  recorded on the exhibit.

19          (Defendant's Exhibit HH received in evidence)

20          All right then we are going to adjourn for now, and we

21  may be resuming later.

22          (Recess)

23          (Continued on next page)

24          THE COURT:  We are now at the MDC.  It's five minutes

25  to five.  Because of the disparate accounts offered by

J257SEG5

1    defendants and the Bureau of Prisons, I ordered evidentiary

2    hearing and visit to the MDC in order to assess the conditions

3    facing inmates housed here.  I plan to inspect the west side of

4    the sixth and seventh floors and the SHU.  If someone would

5    like me to tour another area of the MDC, please tell me now.

6           We are accompanied by an official court reporter.  I

7    would like the attorneys to make their appearances, please.

8           MR. SPILKE:  Ezra Spilke, along with --

9           MS. KUNSTLER:  Sarah Kunstler on behalf of Wilson

10   Perez.

11          MR. OLIVER:  Gideon Oliver.

12          MR. OESTERICHER:  Jeff Oestericher with the U.S.

13   Attorney's office, Southern District of New York.

14          MS. BRETZ:  Emily Bretz, U.S. Attorney's office of the

15   Southern District of New York.

16          THE COURT:  I would like the non-attorneys to identify

17   themselves one by one.  We will start to my left.

18          MS. PASCULLI:  Victoria Pasculli.

19          MS. KENYON:  Emily Kenyon, law clerk.

20          MR. MONTGOMERY:  Dan Montgomery, law clerk.

21          MS. GOLD:  Paula Gold, court interpreter.

22          MR. ROSS:  Supervisor Special Agent John Ross from

23   EDNY.

24          MS. VON DORNUM:  Deirdre von Dornum, attorney in

25   charge Federal Defenders.

J257SEG5

1          MS. JAMES:  Letitia James, Attorney General.

2          MS. LEVY:  Jennifer Levy from the office of the

3     Attorney General.

4          MR. CHERNOFF:  Harry Chernoff from the U.S. Attorney's

5     office criminal division, and I am an attorney.

6          THE COURT:  If I or an attorney would like to make a

7     comment or ask a question, we will stop so that the

8     stenographer may record such comments or questions.  You may

9     ask questions of inmates.  I just want to make sure that they

10    are taken down by the stenographer.

11         When we return to the courtroom, I'm going to call

12    Ms. von Dornum back to the stand so that she may compare the

13    current conditions with those she observed during her visit to

14    MDC on February 1, 2019.  I will recall Inspector Ross for the

15    same purpose.

16         Should I be calling you Special Agent Ross?

17         MR. ROSS:  Either way, that's fine, your Honor.  It's

18    OK.

19         THE COURT:  I am focusing on the status of lighting,

20    heat and medical attention.  At the end of the tour I'm going

21    to ask Mr. Spilke and Ms. Kunstler what specific relief they

22    are seeking from the Court.  I will repeat that question in the

23    courtroom after Ms. von Dornum and Special Agent Ross testify.

24         Any questions before we start?

25         OK.  Let's go.

J257SEG5

1          MS. VON DORNUM:  I'm sorry.  I would just ask that if

2  any defendant plans to speak about their criminal case, that we

3  stop that.

4          THE COURT:  Absolutely, I will not permit them to

5  speak on that.

6          All right.  So we are now in the SHU with warden Quay,

7  and I would like Ms. von Dornum and Special Agent Ross to point

8  out to me anything that you think that I should take note of as

9  we tour the facility.

10          MS. VON DORNUM:  Yes, your Honor.  I would already

11  note that when we were here before it was dark in this area,

12  dimly lit and significantly cooler.

13          MR. ROSS:  This is warm.

14          MS. VON DORNUM:  This is warm compared to what it was.

15  The medical room also did not have lights at all, and the

16  lieutenant had indicated to us that it was difficult to give

17  medical treatment to the SHU inmates because there wasn't even

18  light in that medical room.

19          THE COURT:  You are pointing to the medical room?

20          MS. VON DORNUM:  Yes, the medical room is there to

21  your right behind your law clerk.

22          MR. ROSS:  And I agree, and also I see the med cart,

23  prescription cart just left.

24          THE COURT:  Warden?

25          MS. VON DORNUM:  Should we start with the west side,

1  your Honor, the side facing the water?

2      THE COURT:  So we are now where?

3      WARDEN QUAY:  Inside range 3 of the Special Housing

4  Unit.

5      THE COURT:  And is this the direction going west?

6      WARDEN QUAY:  Yes, it's U-shaped, so we will start

7  here and we can walk all the way around.

8      THE COURT:  Very well.

9      MS. VON DORNUM:  Is the food heating unit working now?

10  It looked like it was.

11      WARDEN QUAY:  Yes.

12      THE COURT:  Ms. von Dornum and Special Agent Ross, if

13  there is a particular space you would like me to look into,

14  please point that out to me.

15      MS. VON DORNUM:  I think -- correct me if I'm wrong --

16  I think the cell with the leak was cell 114 on this range.

17      MR. SPILKE:  I'd just like to note that we just heard

18  someone shouting from one of the cells, "They punish us when we

19  talk.  We would like to talk to someone."

20      THE COURT:  I don't feel the need to do so.

21      MR. SPILKE:  Yes, your Honor.  Thanks.

22      THE COURT:  So I just wanted to observe that we're

23  standing where?

24      WARDEN QUAY:  Range 4 of the Special Housing Unit.

25      THE COURT:  Range 4.  And I am standing under a vent

J257SEG5

1    that is blowing cold air.

2          UNIDENTIFIED SPEAKER:  So one of our facility's

3    personnel is here with the thermometer, so we can check the

4    temperature.

5          PERSONNEL:   72.6

6          (in front of cell 204-114.

7          THE COURT:  So this is facing the water?

8          We are standing outside of range 4, cell 114.  It

9    houses an inmate by the name of Kenneth James Brown, who has

10    inmate register number 83615-053.

11          Ms. von Dornum, this is the cell that you stated had

12    the water damage; is that correct?

13          MS. VON DORNUM:  That's correct, your Honor.

14          THE COURT:  So just looking in the window, this very

15    narrow window, I can see abundant water damage.  Towards the

16    back is a rectangular shaped cell.  On the ceiling you can see

17    copious amounts of paint peeling and hanging from the ceiling.

18    The ceiling is painted white, but the water damaged area has a

19    kind of a golden tone to it.  It almost looks like wet tissues

20    hanging from the ceiling.

21          Ms. von Dornum, do you have anything that you wanted

22    to comment own.

23          MS. VON DORNUM:  The day we were here we couldn't see

24    it because it was dark in the cell, but the inmate described

25    exactly what you're saying, and the lieutenant confirmed what

1  you're saying, that he thinks that's prevalent through parts of

2  the facility, but we were not able to visually see it that day.

3       THE COURT:  Was it this particular inmate that you

4  spoke to?

5       MS. VON DORNUM:  It was.

6       THE COURT:  Did he state that there was water dripping

7  in currently?

8       MS. VON DORNUM:  He said that there was water dripping

9  whenever there was snow melting, or rain or condensation.  That

10  night it was quite cold so it was starting to drip down onto

11  the sheets.  He said the sheets were already soaking wet from

12  prior days, and there had been no fresh sheets for a week, and

13  Lieutenant Ramos confirmed all of that was the case.

14       THE COURT:  Excuse me.  Warden, is there a way that I

15  can ask him questions through the door?

16       MS. VON DORNUM:  Through the crack.

17       THE COURT:  Excuse me, Mr. James, my name is Annalisa

18  Torres; I'm a federal district court judge, and I am inspecting

19  this prison, and I heard that there was water damage on your

20  ceiling.  Could you comment on that?

21       We are having a hard time hearing you, and I want the

22  court reporter who is standing right here -- you can see him,

23  right -- I want him to hear what you're saying, so I'm going to

24  see if he can put his ear next to this little hole and hear

25  you.  Just wait a minute moment, please.  When he is ready to

1  listen to you, he will tell you, and if you could just describe

2  to him the condition.

3       I just heard you say it was like sleeping under a

4  waterfall, and you said that happened during the black-out,

5  correct?

6       INMATE:  Yes.

7       THE COURT:  And what else do you have to say?  You say

8  it was freezing cold and you did not have any boxes?

9       They did not give you briefs or correct clothing to

10 wear under these conditions.  Is that what you just said?

11      INMATE:  Yes.

12      THE COURT:  OK.  Do you have anything else you want to

13 tell me?  One second.  You said it was terrible because you

14 could not see what it is.  He says that he could not take a

15 shower, he said you have to stink because the shower was

16 freezing cold.  What else?  Basically he says they didn't care

17 for you.  If you tried to get an extra blanket, they ignored

18 him.

19      Anything else?  One second.  He says basically these

20 were crazy conditions.  I was sick with a chest cold.

21      Is there anything further you want to say?  He says,

22 no, ma'am, that's it.

23      Thank you, Mr. James.

24      What's your name, sir?

25      INMATE:  Dimetri Moseley.

J257SEG5

1          THE COURT:  One second, Mr. Moseley.  Mr. Moseley has

2    inmate registration number 79413-054, and he has pointed to me

3    parts of his ceiling where there is water dripping.  You can

4    see it, it is abundant, it is plain as day.

5          Did you want to say anything else?

6          He says that they were here with no heat, no extra

7    blankets.  He said that during the whole time -- during the

8    whole time he is a mental health patient, and he was feeling

9    suicidal and no one came to help him.  He said the temperature

10   dropped to freezing, they had nothing in there, they had no

11   thermal shirts.

12         Anything else?

13         No hot water.  He said the food was cold.  We couldn't

14   see, we couldn't read.  We couldn't read the Bible because we

15   couldn't see.  I couldn't do my legal work due to the fact that

16   we had no electricity.  And that's basically it.

17         OK, thank you.

18         And I had no medical attention.  I had no medical

19   attention.

20         And you had no medical attention.  And this is range

21   4, cell 113.  OK, thank you.

22         Sir, tell me your name.

23         INMATE:  My name is Mr. Raynaldo Melendez.

24         THE COURT:  I want to note that Mr. Melendez is a

25   roommate with Mr. Moseley, and his inmate registration number

1  is 71581-054.

2          And what do you have to say, sir.

3          He said he would like to elaborate his cell mate was

4  going through a real mental breakdown here.  He asked for

5  attention because when the power was off the emergency buttons

6  were not working.  The officers were walking around only every

7  hour or so.  When we finally got the officer's attention -- I

8  think his name is Gaymen, to be correct -- and I said the man

9  is suicidal, and I think they took it as a joke.

10          I physically had to take the -- literally had to take

11  the noose out of his cellmate's hand he was trying to kill

12  himself.

13          I'm sorry to hear that.

14          This box on my door, I was having chest pain and --

15          So, you were asking for medical attention, you had

16  chest pains, you couldn't breathe.  But you referred to a box.

17  This box here.

18          One day I asked him, and he said the medical attention

19  is coming.  It never came.  So when I waited the next day, I

20  asked him again, they never came, so when he was handing out, I

21  literally had to stick my arm out to prevent him from closing

22  the slot just so I could get some medical attention.

23          Sorry to hear that.  Thank you for telling me.

24          INMATE:  Thank you very much.  Thank you for being

25  worried about us, ma'am, and treating us like human beings.

J257SEG5

1          THE COURT:  I'm very worried about you.

2          MR. OLIVER:  Back at 1121 there is a significant

3     amount of moisture coming from the ceiling.

4          THE COURT:  My name is Analisa Torres.  I am a judge

5     in the Federal District Court, and I am coming to take a look

6     at the conditions here.

7          Sir, just tell me your name, please.

8          INMATE:  Elgin Brack and Jordan Velez.

9          THE COURT:  So, I am looking into the cell, and I can

10    see abundant water on the ceiling.  You can tell that there is

11    water damage.  He's now showing me a very dingy yellowed

12    blanket that is obviously water damaged.  Yes, I see also mold

13    on top of the florescent light.  It's a black, blotchy mold.  I

14    also saw that in cell number 114.  Mr. Velez is showing me his

15    left arm that has a rash on it, and he says it's from the water

16    dripping.  He says that he thanks God for Ms. Webster who gives

17    him supplies when he needs it.  Mr. Elgin says she is the only

18    officer.  He says -- Mr. Velez says they did not have heat or

19    hot water for two weeks.

20         Thank you both for giving me this information.

21         Is there someone who can contact his family?  We have

22    a lawyer here who might assist you in contacting your family.

23         We are on the seventh floor now, and this is the west

24    side, correct?

25         WARDEN QUAY:  Yes.

J257SEG5

1        THE COURT:  All right.  Is there anything that you

2   want to point out, Ms. von Dornum?

3        MS. VON DORNUM:  Yes.  It's significantly brighter

4   both in the common area which only had emergency lighting

5   previously, and even more notably in the cells.  Significantly

6   warmer in the common area, which I already thought was

7   comfortable when we were here on Friday February 1, but now is

8   significantly warmer.  People are out.  There was nobody out;

9   everyone was locked in when we were here before.  And they

10  appear to be allowed to move around freely, and people are

11  wearing far less clothing than when I last saw them.

12       THE COURT:  Yes, there are a lot of people dressed in

13  shorts.

14       Is there anything else you wanted to point out beyond

15  that?

16       MS. VON DORNUM:  Can we go in a cell?  I don't want to

17  invade anybody's privacy.

18       When we were in here the last time we were here the

19  cells windows had frost on the glass.

20       THE COURT:  This is cell 13.  Do you know what

21  direction this is facing?

22       MS. VON DORNUM:  It looks like this is facing the

23  street, Third Avenue.  This looks like it's the east side here.

24  And the west side is those cells.

25       THE COURT:  And you say you saw frost on the inside of

J257SEG5

1    these windows.

2          MS. VON DORNUM:  On both sides on this floor.  It was

3    quite cold.

4          THE COURT:  Tell me your name.

5          INMATE:  Thomas.

6          THE COURT:  My name is Annalisa Torres.  I am a

7    federal judge.

8          INMATE:  How are you doing, Annalisa?

9          THE COURT:  There was a time when there was a lack of

10   heat.

11         INMATE:  Yes.

12         THE COURT:  Recently; is that right?

13         INMATE:  Yes.

14         THE COURT:  And can you describe to me what the

15   conditions were like in your cell.

16         INMATE:  If was cold.  We just now got blankets a

17   couple days ago.  What day was that?  Yeah, Monday, we just now

18   got the blankets.  We went a whole week with it being freezing,

19   no lighting, my toilet not working.  You can flush the toilet

20   right now, it's not working.  It was cold.  They're not letting

21   us take showers.  They're not feeding us properly.  We supposed

22   to come out at least one hour regularly.  They keep us in the

23   cell for 23 hours, and we didn't come out at all.

24         THE COURT:  What made you realize how cold it was?

25   Was there anything that you could see?

J257SEG5

1           INMATE:  You could see your breath on the window.

2           THE COURT:  What is your name?

3           INMATE:  Salvin Johnson.

4           THE COURT:  And you say you could see your breath on

5    the window?

6           INMATE:  Yes.  It was so cold that we had to block the

7    air vent.

8           THE COURT: Tell me your name.

9           INMATE:  Sanders.

10          THE COURT:  And you're saying that the air vent needed

11   to be covered; is that it?

12          INMATE:  Still covered right now.

13          THE COURT:  Let me take a look at that.  Where is

14   that?  So walking into cell 13 on the right side, near the

15   ceiling there is a vent which is covered.

16          INMATE:  Cardboard, cardboard and string.

17          THE COURT:  And why did you cover it?

18          INMATE:  Because it was too cold.

19          THE COURT:  Was it you who put the cover on?

20          INMATE:  Yes.

21          THE COURT:  Thank you.

22          MS. KUNSTLER:  Your Honor, this is unit J71.

23          THE COURT:  On the seventh floor, OK.  Thank you.

24          What is your name, sir.

25          INMATE:  Marcello Cutler.  I have been waiting to see

J257SEG5

```
 1    a doctor since we locked down.  I have colitis, many medical
 2    issues along with mental health issues.  I was locked in my
 3    cell, I used the bathroom maybe over the course of 15 to 20
 4    times.  My toilet was shut off all night.  And then on top of
 5    that I have a rash.  Now I have to try to make it to court
 6    tomorrow.  I have a rash that's bleeding.  I showed the officer
 7    my underwear, and they said it's above my pay grade.
 8              THE COURT:  So sorry to hear that, sir.
 9              INMATE:  Then on top of that I still haven't seen
10    anybody for my issues.
11              THE COURT:  Can you tell me the name of your lawyer?
12              INMATE:  Karloff Comisho.
13              THE COURT:  Say that loud?
14              INMATE:  Karloff Comisho.
15              THE COURT:  OK.
16              INMATE:  I'm in the Southern District.
17              THE COURT:  I am going to contact him and let him know
18    about what you're telling me.  And I am certainly hoping that
19    you feel better, sir.
20              INMATE:  I will try to make it to court tomorrow.  I
21    mean I'm bleeding, so...
22              THE COURT:  Sorry to hear that.  I really do hope you
23    get better.
24              INMATE:  Thank you, ma'am.
25              THE COURT:  Tell me your name.
```

1          INMATE:  Richard Luthman.  I just wanted to make the

2     point that I have obstructive sleep apnea and was without my

3     machine for seven days.

4          THE COURT:  Why were you without the machine?

5          INMATE:  There was no power, no power to plug in.  My

6     cell is right over here, and the only power outlet is outside

7     the cell and all the outlets were out, and so I -- it's a

8     deadly condition if it goes the wrong way.  And I'm not alone.

9     I think there were eight other people in the building that had

10    obstructive sleep apnea and were in the same condition I was.

11         THE COURT:  And when were you able to get the machine

12    back?

13         INMATE:  I was only until -- the first Saturday when

14    the event happened and the electrical fire, it was the next

15    Saturday after they brought us over to the east building where

16    they had electricity and we could plug in our machines.

17         THE COURT:  You were sleeping in the east building?

18         INMATE:  Only for one night.  I spent an entire week

19    without my machine and it was hard to sleep.  It was very,

20    very, you know, very anxiety because you have to worry about

21    when you go to sleep and the apnea.

22         THE COURT:  Sorry to hear that.  I hope that that

23    doesn't happen again.

24         INMATE:  Thank you.

25         THE COURT:  Frank White?

J257SEG5

1            INMATE:  I was stuck in the cell.  I wasn't getting my

2    medicine properly.

3            THE COURT:  When did this happen, sir?

4            INMATE:  During the whole lockdown.  It was like a

5    week.  A week, a whole lockdown.  And they wasn't feeding us

6    right.

7            THE COURT:  What is your name.

8            INMATE:  Freddie Jamian.  Like at 6:30, they were

9    feeding us at 10 o'clock.  That was breakfast.  And at lunch we

10   supposed to get at 11 o'clock, we was getting that at 5

11   o'clock.  And that's dinner time.  Then at 7:30, you know, the

12   food is cold.  There was days the lunch they wanted to give it

13   to us as dinner at night.  The same lunch, they wanted to give

14   it to us as dinner.

15           THE COURT:  And what is your name?

16           INMATE:  Adolfo Diaz.

17           THE COURT:  Thank you very much.  I appreciate you

18   giving me this information?

19           INMATE:  On officer -- the officer jammed the arrest

20   button.  So Sunday morning I passed out, I had to go to the

21   hospital, I could have bust -- I couldn't press the arrest

22   button because they jammed it.  We was told we shouldn't be

23   pressing the button.

24           THE COURT:  Are you all right now?

25           INMATE:  No I still haven't been seen yet.  I still

 1    don't know.  I am still in pain.

 2              THE COURT:  Do you know the name of your lawyer?

 3              INMATE:  Jacob Mitchell.

 4              THE COURT:  So I'm going to contact your lawyer and

 5    tell him about having these problems.

 6              All right.  Thank you, sir.  I'm going to go to

 7    inmates on the sixth floor now.

 8              INMATE:  My name is Leonard Hinton.  I had a host of

 9    medical problems.  I haven't gotten my medication.  I couldn't

10    get the medication until Monday.

11              THE COURT:  Today is Tuesday.  You are talking about

12    yesterday?

13              INMATE:  Last week.

14              THE COURT:  Last week.

15              INMATE:  Last week.  And as you can see I'm in a wheel

16    chair, and I have some problems with stuff, a lot of things,

17    and off the record I will speak.

18              THE COURT:  I understand, sir.

19              INMATE:  It's serious.  Serious problems.

20              THE COURT:  Well, I hope that you are feel better and

21    I hope the conditions improve.  Thank you for telling me.

22              I'm going to the sixth floor.

23              We're now on the sixth floor on the west side.

24    Ms. von Dornum, is there a particular location you would like

25    me to look in?

J257SEG5

1          MS. VON DORNUM:  Your Honor, this is unit 61 where

2     many inmates complained of medical problems including the man

3     with the bandages that hadn't been changed in two weeks with

4     the gunshot wound and the emaciated man.  And it was quite cold

5     in this unit.  So we could compare the conditions.  I don't

6     think you're going to learn anything different than you learned

7     above.  But there were many medical cases on this particular

8     unit that Investigator Ross and I saw.

9          THE COURT:  OK.

10          MS. VON DORNUM:  This is Rinell Watson.

11          THE COURT:  Hi, Mr. Watson.

12          INMATE:  How are you doing.

13          THE COURT:  How are you?

14          INMATE:  I'm fine, but my situation is that I got

15     glaucoma, and I needed to go to the hospital because the

16     pressure in my eye is high, and they haven't taken me yet.  And

17     then I also got these bandages on for over three weeks.  They

18     still didn't take me out the building to change the bandages.

19     And like the situation here was just really ridiculous, you

20     know, it's cold in the room, there is no shower, no laundry.

21          THE COURT:  When was that?

22          INMATE:  All last week.  You know, I kept asking them

23     I seen flashes in my eyes and I'm supposed to go immediately if

24     I see flashes in my eye.  And I was telling the officers, and

25     they was just completely ignoring me.  So like I don't know

1    what's is going to happen.  They still haven't taken me out yet

2    to see any medical situation.

3           THE COURT:  Perhaps you can take the name of an

4    attorney?

5           MS. VON DORNUM:  We're his attorneys, your Honor.  We

6    brought it to the attention of the Court.  I also brought it to

7    the attention of Ms. McFarland on Friday when we were standing

8    here, and Assistant Warden King, and pointed out the bandage

9    and the glaucoma.  That is Friday when Investigator Ross and I

10   were here.

11          But you haven't received medical attention since

12   Friday?

13          INMATE:  No, no.

14          THE COURT:  Sorry to hear that.

15          INMATE:  And I told them -- I explained to them like

16   my doctors told me if I see color or floaters, that I'm

17   supposed to immediately go to the hospital.  And I seen it a

18   few times already, and I told them that, and they just

19   completely ignored me.  I may have a retina detachment and not

20   know it right now.

21          THE COURT:  All right.  I'm certainly hoping you get

22   to see the doctor soon.

23          INMATE:  Thank you.

24          Excuse me.  My name is Franklin Sterling, and I have a

25   mean headache and my chest be hurting me.  I have been spitting

1    blood.  Every time I cough, this right here on this left side I

2    got a ball, you know.  I have sent e-mail for medical.  Today I

3    sent an e-mail for medical, and nobody called me, you know.  I

4    don't know what's going on, and I really need medical

5    attention.

6              THE COURT:  Very sorry to hear you're not feeling

7    well.

8              If you would please take down the name of his attorney

9    and contact him, I would appreciate that.

10             INMATE:  My name is Michael Crumble.  Now for some

11   reason the food was coming up undercooked and cold.

12             THE COURT:  When was this?

13             INMATE:  This was Saturday, and I think Friday night.

14   One of them, Friday, Saturday or Sunday.  It was two days in

15   the nighttime it came up cold, so I caught a bad stomach ache

16   with a bunkie in the cell, so I'm trying to explain to the

17   officer, listen, I need to see medical attention.  They would

18   not see me see, medical attention.  Two days later and the

19   stomach ache is gone, so I'm just nasty.

20             THE COURT:  Sorry to hear you weren't feeling well,

21   but happy to hear that you are better.  Thank you so much.

22             MR. SPILKE:  I believe the sixth floor is also where

23   Tabb is, and he was going to be a witness today.  He was the

24   one who wasn't brought over because he allegedly spit at a

25   marshal.

J257SEG5

1          THE COURT:  Do you know if he is here?

2          MS. VON DORNUM:  He is in unit 62.

3          THE COURT:  All right.  So let's go see him.

4          Hello, sir.  My name is Annalisa Torres, I'm a federal

5   district court judge.  I am had a hearing today, and I was

6   expecting you to come.  What happened?

7          INMATE:  I went downstairs.

8          THE COURT:  Before you say anything, what's your name?

9          INMATE:  Zimian Tabb.

10         THE COURT:  OK, go ahead.

11         INMATE:  I went downstairs.  I was waiting for like an

12  hour or two.  The marshals came and said do you know it's a

13  legal visit, it's not court; do you still want to go?

14         INMATE:   I said of course I want to go.  He's like,

15  well, if you want to go, just wait in the bullpen.  I waited,

16  and the next thing he is saying I can't go with my sneakers.  I

17  changed out of my sneakers, I changed into blue shoes.  After

18  that he is like -- he had like an attitude, so I got an

19  attitude back to him.  I didn't curse at him or anything.  The

20  next thing he's like I'm not taking him at all; you're going to

21  have to call somebody else to come get him, or whatever.

22         THE COURT:  So did you want to come?

23         INMATE:  Of course.  I was down there.  I kept telling

24  him after he was saying he wasn't going to take me, I kept

25  saying I want to go, I'm not refusing.  Because they kept on

1    saying either you refuse or you're not.  I said I'm not

2    refusing, I want to come.  He is like we just going to call

3    somebody else for someone to get you.  I waited another three

4    hours, nobody ever came.  The next I know they said you got to

5    go back to your house, it was canceled.

6              MS. VON DORNUM:  Mr. Tabb, was there anything in

7    particular that you wanted to tell the Judge if you came to

8    court today?

9              INMATE:  I wanted to tell her if we get some hot

10   water.

11             THE COURT:  Are you saying currently you do not have

12   hot water?

13             INMATE:  It's like mild, it goes in and out, keeps

14   going in and out basically like the showers, like the cells

15   have hot water but the whole week we didn't have anything.  It

16   was crazy.

17             THE COURT:  So during the week what about the showers?

18             INMATE:  They didn't give us no showers at all.  We

19   were locked inside the cell since Thursday.  After this

20   everybody started getting on the public defender phone.  After

21   that we couldn't come out after that, they locked us in after

22   that.  So from Thursday on we weren't able to do anything.

23   Before that there was no hot water to take a shower before

24   Thursday at all.

25             THE COURT:  Do you know when the hot water went out?

J257SEG5

1          INMATE:  Oh, about Saturday?  Saturday night.

2          THE COURT:  You're talking about last Saturday or the

3     Saturday before?

4          INMATE:  Last Saturday.

5          THE COURT:  So today is Tuesday.

6          INMATE:  Not the Saturday just passed, the Saturday

7     before that.

8          THE COURT:  OK, all right.  Thank you for telling me.

9          INMATE:  All right.

10         THE COURT:  OK.

11         MS. KUNSTLER:  Your Honor, both Mr. Spilke's client

12    and my client are on unit 42, the same unit, so we would

13    request that we go to that unit since we're here.

14         MR. SPILKE:  Yes.

15         THE COURT:  And what is the purpose of going there?

16         MS. KUNSTLER:  Well, to talk to other people on the

17    unit about how their medical conditions are being addressed.

18         MR. SPILKE:  That's for you.

19         THE COURT:  So your client and your client were both

20    in the courtroom today.  If you wanted them to talk, you could

21    have put them on the stand.  That's why I don't see a need to

22    talk to them now.

23         MR. SPILKE:  Not necessarily to talk to them, Judge.

24    Just to see what the conditions are on the unit and in their

25    cells.  I think it makes sense.

1    THE COURT:  Well, if you wanted to put evidence on,

2  you should have put it on today.  Let's go.

3    All right.  It's 6:15, and we have come to the end of

4  our tour of the MDC.  As I stated at the beginning, I would

5  like to know what your application is at this point.  What is

6  the relief that you're seeking, Mr. Spilke?

7    MR. SPILKE:  Yes, your Honor.  On behalf of my client,

8  we request an immediate transfer to another institution because

9  of fear of retaliation, incredible fear of retaliation that my

10  client brought to my attention.  Another man on his unit was

11  punitively transferred to the SHU for no reason, and the

12  understanding was -- at least what was said -- was he was being

13  made an example of.

14    THE COURT:  So transfer to where?

15    MR. SPILKE:  Any other institution that the marshals

16  can bring him to.  I know that Valhalla, for instance, MCC.

17    THE COURT:  And retaliation for what?

18    MR. SPILKE:  For bringing this motion, for bringing

19  this to this level of scrutiny, to the attention of this Court,

20  and, might I add, to several presidential candidates, media

21  outlets, international news.  There is intense scrutiny on this

22  institution because of the many letters that criminal lawyers

23  sent complaining about inability to access our clients.  And

24  that's really the genesis of this.  That was the genesis of

25  this whole thing, that I just could not see my client; I did

J257SEG5

1    not know what was going on with him.  I want to do a welfare

2    check, and I wasn't able to do that.  And I think that --

3              THE COURT:  But you did see him today.

4              MR. SPILKE:  I did, but we've seen throughout the

5    course of this hearing that the problems here are bigger than

6    any one person, any one team of staff members, and it's

7    endemic.  Yes, it's warm today, it's warm outside today, but

8    when is the next thing going to happen?  And everything has

9    been a Bandaid fix and not permanent.  And just the only reason

10   why I think people are getting medical attention today and hot

11   food and seemed pretty happy relatively to what the reports

12   were is because of the scrutiny.

13             So, I think that scrutiny needs to continue.  I think

14   that my client needs to be transferred because of fear of

15   retaliation, and I think a special master needs to be appointed

16   for the reasons stated by Ms. von Dornum on the stand today.

17             MS. KUNSTLER:  Your Honor, based on what we saw here

18   today and on Ms. von Dornum's testimony, I have no confidence

19   in this facility's ability to provide adequate medical care to

20   any inmate who needs care, including my client.  I can supply

21   the Court with medical records from my client through

22   October -- through November 22.  I subpoenaed but did not get

23   medical records for him from that date forward, so I was unable

24   to question him and speak with him about any care --

25   corroborate anything he would tell me post that date in terms

1    of the care he was or was not receiving at the facility.

2            I have been told by Adam Johnson that he will try to

3    get me the records today, tonight.  He was going to talk to

4    Nicole McFarland.  I know from my client that he is supposed to

5    be returned to the hospital for follow-up care with the place

6    that put in his eye socket, and that he has not been taken out

7    to receive that care.  And I remain concerned about him for

8    that reason.

9            So I join in Mr. Spilke's request for a special master

10   to be appointed on behalf of my client and everyone

11   incarcerated here.

12           I do want to take time -- I know this hearing today

13   was not about my client's bail application, but I do want to

14   take time to consider that.  If there is not another suitable

15   facility that can take him, if he cannot be taken to a

16   hospital, then he should be released so he can get the medical

17   care he needs.  Somebody who has orbital surgery needs to

18   return to the hospital for follow-up.

19           THE COURT:  So you're saying that you want his

20   transfer to a hospital or transfer to another facility?

21           MS. KUNSTLER:  Well, I would like him to be taken to a

22   hospital to evaluate his eye socket, but I don't have any

23   confidence that he can get medical care here, so I would like

24   his transfer to another facility.

25           MR. SPILKE:  Might I note that Ms. McFarland is

1    present and has joined the tour and might be able to speak on

2    the medical aspect.

3              THE COURT:  The time for direct on medical records was

4    during the hearing today, and inexplicably you put on no

5    evidence.  You did not even call your client to say how he was

6    feeling.

7              All right.  We're going to return to the courtroom.

8    As I said again, I'm going to ask you to repeat the remedy that

9    you're seeking, and I will make a ruling at that time.

10             (Recess)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J25nseg6

|     |                                                                    |
|-----|--------------------------------------------------------------------|
| 1   | (In open court)                                                    |
| 2   | THE COURT:  Please be seated.                                      |
| 3   | I will now re-call to the stand Ms. von Dornum.                    |
| 4   | DEIRDRE von DORNUM, resumed.                                       |
| 5   | THE COURT:  I just want to remind you that you are                 |
| 6   | still under oath.                                                  |
| 7   | THE WITNESS:  Yes, your Honor.                                     |
| 8   | THE COURT:  You may be seated.                                     |
| 9   | THE WITNESS:  Thank you.                                           |
| 10  | THE COURT:  Ms. von Dornum, we are just getting back               |
| 11  | from a tour of MDC.  I would like you to describe how the          |
| 12  | conditions are different, if they are, from your visit on          |
| 13  | February 1.                                                        |
| 14  | THE WITNESS:  Yes, your Honor.  Beginning with the                 |
| 15  | entry into the lobby, it was far warmer and it was bright.         |
| 16  | There were multiple COs, correctional officers, there.            |
| 17  | When I was there on February 1, it was dark and cold               |
| 18  | in the lobby, so that was the first difference.  And the           |
| 19  | regular processing seemed to be up and the regular security       |
| 20  | systems seemed to be up.                                           |
| 21  | And then when we moved into, I guess I would call it               |
| 22  | the vestibule, where we had our hands checked, when I was there    |
| 23  | on February 1, there was a big backup source of light that had     |
| 24  | been placed there, because otherwise it was quite dim, and that    |
| 25  | was fully lit.                                                     |

1    I saw that the visiting room was now fully lit.  It

2    had the emergency lights on when I was there before.

3        When we went through into the elevator bank, it was

4    still significantly warmer than when I had gone up to the SHU

5    and the housing units on February 1, and the lights were on

6    fully.  So those were the major differences on the first floor.

7        When we went up to the SHU to start with, just as I

8    did on February 1, when we went up to the SHU, the first thing

9    I noticed was, again, it was much brighter, much warmer, I

10   would say almost getting a little uncomfortably warm at times.

11   When we went in to the units I noticed again it was much

12   brighter.

13       The medical facility -- it's really an examination

14   room that they have on the SHU floor -- was lit, whereas

15   previously it was dark, and the lieutenant who was the SHU

16   lieutenant had previously explained to me that it was difficult

17   to give medical care during last week because of it having no

18   light.  So it was harder to examine people then.  Now it seemed

19   to be fully lit.

20       I saw the heating unit for the food plugged into the

21   wall in the SHU, and I confirmed with the Warden Quay that it

22   was indeed working now, whereas when we went on February 1 the

23   SHU lieutenant had told us that the food heating equipment was

24   inoperable on the floors, leading to the food being served

25   colder than ordinarily.

1    The lights in the hallways were much brighter.

2    Previously it was all emergency lighting.  The floors had

3    clearly been scrubbed.  When we were there before they were

4    quite dirty and there was a lot of water on them when

5    Investigator Ross and I previously toured on February 1.  Now

6    that had clearly been cleaned.

7    It was significantly warmer, the air coming out from

8    the cells particularly on the west side.  We didn't go into a

9    cell, so I didn't see that temperature, but when we looked into

10   the cells they were quite bright, unlike before.

11   Some of the things that seemed to be the same were the

12   leaks in the ceilings both in cell 114, as I mentioned earlier,

13   but also in other cells that we were able to observe, this time

14   with the lights on, dripping water, currently dripping water as

15   well as evidence of a great deal of water damage inside the

16   cells, and, you know, inmates describing being cold and the

17   water dripping on them and showing us mold on their lamps,

18   which we weren't able to previously see, as well as describing

19   how hard it was to be in the dark and cold.

20   Also consistent with my last visit was the statements

21   by inmates about medical care, that they still weren't

22   receiving it, and in fact one inmate described how when he was

23   trying to receive medical care and urgently asking for it for

24   his cellmate, who was having psychiatric issues and suicidal

25   issues, he then was disciplined for that by having the security

1    box placed on the outside of the door.

2           So it was much warmer, much brighter, but it was clear

3    that the medical situation had not been rectified, and the

4    inmates seemed to be expressing a lot of concern about how they

5    had been treated, with the exception of CO Webster, who they

6    singled out as having provided very good care to them during

7    this period.

8           We didn't have a chance to ask them -- and that was

9    probably my fault, your Honor -- about whether they had been

10   out for rec since the power went on, so I don't know about that

11   part of it, but they did tell us they had no social or legal

12   calls up in SHU so far.

13          Down on the seventh floor, which was our next stop,

14   again it was much, much brighter, both in the vestibule areas

15   and the corridors, far more than the emergency lights that had

16   been on when Investigator Ross and I went on February 1.  It

17   was also significantly warmer both in the common rooms and in

18   the air coming out from the cells.

19          We went to -- J71 was the unit we went to on the

20   seventh floor, so definitely the light and heat were far

21   better, although in the one cell that we were able to go into,

22   which belonged to an inmate named Clarence Clark, he described

23   how still they could feel cold air coming out of the vents and

24   they still had their vents covered with cardboard, so that was

25   consistent with what we had seen when I went with Investigator

1   Ross on February 1.

2           The phones were clearly up.  In fact, we saw inmates

3   making social calls while we were there, inmates on the

4   computers, inmates able to exercise.

5           All of that was quite different from when I was there

6   and the people were locked down.  Now on the units people were

7   out, so I would say that was a significant difference.

8           One thing that remained very much the same, according

9   to the inmates that spoke to us, including inmates that

10  Investigator Ross and I spoke to on February 1, was the

11  continuing lack of medical care, including for inmates that

12  Investigator Ross and I had specifically pointed out to Nicole

13  McFarland and the assistant warden and asked that they get them

14  medical care.  Even those people had still not been seen by a

15  doctor since our visit on Friday.

16          And a number of people noted concerns about the

17  longstanding nature of what they suffered last week.  We didn't

18  test a shower, unlike when Investigator Ross and I went, but

19  several of the inmates noted to us that the shower water is

20  still quite cold, but that there is hot water in their cells.

21          I should note that when we went to the SHU -- I

22  forgot, your Honor -- the inmates in the SHU, where they're

23  only allowed to shower inside their cells, said that the water

24  is still cold in those showers inside the cells in the SHU.

25          We then went to the sixth floor, and there, again, the

1   lighting was far brighter.  The heat was far warmer.  Inmates

2   were out.  Inmates were exercising and making social phone

3   calls and on the computers.  But again we encountered people

4   with significant medical problems, including, again, people who

5   Investigator Ross and I had sought specific care for, and they

6   had not received that medical care.

7            In fact, I don't think we encountered anyone during

8   the visit who said that in the intervening days they have

9   received the medical care that they sought.  So that continues

10  to be a concern.

11           I did not see any legal visits taking place, but I did

12  see social visitors when we were exiting the facility who were

13  clearly coming in to see their family members.  I was glad to

14  see that.

15           I think those are the significant similarities and

16  differences, your Honor.

17           THE COURT:  Any questions from counsel?

18           MS. BRETZ:  May I confer one moment, your Honor, just

19  briefly.

20           No further questions, your Honor.

21           MS. KUNSTLER:  Just one, your Honor.

22  REDIRECT EXAMINATION

23  BY MS. KUNSTLER:

24  Q.  Prior to when we left for MDC in response to a question

25  from the Court, you were discussing the need for a special

1    master.

2          Did this visit today in any way change your opinion

3    that a special master is needed?

4          MS. BRETZ:  Objection.

5          THE COURT:  Overruled.

6          You can give your opinion.  Go ahead.

7          THE WITNESS:  Thank you, your Honor.

8    A.   It did not, because what struck me, again, was our

9    inability to get reliable information.  So in the time since

10   the power has gone back on, which I'm grateful for, the MDC and

11   the U.S. Attorney's Office, no doubt relying on the MDC, have

12   repeatedly represented to the Court, at least in the Eastern

13   District that medical care is now being provided, that medical

14   care is consistent, that there's no longer, to the extent there

15   ever was according to them, problems with medical care.

16         What we saw tonight made clear that was not accurate,

17   so it again raises my concern about, if we continue to just

18   raise the issue in individual cases how do we get accurate

19   information.

20         It seems to me that a neutral fact-finder, again, who

21   could go unannounced at any time and could talk to people

22   directly and could have the authority to ask for medical

23   records or you know to check on the provision of medical

24   services and have, you know, food and psychiatric medications,

25   would be a least a way to try to obtain the information that

1   right now makes it hard for us to even inform the Court.

2           I had many court appearances last week where I was

3   making representations based on the inmate and the government

4   was making representations based on the BOP, and the Court had

5   no ability to figure out what was happening.  So I do think

6   having a special master, while obviously they can't meet with

7   every person and solve every problem, at least we would have

8   far greater insight into the systemic problems like the medical

9   care.

10          MS. KUNSTLER:  Thank you.  No further questions.

11          MS. BRETZ:  May I ask one question on redirect, your

12  Honor.

13          THE COURT:  Yes.

14  RECROSS-EXAMINATION

15  BY MS. BRETZ:

16  Q.  Did you speak to any medical faculty while you were at the

17  tour today.

18  A.  I did not see any doctors.  The only person I saw who might

19  be referred to as a medical faculty was the CO who was pushing

20  the medications out of the SHU.  I did not speak to her, but I

21  believe from prior conversations with her that she is in fact a

22  correctional officer and not a medical faculty.

23          MS. BRETZ:  Thank you.

24          THE COURT:  You may step down.

25          THE WITNESS:  Thank you, your Honor.

J25nseg6

1          (Witness excused)

2          THE COURT:  I am now going to re-call to the stand

3    Special Agent Ross.

4     JOHN ROSS, resumed.

5          THE COURT:  Special Agent Ross, just remember that you

6    are still under oath.  You may be seated.

7          THE WITNESS:  I do.  Thank you.

8          THE COURT:  Would you comment on whether there are any

9    differences in the conditions at MDC compared to February 1

10   when you were there, having just come back from MDC today?

11         THE WITNESS:  Yes.  I mean, the obvious thing, the

12   heat is higher.  For reference, I would consider the heat today

13   as warm, you know, throughout most of the building, and, of

14   course, the lighting is on in the -- full power in the common

15   areas and now also in the cells.  So we could see into the

16   actual cell.

17         THE COURT:  Anything else?

18         THE WITNESS:  The inmates are out.  You know, you

19   could see most of the inmates are out and about as, you know,

20   the normal routine.

21         THE COURT:  Any questions for Special Agent Ross?

22         MS. BRETZ:  No, your Honor.

23         MS. KUNSTLER:  No, your Honor.

24         THE COURT:  You may step down.

25         THE WITNESS:  Thank you.

J25nseg6

| | |
|---|---|
| 1 | (Witness excused) |
| 2 | MS. KUNSTLER:  Your Honor –– |
| 3 | THE COURT:  One moment. |
| 4 | Last Thursday and Friday, after receiving letters from |
| 5 | defense counsel alleging conditions at MDC that, if true, could |
| 6 | rise to the level of constitutional violations, I felt it |
| 7 | imperative that I conduct a full evidentiary hearing and an |
| 8 | inspection of MDC. |
| 9 | Starting this morning, I heard over four hours of |
| 10 | testimony.  Eleven of the witnesses testified about the |
| 11 | conditions they experienced during the power outage and cold |
| 12 | spell.  From 5:05 to 7:15 p.m. today I visited the west side of |
| 13 | floors 6 and 7 and the special housing unit. |
| 14 | A court stenographer accompanied me along with the |
| 15 | following people:  My three law clerks, Ezra Spilke, Sarah |
| 16 | Kunstler, Gideon Oliver, Jeff Ostericher, Emily Bretz, Paula |
| 17 | Gold, the interpreter, John Ross, Deirdre von Dornum, Letitia |
| 18 | James, Jennifer Levy, Harry Chernoff, and Warden Herman Quay. |
| 19 | I spoke with at least a dozen inmates, some in their |
| 20 | cells and some in the common areas.  I inspected about seven |
| 21 | cells. |
| 22 | At the MDC this evening on the record I asked both |
| 23 | defense attorneys to state the remedy that they are seeking for |
| 24 | their clients.  Both request that I transfer the defendants |
| 25 | from the MDC, Mr. Segura-Genao claims that MDC administrators |

1    will retaliate against him for complaining publicly about the

2    conditions there.  Mr. Perez claims that he must be transferred

3    to a hospital for treatment.

4            What I find utterly inexplicable is that neither

5    defendant offered a shred of evidence to support their claims.

6    If Mr. Segura-Genao fears retaliation, why didn't he take the

7    stand and say so?

8            If Mr. Perez feels that he should be hospitalized, why

9    did he sit back and remain silent during several hours of

10   witness testimony?

11           Those are my questions.

12           MS. KUNSTLER:  Your Honor, I have spoken with my

13   client and circumstances have changed and he would like to take

14   the stand and testify about his medical condition and care.

15           THE COURT:  We had an evidentiary hearing that lasted

16   over four hours.  That was your opportunity.  I am going to

17   deny the application without prejudice to renewal on papers

18   offering an explanation for why it is that you think your

19   client should have this relief.  You don't come at the 11th

20   hour, after all of the evidence is in, and make such a request.

21           MR. SPILKE:  Your Honor, if I might offer an

22   accommodation, that we be allowed to submit an affidavit within

23   48 hours.

24           THE COURT:  I stated you may submit a writing that

25   supports your request.

J25nseg6

1          MR. SPILKE:  Understood, your Honor.  I thought you

2     meant briefing.  Now I understand.  Thank you.

3          THE COURT:  So those applications are denied.

4          Are there any further applications?

5          MS. KUNSTLER:  Yes, your Honor.

6          MR. SPILKE:  Yes, your Honor.  We also -- sorry.

7          Ms. Kunstler.

8          MS. KUNSTLER:  Yes.  We also request that the Court

9     appoint a special master to supervise the MDC.  Now, frankly,

10    your Honor, I don't think -- I think this emergency situation

11    shined a light on a continuing problem that has been tolerated

12    for way too long.  There's a big problem here.  It impacts my

13    client and the 1599 some-odd other inmates incarcerated there

14    at the MDC.

15          A special master, as Ms. von Dornum indicated, would

16    be able to serve as an intermediary.  The Court went there

17    tonight, but the Court cannot go there on every occasion to

18    check out every situation and every allegation.

19          We heard testimony today from Ms. von Dornum that

20    clearly indicated there is a problem not only with medical

21    treatment at the facility, but a problem in communication with

22    the jail.  The reporting from the jail has frankly been

23    unreliable about this entire incident.

24          Given the unreliability of the BOP in this emergency

25    situation to relay accurate information about what was

1 happening there, how can we trust the BOP to report accurate

2 information about our client and their medical needs.

3     As we saw today when we went to the facility and as

4 Ms. von Dornum testified, those needs are still not being met

5 not even after Ms. von Dornum highlighted the problem on

6 Friday, and here we are back today visiting the same unit and

7 the same inmates.

8     Frankly, your Honor, there is a crisis of confidence

9 here, a crisis of confidence for all of our clients, and the

10 U.S. Attorney's Office is simply not in a position to play the

11 role that a special master would play.  They have a conflict.

12 They have a client.  Their client here is the BOP.  They cannot

13 step in and someone needs to step in.

14     The fix of this problem the utilities manager Maffeo

15 testified was not a permanent fix.  It's a temporary fix.

16 There is a part that still needs to be ordered that may take

17 much as a year to get here.

18     Officer Barnwell testified that this is a problem that

19 has been ongoing for many years.  There's just -- it's too

20 much, your Honor.  I am overwhelmed by our experience at the

21 jail talking to incarcerated people about their needs not being

22 met.  I am overwhelmed by the inconsistencies we have heard

23 today in this courtroom.I'm overwhelmed by the inconsistencies

24 identified by Mr. Von Dornum in her efforts to seek the truth

25 here.

1          For all of these reasons this Court in its power as a

2     steward of criminal cases, I ask you to consider appointing a

3     special master to take care of all of our clients.

4          Thank you.

5          THE COURT:  So that specific relief is requested in

6     the complaint filed by the Federal Defenders in the Eastern

7     District of New York.  At page 10, paragraph 44E, you will see

8     that addressed.  It is in the context of that civil action that

9     it is appropriate to seek that relief.  I don't think that it

10    is an appropriate remedy in the criminal context.

11         Are there any other applications?

12         MR. SPILKE:  Your Honor, I join in Ms. Kunstler's

13    application.  I don't have much to add.  I think she summed it

14    up quite eloquently.

15         I think that, yes, your Honor is correct, of course,

16    that that civil action does provide for a special master.

17    However, this Court has supervisory power over its defendants,

18    and we've seen over and over again that this is bigger than one

19    CO, one captain, one warden.  And, you know, it's not just --

20    we saw that when the people who are entrusted to the MDC are

21    suffering, so do the COs.  We saw that in the testimony of

22    several of the witnesses, and I believe your Honor saw that

23    tonight in our tour of the MDC.  So I do think that this Court

24    does have the power to do that, and I join Ms. Kunstler.

25         That's it.

1          THE COURT:  Well, I adhere to my decision.  The

2     application for a special master is denied.

3          You may submit the affidavits that you mentioned

4     concerning your clients' requests for transfers, and I will

5     consider them.

6          The matter is adjourned.

7          MR. SPILKE:  Thank you, your Honor.

8          MS. BRETZ:  Thank you, your Honor.

9          (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# *A letter to my inner self*

Hey self". Aren't you exhausted of hurting your family and putting them through that excuciating pain. Aren't you ashamed for missing out on the most important times of your child life. When are you going to realize you're not only hurting yourself, but most of all you're hurting the people that surround you.

Robbing drug dealers and credit card scammers outside of strip clubs in Queens isn't going to bring your brother back "Yes" your right", but at the same time I felt that's the only way I can seek retribution at the moment. It became a mental in psychological issue I felt that taking matters into my own hands would make things different, and it didn't. Now I'm stuck here dealing with the backlash from the wrong decisions I've made in my life. Honestly I wish there weren't any guns manuf-actured ~~throughout~~ throughout this whole world, and I say that because everyday 96 Americans are killed and hundreds are being injured everyday due to gun violence in America alone. My point I'm trying to make is that, I hate to hear or see another mother, love one or significant other endure that pain from losing a love one. The NRA isn't making the issue any better because these guns are easy to purchase on the streets of America. It's a lucrative business. However" we can't only point the finger at the NRA due to the fact that they aren't the ones pulling the triggers on these weapons. I feel there should be a 90 day mental evaluation on a person before they are eligible to

purchase a firearm. Last but not least. I've learn to love more in hate less, and always remember a slow walk will always beat a fast run. So just put you faith in the Lord hands and he'll guide you down the right path. Thank you for taking the time out to listen to me.